**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ILYA ERIC KOLCHINSKY, | Civil Action No. 12-cv-1399 (WHP) |
| Plaintiff, | |
| v. | |
| MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., and JOHN DOES #1-100, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.***

Stephen A. Weiss
Asa R. Danes
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
E-mail: sweiss@seegerweiss.com
            adanes@seegerweiss.com

*Attorneys for Plaintiff/Relator*

## <u>TABLE OF CONTENTS</u>

I.      STATEMENT OF THE CASE ................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................9

III.    PARTIES ............................................................................................................9

      A.      Plaintiff/Relator Ilya Eric Kolchinsky ...................................................9

      B.      Defendants Moody's Corporation and Moody's Investors Service......................11

      C.      Defendants John Does #1-100 ...............................................................13

IV.     BACKGROUND ON MOODY'S RATINGS OF STRUCTURED FINANCE
      INSTRUMENTS..................................................................................................14

      A.      Credit Ratings Generally..........................................................................14

      B.      Structured Finance ..................................................................................14

      C.      Moody's Ratings Were Essential in the Marketing and Sale of RMBS and
           CDO Instruments ..................................................................................16

      D.      State and Federal Requirements that Certain Investors Hold Investment
           Grade Securities ..................................................................................19

      E.      Insurance Company Exposure to Structured Finance...........................................19

      F.      Distribution of Credit Ratings................................................................23

V.      MOODY'S KNOWINGLY VIOLATED STANDARDS OF CONDUCT
      EMBODIED IN ITS NRSRO CERTIFICATIONS .............................................24

      **A.      Moody's Widespread Conflicts of Interest Led it to Issue False Credit
           Ratings** ..................................................................................24

      B.      Moody's CDO Group Engaged in Fraudulent Publication of CDO Credit
           Ratings Beginning in October 2007..........................................................26

      C.      Moody's Mass RMBS Credit Rating Downgrades Beginning in October
           2007..................................................................................27

           1.      Moody's Failed to Publish True Credit Ratings for ABS CDOs..............29

           2.      "Half-Way" Downgrades........................................................36

           3.      Misuse of "Watch for Downgrade" Designation .................................37

4.      Special Committees to Protect Aaa CDO Ratings .................................... 38

5.      Example of "Aaa committee" Influence – Glacier Funding IV ............... 40

6.      Additional Examples of CDO Tranches that were not Properly Downgraded ........................................................................................... 42

7.      Moody's Failure to Monitor Had Cumulative Effects ............................. 44

8.      Moody's Excludes Certain CDO Tranches from the Ratings Charade ................................................................................................... 46

D.      Moody's publishes false ratings on TruPS CDOs. ................................................. 47

VI.     MOODY'S RATINGS ON AIG AND THE MONOLINES VIOLATED STANDARDS OF CONDUCT EMBODIED IN ITS NRSRO CERTIFICATIONS ........................................................................................................... 49

A.      AIG Built a Massive Portfolio of Sub-Prime Related Securities .......................... 50

B.      Moody's Knowingly False Ratings For the Monolines and AIG ......................... 51

1.      Moody's Model for the Monolines and AIG is Designed to Show No Losses ............................................................................................... 54

2.      Moody's Assists AIG in Negotiating an "Upside" ................................. 61

3.      Moody's Forced Concessions from the Government to Benefit AIG ........................................................................................................ 63

4.      November 2008 Restructuring ................................................................ 64

VII.    MOODY'S MATERIAL MISREPRESENTATIONS CONCERNING ITS INDEPENDENCE AND LACK OF CONFLICTS OF INTEREST ................................ 71

A.      December 2004: International Organization of Securities Commissions ("IOSCO") Adopts Model Code of Conduct .......................................................... 71

B.      Moody's Failed to Comply With Its Own Code of Professional Conduct ........... 74

C.      BREACHES OF THE MOODY'S CODE .......................................................... 78

D.      Moody's Further Mispresentations .................................................................... 84

1.      Moody's Annual Report for 2005 ........................................................... 84

2.      Moody's Form 10-K for 2005 ................................................................. 86

3.  Moody's April 12, 2006 Report on the Implementation of its Code of Conduct..................................................................87

4.  Moody's Form 10-K for 2006..................................................................88

5.  Moody's Annual Report for 2006.............................................................88

VIII.  MOODY'S LIED ON ITS APPLICATION FOR CERTIFICATION AS A NATIONALLY RECOGNIZED STATISTICAL RATING ORGANIZATION ("NRSRO")...................................................................................90

A.  Moody's June 26, 2007 Form NRSRO Application.............................................91

B.  Moody's Form NRSRO Application Failed to Disclose Widespread Conflicts of Interest and Other Failures..................................................93

IX.  MOODY'S KNOWINGLY CAUSED THE SUBMISSION OF FALSE, FRAUDULENT OR MISLEADING CLAIMS, OR FALSE RECORDS OR STATEMENTS, CONTAINED IN BANKS' REPORTING TO THE FDIC AND OTHER REGULATORS...................................................................................97

X.  MOODY'S KNOWINGLY CAUSED THE SUBMISSION OF FALSE, FRAUDULENT OR MISLEADING CLAIMS, OR FALSE RECORDS OR STATEMENTS, CONTAINED IN REGISTRATION STATEMENTS FILED WITH THE SEC...................................................................................103

XI.  DEFENDANTS' RETALIATION AGAINST RELATOR KOLCHINSKY ...............105

A.  Problem CDO Portfolio Ratings post AIG: NGFII ............................................106

B.  Relator Kolchinsky Is Constructively Discharged after He Complains to Moody's Chief of Compliance, Michael Kanef..................................................108

XII.  CLAIMS FOR RELIEF ...................................................................................110

COUNT I VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(1) (2006), AND AS AMENDED, 31 U.S.C. § 3729(A)(1)(A)) CAUSING FALSE CLAIMS ...................................................................................110

COUNT II VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(2) (2006), AND AS AMENDED, 31 U.S.C. § 3729(A)(1)(B)) USE OF FALSE STATEMENTS...................................................................................111

COUNT III VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(3) (2006), AND AS AMENDED, 31 U.S.C. § 3729(A)(1)(C)) CONSPIRACY ...............112

COUNT IV VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(7) (2006), AND AS AMENDED, 31 U.S.C. § 3729(A)(1)(G)) MAKING OR

USING FALSE RECORD OR STATEMENT TO AVOID AN OBLIGATION
TO PAY OR REFUND...................................................................................................112

XIII.   JURY TRIAL DEMAND ...............................................................................................114

Exhibit A

Exhibit B

**AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 *ET SEQ.***

This action is brought on behalf of the United States of America (the "Government") by Ilya Eric Kolchinsky ("Relator Kolchinsky"), by and through his attorneys, against Moody's Corporation, Moody's Investors Service, Inc. (collectively, "Moody's" or the "Company") and John Does #1-100 (collectively with Moody's, the "Defendants") pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

## I.  STATEMENT OF THE CASE

1.  This is an action to recover damages and civil penalties on behalf of the Government arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees, co-conspirators and certain regulated financial institutions, to the Government under the False Claims Act.

2.  At all times material hereto, Moody's was granted its status by the United States as a Nationally Recognized Statistical Rating Organization ("NRSRO") under Section 15E of the Securities and Exchange Act of 1934 and Exchange Act Rule 17g-1. Pursuant to the Exchange Act, Moody's was subject to the standards of conduct expected of NRSROs. As a condition of the grant of its status as a NRSRO, Moody's was required to, and did, expressly certify as to those standards, which included, *inter alia*, its ratings independence and objectivity, as well as policies to enforce the same, upon which investors (such as federal and state programs, Government Sponsored Enterprises, and private corporations) relied to make investment purchasing decisions and upon which state and federal regulators relied to perform their duties.

3.  Between 2004 and 2007, Moody's issued credit ratings for tens of thousands of U.S. residential mortgage backed securities ("RMBS") and collateralized debt obligations

("CDOs"). Motivated by Wall Street firms' willingness to pay hundreds of millions of dollars in fees to obtain investment grade credit ratings, and Moody's single-minded desire to increase its share of the lucrative and increasingly competitive CDO and RMBS markets, Moody's issued its highest ratings, Aaa, and similarly positive investment grade credit ratings, for the vast majority of those RMBS and CDO securities. Unbeknownst to investors, these ratings were not the product of independent, objective calculation, but rather the result of concealed conflicts of interest and Moody's reckless profit-maximization policies. Moody's concealed its profit-driven ratings inflation practices by its certifications to the Securities and Exchange Commission ("SEC") to the contrary – that its ratings reflected legitimate practices and policies. Moody's certifications were a lie.

4.      During the height of the 2007-09 financial crisis, beginning in October 2007 until approximately December 2009, Moody's knowingly failed to timely downgrade and published approximately 466,700 false ratings that were not derived in accordance with its published ratings methodologies. The false ratings at issue during this time period constituted over 40% of all Moody's ratings. The falsely rated securities had a face value of over $2.3 trillion, and Moody's fraudulent conduct with respect to these securities threatened the stability of the U.S. financial system. During the relevant time period, Moody's did not believe these ratings to be true, and Moody's did not believe that these ratings accurately reflected its true assessment of the creditworthiness of the securities at issue.

5.      As the SEC has said, "[t]he credibility and reliability of an NRSRO and its credit ratings depends on the NRSRO developing and implementing sound methodologies for determining credit ratings and following those methodologies." *See* SEC Release No. 34-55857 ("Oversight of Credit Reporting Agencies Registered as Nationally Recognized Statistical Rating

Organizations"). The SEC has also stated that whether "an issuer … agrees … to purchase a credit rating or other service or product from the NRSRO and its affiliates should have no bearing on the NRSRO's credit assessment of the issuer…." *See id.* During the relevant time period, Moody's failed to follow its methodologies for determining credit ratings and allowed its conflicts of interest to corrupt its ratings process.

6.      Moody's hid its true opinion of the creditworthiness of these securities, and, instead, knowingly published false and misleading information that cannot be called a true credit rating. *See* 15 U.S.C. § 78c(a)(60) ("The term 'credit rating' means an assessment of the creditworthiness of an obligor as an entity or with respect to specific securities or money market instruments."). Moody's knew this false and misleading information was (a) material to investors' decisions to purchase the securities at issue; (b) material to false or fraudulent claims; and (c) material to obligations to pay or transmit money to the Government.

7.      Moody's corrupted its own rating procedures and methodologies to allow false ratings to remain public after it knew these credit ratings should be downgraded. Despite assuring the market that it was addressing circumstances presented by the 2007-09 financial crisis, Moody's failed to take the steps it promised it would take.

8.      This massive fraud included knowingly false credit ratings on: (a) CDOs with collateral composed of RMBS and other CDOs ("ABS CDOs" or "structured finance CDOs") from approximately October 2007 to approximately December 2008; (b) CDOs with collateral composed of trust preferred securities ("TruPS CDOs") from approximately January 2008 to approximately December 2009; (c) entities that offered so-called "credit protection" on CDOs, including American International Group Inc. ("AIG") and various monoline insurance companies, including Ambac, MBIA, Financial Guaranty Insurance Company and Syncora

Capital (collectively, the "Monolines"), from approximately December 2007 to approximately March 2009, which, in turn, affected thousands of ratings of municipal securities and structured finance securities that had so-called "credit protection" offered by these companies.

9.      With respect to the ratings for AIG and the Monolines, Moody's deliberately sabotaged the ratings of these entities by (a) failing to timely and adequately downgrade ratings of ABS CDOs, to which AIG and the Monolines had tremendous exposure; and (b) intentionally supplanting Moody's methodology for rating these entities (without public disclosure of this change) to a quantitative model that was designed to show only minor losses and did not have any relation to their creditworthiness. The false ratings on the Monolines affected approximately half of the huge U.S. municipal securities market.

10.     The table below summarizes the approximate number of false ratings and the approximate par value of the securities affected by Moody's fraud:

| Type of Security | Approximate Number of False Ratings | Approximate Par Value ($ billions) |
|---|---|---|
| ABS CDOs | 5,500 | 575 |
| TruPS CDOs | 200-300 | 55 |
| Monoline and insured | 461,000 | 1,718 |
| Total | 466,700 | 2,348 |

11.     The sheer scale of the fraud permeated the financial markets, including structured products, financial institutions and municipal securities. It impeded regulators' ability to respond to the financial crisis and extensively increased the losses borne by the Government. Among other losses to the Government, Moody's fraud significantly decreased the amount of premiums

that federally insured banks were required to pay to the Federal Deposit Insurance Corporation ("FDIC").

12.     Moody's subjected itself to the standards of conduct expected of NRSROs pursuant to the Exchange Act. As a condition of the grant of its status as a NRSRO, Moody's was required, and did, expressly certify as to those standards, which included, *inter alia*, its ratings independence and objectivity.

13.     Among other policies, Moody's NRSRO application and annual certifications incorporated the Moody's Code of Professional Conduct (the "Code) as a policy to "Address and Manage Conflicts of Interest" and as a "Code of Ethics."

14.     The Code sets out policies that must be followed in order for an analytical product to be a true NRSRO credit rating. For example, and as discussed in more detail herein, Section 1.6 of the Code requires that "[Moody's] and its Analysts will take steps to avoid issuing any credit analyses, Credit Ratings or reports that knowingly contain misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation." Similarly, Section 2.3 of the Code demands that "the determination of a Credit Rating will be influenced only by factors relevant to the credit assessment." Section 2.4 of the Code requires that "The Credit Rating [Moody's] assigns to an Issuer or obligation will not be affected by the existence of, or potential for, a business relationship between [Moody's] (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship."

15.     Moody's urged federal banking regulators to rely on the NRSRO certification and not to impose any additional requirements for credit ratings that are used to set capital requirements for federally insured depository institutions and the FDIC deposit insurance assessment.

16.     Moody's knew that the false credit ratings it published during the 2007-09 financial crisis did not meet the definition of a credit rating for purposes of federal law, the Code or its NRSRO certification. Nevertheless, Moody's misleadingly distributed the false ratings described herein with the knowledge that federal and state regulators would believe that they complied with the Code and Moody's other procedures, polices, and methodologies and were true opinions reflecting the actual credit quality of the security, Issuer or guarantor at issue.

17.     Moody's failed to perform its duties to monitor the validity of these ratings prior to and during the 2007-09 financial crisis. Unbeknownst to investors and regulators, these ratings were not the product of independent, objective calculation, but rather the result of concealed conflicts of interest and Moody's reckless profit-maximization policies.

18.     In late 2006, high-risk mortgages began incurring delinquencies and defaults at an alarming rate. Despite signs of a deteriorating mortgage market, Moody's continued to issue investment grade ratings for numerous RMBS and CDO securities. Then, in October 2007, as mortgage delinquencies intensified, Moody's abruptly reversed course and began downgrading at record numbers hundreds and then thousands of its RMBS and CDO ratings, some less than a year old. However, these downgrades were not performed according to Moody's NRSRO-certified criteria and were conducted in a manner designed to maintain overinflated ratings that continued to mislead the investing public and the Government.

19.     Moody's knowingly published false, overinflated ratings to protect its market share under threat of losing business to other credit rating agencies. Moody's feared that the Wall Street banks that issued RMBS and CDOs, and AIG and the Monolines that guaranteed RMBS and CDOs, would seek ratings from other credit rating agencies if they could not rely on Moody's to maintain the façade that all was well in the structured finance market and on the

6

balance sheets of financial institutions. Moody's was heavily dependent on the fees generated by rating these securities, and maintaining Moody's revenues was unduly emphasized following its initial public offering ("IPO") in 2000.

20.     Researchers have found that Moody's credit ratings for new and outstanding corporate bonds were significantly more favorable to Issuers relative to S&P's ratings after Moody's IPO in 2000, and that the higher ratings assigned by Moody's after its IPO were more pronounced for clients that are large Issuers of structured finance products and operate in the financial industry.

21.     Researchers have also found that Moody's ratings were also more favorable for clients where Moody's is likely to face larger conflicts of interest: (i) large Issuers; (ii) firms that are more likely to benefit from higher ratings; and (iii) in industries with greater competition from Moody's competitors, such as Fitch Ratings.

22.     During the 2007-09 financial crisis, investors and financial institutions holding Moody's Aaa-rated securities lost billions of dollars. Those widespread losses led, in turn, to a loss of investor confidence in the value of the Moody's Aaa rating, in the holdings of major U.S. financial institutions, and even in the viability of U.S. financial markets. As a result, public and private investors lost many billions of dollars, and those losses rippled throughout the U.S. economy.

23.     Moreover, Moody's deliberately delayed issuing critical ratings downgrades, which would have mitigated huge investor losses (including losses to the Government). As more fully described herein, Moody's ratings practices, as well as its downgrading practices, contravened the standards of conduct expected of NRSROs pursuant to the Exchange Act and Form NRSRO, which Moody's expressly certified to the United States to uphold.

24.     Accordingly, Moody's express certifications made in its NRSRO application, and subsequent certifications, were materially false. Moody's false certifications deceived the Government and investors alike into believing its credit ratings were independent of pecuniary and other outside influence, and thus credible and reliable. If the Government (and private investors) had known that Moody's had lied as to its standards of conduct embodied in its Form NRSRO and related certifications, investors, including Government-sponsored entities, pension funds and private corporations, either would not have purchased Moody's-rated securities at all, or at a minimum would have purchased far fewer. Moreover, Moody's conduct as described in this Complaint caused the United States to pay billions of dollars to cover investor losses and be underpaid billions of dollars incurred by Moody's deception, including but not limited to the bailout of American International Group, Inc. ("AIG").

25.     Additionally, regulators, such as the FDIC, the Office of the Comptroller of the Currency ("OCC"), the Office of Thrift Supervision ("OTS"), the Federal Reserve Bank, state banking regulators and state insurance regulators, relied on Moody's ratings to evaluate the credit risk of, among other things, collateral held by insurance companies, banks, credit unions, savings and loan associations and other financial institutions. Moody's conduct placed the entire United States financial system at risk. Among other damages to the Government, federally insured financial institutions underpaid deposit insurance premiums to the FDIC during the 2007-09 financial crisis by hundreds of millions of dollars.

26.     Moody's played an exceptionally important role in AIG's collapse and the subsequent Government rescue. Moody's false credit ratings were a key factor in AIG's financial difficulties, and Moody's conduct significantly constrained the Government's options in the rescue of AIG.  After the Government's initial September 2008 rescue, Moody's threatened to

downgrade AIG's rating – an action that would have cost the Government tens of billions of dollars it had already invested.  Moreover, in the context of this downgrade threat, Moody's made false statements to the Government in order to justify an "upside" payment to AIG, resulting in an underpayment to the Government of over $3.3 billion.

27.     Likewise, Moody's conduct directly caused false certifications to be submitted to the SEC in Registration Statements and related documents.

28.     Moody's conduct, concealed by its false NRSRO certifications, caused the United States to incur billions of dollars in losses bailing out AIG and other entities.

## II.     JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

30.     This Court has personal jurisdiction over Defendants because, among other things, Defendants conduct business in this District.

31.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Further, acts proscribed by 31 U.S.C. § 3729 occurred in this District.

32.     The claims alleged herein are timely brought because, among other things, of efforts by Defendants to conceal from the United States its wrongdoing in connection with the allegations made herein.

## III.     PARTIES

### A.     PLAINTIFF/RELATOR ILYA ERIC KOLCHINSKY

33.     Plaintiff/Relator Ilya Eric Kolchinsky, a citizen of the State of New Jersey, is a former Moody's Managing Director. He has testified before the Financial Crisis Inquiry Commission ("FCIC") and two Congressional committees regarding the role of credit rating agencies in the recent crisis. In addition, he has been the source of much of the information that

has since come to light about the rampant failings of Moody's in the face of the subprime mortgage crisis and the financial meltdown which occurred in 2007 and 2008. He is currently employed by the National Association of Insurance Commissioners ("NAIC"), and was appointed as the first Director of the NAIC's Structured Securities Group. Relator Kolchinsky was formerly an NAIC consultant and was formerly a consultant to the Office of the Commissioner of Insurance of the State of Wisconsin, in its role as the regulator of one of the leading monoline insurance companies, Ambac. In these capacities, he is and was responsible for setting methodologies and overseeing the valuation of structured finance securities. As a Managing Director at Moody's, he served as the head of structured finance methodology and quality assurance for Moody's Analytics, COO of an evaluated pricing company, and as head of US ABS CDOs for Moody's Investors Service. He has also worked at Lehman Brothers, Goldman Sachs, Merrill Lynch and MBIA in their respective structured finance groups. Relator Kolchinsky holds a law degree from New York University ("NYU"), an MS degree in Statistics from NYU's Stern School of Business, and a BS degree in Aerospace Engineering from the University of Southern California.

34.     In September 2009, after bringing compliance violations to the attention of the compliance office and others at Moody's, he was forced to leave the Company. After his constructive termination, Relator Kolchinsky was invited to testify in front of the House Committee on Oversight and Government Reform (the "House Committee") and the Senate Permanent Subcommittee on Investigations, where he voluntarily provided numerous documents and testimony concerning the rampant conflicts of interest at Moody's which led to the tainted ratings of numerous securities. Prior to, and following, his solicited testimony to the

Government, Moody's embarked on a carefully planned retaliatory media campaign to discredit Relator Kolchinsky, and impugn his integrity, honesty, work and abilities.

35.     Relator Kolchinsky is the original source of allegations in this Complaint, and his allegations are not based upon publicly-disclosed information. Relator Kolchinsky has provided the Government with material information prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2).

### B.     DEFENDANTS MOODY'S CORPORATION AND MOODY'S INVESTORS SERVICE

36.     Defendant Moody's Corporation is the parent of Moody's Investors Service, Inc. ("MIS"), an NRSRO. Moody's Corporation is a Delaware corporation with its principal place of business in New York, New York. Defendant Moody's Investors Service, Inc. is a wholly-owned subsidiary of Moody's Corporation. Upon information and belief, Moody's Investors Service is a Delaware corporation with its principal place of business at 7 World Trade Center, 250 Greenwich Street, New York, New York.

37.     At all times material hereto, the Company operated in two segments: Moody's Investors Service and Moody's KMV (later renamed "Moody's Analytics"). Moody's Investors Service publishes rating opinions on a broad range of credit obligations issued on domestic and international markets, including various corporate and governmental obligations and structured finance securities. Moody's Investors Service's credit ratings provided nearly all its reported revenue. Moody's KMV develops and distributes quantitative credit risk assessment products and services for banks, corporations and investors in credit-sensitive assets. In August 2007, Moody's announced, and in January 2008 effected, a business reorganization that removed certain sales and marketing operations from Moody's Investors Service so as to make ratings provisioning its only business.

38.     Moody's Investors Service's financial information is included in the consolidated financial statements of Moody's Corporation.

39.     Defendant Moody's Corporation, with its wholly owned subsidiaries, is a publicly traded company. Moody's shares are traded on the New York Stock Exchange under the ticker symbol "MCO."

40.     Moody's Corporation and Moody's Investors Service, Inc., have interrelated operations. Specifically, there is a single complaint procedure that governs all of Moody's. Moody's Corporation and Moody's Investors Service, Inc. share common management. Likewise, Moody's Corporation and Moody's Investors Service, Inc. share centralized control of their labor relations. Specifically, the human resources department oversaw the personnel needs of Moody's Corporate Services, Inc., and all of its subsidiaries.

41.     Moody's Corporation and Moody's Investors Service, Inc., share common ownership/financial control, as evidenced by their shared stock ticker symbol on the New York Stock Exchange.

42.     Moody's, as a credit rating agency and NRSRO, assesses the credit-worthiness of debt instruments and is paid billions for doing so. It is one of the two largest providers of such opinions: Moody's enjoys approximately 40% of the credit rating market while Moody's largest competitor Standard & Poor's ("S&P") enjoys a similar share. A third rating agency, Fitch Ratings Ltd. ("Fitch"), comes in a distant third with an approximate market share of 15%.

43.     While Moody's has been in business for a century, Moody's business has in the last three decades been transformed by two primary phenomena. First is Moody's switch from an "investor pays" to an "Issuer pays" business model. That is, Moody's is not paid by the investors who use its credit ratings, but rather by the very entities its ratings assess. The fees Moody's

charges to debt instrument Issuers are based on the total size (dollar value) of the debt security issuance (for example, CDO ratings were billed at 0.07% of the total deal par, up to a cap). Moody's revenues, income, growth, and prospects are thus a function of the amounts of debt securities being issued. As a result, Moody's management placed great pressure on analysts to grow market share of the structured finance deals being rated, frequently in the process forsaking what it publicly touted as its objectivity and independence. Second, while the Company has long been known for its corporate debt ratings, in recent years the Company's rating business has been increasingly driven by structured finance ratings. In the previous decade, the Moody's structured finance business has become the single largest, most lucrative, and the fastest growing source of credit ratings assignments and revenue. In 2005, structured finance began to provide Moody's with more rating revenue and income than all other product ratings combined.

### C.   DEFENDANTS JOHN DOES #1-100

44.    John Does #1-100, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, and who are unknown co-conspirators who conspired with Moody's to perpetuate the schemes described herein. To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals or entities described herein as John Does #1-100, fictitious names, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to John Does #1-100 and/or other co-conspirators who conspired with Defendants to perpetrate the schemes described herein. As a result of actions of John Does #1-100, the Government has suffered significant financial harm.

## IV.   BACKGROUND ON MOODY'S RATINGS OF STRUCTURED FINANCE INSTRUMENTS

### A.   CREDIT RATINGS GENERALLY

45.    Moody's credit ratings are supposed to be an assessment of the likelihood that a particular financial instrument, such as a corporate bond or mortgage backed security, of relative expected loss, which is an assessment of probability of default and expectation of loss in the event of default. Typically, a high credit rating indicates that a debt instrument is more likely to be repaid and so qualifies as a safe investment.

46.    Credit ratings are issued by private firms, some of which, like Moody's, have been officially designated by the SEC as NRSROs. Not all "credit rating agencies" are NRSROs. While there are ten registered NRSROs in the United States, the market is dominated by just three: Moody's, S&P, and Fitch. By some accounts, these three firms issue about 98% of the total credit ratings and collect 90% of total credit rating revenue in the United States.

47.    Credit ratings from Moody's use a scale of letter grades to indicate credit risk, ranging from Aaa to C, with Aaa ratings designating the safest investments. Investments with Moody's Aaa ratings have historically had low default rates. For long-term investments, Moody's Aaa through Baa3 ratings were considered "investment grade," while its Ba1 through C ratings were considered "speculative," also called "junk."

### B.   STRUCTURED FINANCE

48.    In recent years, Wall Street firms have devised increasingly complex financial instruments for sale to investors. These instruments are often referred to as "structured finance." Because structured finance products are so complicated and opaque, investors often place particular reliance on credit ratings to determine whether they should buy them.

49.     To create these securities, Issuers – often working with investment banks – bundle large numbers of home loans (or other assets) into a pool, and calculate the revenue stream coming into the pool from the individual assets. They then design a "waterfall" that delivers a stream of revenues in a specified order to "tranches." The first tranche is at the top of the waterfall and is typically the last to incur losses from the pool of assets. Since that tranche is the last to take a loss, it is the safest investment in the pool. The Issuer creates a security, often called a bond, linked to that first tranche. That security typically receives a Aaa credit rating since its revenue stream is the most secure.

50.     The security created from the next tranche receives the same or a lower credit rating and so on until the waterfall reaches the "residual" or "equity" tranche at the bottom. The equity tranche typically receives no rating since it is the first to incur losses if assets in the pool default.

51.     Since virtually every pool has at least some assets that default, equity tranches are intended to provide loss protection for the tranches above it. Because equity tranches are riskier, however, they are often assigned and receive a higher rate of interest and can be profitable if losses are minimal. One securitized pool of assets might produce five to a dozen or more tranches, each of which is used to create a security that is rated and then sold to investors.

52.     Ratings of CDOs are dependent, as a matter of mathematical calculation, on the ratings of the securities that are held as collateral (in a cash CDO) or in the reference portfolio (in a synthetic CDO). Any downgrades of ratings of a CDO's collateral generally require downgrades of the CDO's rating as well. Because of this relationship, Moody's CDO group was also known within Moody's as the "Derivatives Group" because the ratings that the CDO group determined were derived from other ratings. Adequate monitoring of CDO ratings is critical

because the riskiness of the CDO is dependent on understanding the riskiness of the collateral or reference pool. The monitoring of managed CDOs is particularly important because the assets in the collateral or reference pool change throughout the life of the CDO.

### C. MOODY'S RATINGS WERE ESSENTIAL IN THE MARKETING AND SALE OF RMBS AND CDO INSTRUMENTS

53.     Wall Street firms helped design RMBS and CDO securities, worked with Moody's to obtain ratings for the securities, and sold the securities to investors, such as federally insured depository institutions, pension funds, insurance companies, university endowments, municipalities, and hedge funds.

54.     Without Moody's ratings, Wall Street firms would not have been able to sell structured finance products to investors, pursuant to the SEC's shelf registration requirements. In addition, sales would have been restricted by federal and state regulations limiting certain institutional investors to the purchase of instruments carrying investment grade credit ratings.

55.     Moody's NRSRO-certified credit ratings are integral to the health and stability of the U.S. financial system, and federal and state regulators relied on Moody's to fulfill their duties. Moody's knew of, and encouraged, the use of its ratings by regulators, as this reliance created demand for its products. As the SEC has recognized:

> Credit ratings play an important role in the financial markets. Market participants use them in making financial decisions on whether to buy or sell debt securities and extend credit to rated entities. Moreover, credit ratings of NRSROs are used in federal and state laws and regulations to establish limits or confer exemptions or privileges. Consequently, an entity may benefit from having an NRSRO credit rating because the credit rating makes its securities more marketable; or the credit rating qualifies the entity for an exemption or privilege or makes holding the entity's debt securities or transacting with the entity more attractive to other regulated entities.

SEC Release No. 34-55857 ("Oversight of Credit Reporting Agencies Registered as Nationally Recognized Statistical Rating Organizations").

56.     Credit ratings of CDOs were particularly important because the complexity of the securities typically prevented an independent review by investors and regulators of the risks presented by CDOs.

57.     To ensure compliance with the 1933 Act and related regulations, the SEC promulgated regulations that require sellers of RMBS to provide potential investors with copious amounts of information and disclosures, and to attest as to the sellers' compliance with the 1933 Act and SEC requirements. For example, for RMBS, sellers must complete and file a formal Registration Statement and related documents, such as SEC Form S-3 Registration Statements. Form S-3 also contains a certification, which states that the seller certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3. One of the requirements for filing on Form S-3 is that the security is deemed "investment grade." Therefore, sellers are certifying on Form S-3 as to the investment grade ratings for RMBS.

58.     Still other regulations conditioned a bank's capital reserve requirements on the credit ratings assigned to the bank's investments. Investment grade credit ratings, thus, purported to simplify the investors' due diligence review, ensured some investors could make a purchase of rated securities, reduced banks' capital calls, and otherwise enhanced the sales of the structured finance products.

59.     The more complex and opaque the structured finance instruments became, the more reliant investors were on high credit ratings for the instruments to be marketable. In addition to making structured finance products easier to sell to investors, Wall Street firms used financial engineering to combine Moody's Aaa ratings – normally reserved for ultra-safe investments with low rates of return – with high risk assets, such as the Moody's Aaa tranche

from a subprime RMBS paying a higher rate of return. Higher rates of return, combined with Moody's Aaa ratings, made RMBS and related CDOs especially attractive investments.

60.    From 2004 to 2007, Moody's produced a record number of ratings and a record amount of revenues for rating structured finance products. Revenues increased dramatically over the same time period.

61.    Moody's charged substantial fees to rate a product, resulting in considerable growth in profit. Over a five-year period, Moody's gross revenues from RMBS and CDO ratings more than tripled, going from over $61 million in 2002, to over $260 million in 2006.

62.    Rating CDOs was a profitable business for Moody's. Including all types of CDOs—not just those that were mortgage-related—Moody's rated 220 deals in 2004, 363 in 2005, 749 in 2006, and 717 in 2007; the par value of those deals rose from $90 billion in 2004 to $162 billion in 2005, $337 billion in 2006, and $326 billion in 2007. The reported revenues of Moody's Investors Service from structured products—which included RMBS and CDOs—grew from $199 million in 2000, or 33% of Moody's Corporation's revenues, to $887 million in 2006 or 44% of overall corporate revenue.

63.    The rating of ABS CDOs alone contributed more than 10% of Moody's revenue from structured finance in 2006. The boom years of structured finance coincided with a Company-wide surge in revenue and profits. From 2000 to 2006, the corporation's revenues surged from $602 million to $2 billion and its profit margin climbed from 26% to 37%.

64.    Top Moody's executives received millions of dollars each year in compensation. Moody's CEO Raymond McDaniel, for example, earned more than $8 million in total compensation in 2006. Brian Clarkson, the head of Moody's structured finance group, received $3.8 million in total compensation in the same year. Upper and middle managers also did well.

Moody's managing directors made between $385,000 to about $460,000 in compensation in 2007, before stock options. Including stock options, their total compensation ranged from almost $700,000 to over $930,000.

### D. STATE AND FEDERAL REQUIREMENTS THAT CERTAIN INVESTORS HOLD INVESTMENT GRADE SECURITIES

65.    State and federal laws restrict the amount of investments certain investors can hold that are rated below investment grade, and such investors include pension funds, insurance companies and banks. For example, banks are limited by law in the amount of non-investment grade bonds they can hold and are sometimes required to raise additional capital for those higher risk instruments.

66.    The rationale behind these legal requirements is to require or provide economic incentives for banks and other financial institutions to purchase investments that have been identified as liquid and "safe" by an independent third party with a high level of market expertise, such as a credit rating agency.

67.    Because many federal and state statutes and regulations require the purchase of investment grade ratings, Issuers of securities and other instruments work hard to obtain favorable credit ratings to ensure that regulated financial institutions can buy their products. As a result, those legal requirements not only increased the demand for investment grade ratings, but also created pressure on Moody's to issue top ratings in order to make the rated products eligible for purchase by regulated financial institutions.

### E. INSURANCE COMPANY EXPOSURE TO STRUCTURED FINANCE

68.    Bond insurance (also known as "financial guaranty insurance" or a "wrap") guarantees scheduled payments of interest and principal on a bond or other security in the event of a payment default by the Issuer. Issuers will often obtain bond insurance to either increase the

rating of one of their debt issues or to ensure that the rating of a debt issue does not become downgraded. As compensation for its insurance, the insurer is paid a premium (as a lump sum or in installments) by the Issuer or owner of the security to be insured. Bond insurance is a form of "credit enhancement" that generally results in the rating of the insured security being higher than the rating that the bond would have been given absent insurance (also known as the "underlying" or "shadow" rating). Insured securities range from municipal bonds and infrastructure bonds to asset-backed securities, such as RMBS and CDOs, domestically and abroad. The ratings of debt securities that are insured often reflect the insurer's credit rating.

69.    Municipal bond insurance was introduced in the United States in 1971 by American Municipal Bond Assurance Corp. (subsequently renamed AMBAC and later "Ambac"), which was the first financial guaranty corporation formed as a separately capitalized insurance company for the purpose of insuring bonds (these companies are also referred to as "monoline" insurance companies or "financial guarantors" interchangeably). Ambac was joined in 1973 by Municipal Bond Insurance Association (subsequently renamed "MBIA"), Financial Guaranty Insurance Company ("FGIC") in 1983. Other participants in this sector included Capital Markets Assurance Corp. (nicknamed "CapMac") (beginning in approximately 1988) and Bond Investors Guaranty Insurance Company ("BIG") (beginning in approximately 1985), both subsequently acquired by MBIA; and College Construction Loan Insurance Corporation (nicknamed "Connie Lee") (beginning in approximately 1987), subsequently acquired by Ambac. Security Capital Assurance was a monoline insurer spun-off from the reinsurer XL Capital and later renamed Syncora Capital.

70.    Bond insurance of RMBS commenced in the 1980s, but expanded at an accelerated pace in the 2000s, leading up to the 2007-09 financial crisis. The Monolines also sold

credit default swaps ("CDSs"), through subsidiaries that they guaranteed and controlled, on CDOs and other structured finance instruments that would guarantee payment if the reference obligations defaulted.

71.     Along with the Monolines, AIG provided guarantees for financial instruments through its subsidiary, AIG Financial Products ("AIGFP"). AIG wrote CDSs on municipal bonds, CDOs and other structured finance instruments. Like bond insurance, a CDS was used to lower the risk-based capital requirements and deposit insurance premiums for regulated financial institutions. In 2008, AIG's failure to post required collateral on the billions of dollars in CDS it sold was the cause of its near-collapse.

72.     CDSs are unregulated insurance contracts where one party "buys protection" from another party regarding the default of an identified "reference obligation" – for example, a CDO. AIG and the Monolines provided "protection" to many institutional third parties on the most senior tranches (called "super-senior" tranches) of CDOs for which they were paid a periodic premium. A party that bought protection through the CDS faced the risk that the insurer could default rather than pay the (typically very large) amounts due. While a CDS transaction typically does not involve an exchange of funds at inception, "counterparty risk" was typically addressed through contractual obligations requiring a CDS seller to pay cash collateral in escrow under certain circumstances. For example, with respect to AIG's CDSs on CDOs, collateral posting requirements were generally triggered upon (a) a downgrade of the credit rating of AIG; or, (b) a downgrade of the rating or fall of the price of the "reference obligation" (e.g., the CDO). The amount posted was typically a function of the market value of the reference obligation. Accordingly, AIG's credit rating and the market value of the reference obligations it guaranteed were vital to AIG's financial well being and the structured finance market in general.

73.     During the 2007-09 financial crisis, CDS sellers were faced with billions of dollars of claims, with uncertain prospects for recoveries from the sponsors of the securitizations giving rise to those claims. The most severe losses were experienced by those insurers that had insured ABS CDOs.

74.     Prior to the 2007-09 financial crisis, Moody's had assigned the Monolines its highest rating, Aaa. Accordingly, securities guaranteed by the Monolines would typically receive a Aaa rating as well. A change in the credit rating of the CDS seller or guarantor would change the credit rating of the guaranteed security, and Moody's knew that the potential impact of a downgrade of a Monoline or AIG would be substantial. During the relevant period, hundreds of thousands of securities had credit ratings based on the credit ratings of AIG and the Monolines. At the end of 2007, MBIA and Ambac had outstanding insurance policies in a par amount, net of reinsurance, of approximately $678 billion and $524 billion, respectively. Moody's fraudulently maintained the ratings of these insurers to protect its profit margin and market share.

75.     Moody's failed to downgrade its ratings of the Monolines and AIG, because Moody's knew that a downgrade of these companies would decimate the RMBS and CDO market and adversely impact Moody's ability to generate fees from rating these and other securities. Moody's knew that the amount of risk guaranteed by the Monolines and AIG was not accurately reflected in its ratings of securities they guaranteed. Moody's also knew that the understatement of this risk threatened the solvency of these entities.

76.     As the 2007-09 financial crisis deepened, Moody's, after much delay, ultimately downgraded the ratings of the Monolines and AIG, and, in turn, these downgrades led to substantial downgrades of guaranteed securities. Moody's delayed downgrading AIG and the

Monolines based on its own profit motive, not an objective evaluation of the credit risk facing these entities.

### F.   DISTRIBUTION OF CREDIT RATINGS

77.    In addition to making its ratings available publicly on its website (www.moodys.com), Moody's delivers its ratings to subscribers and the market through an electronic delivery service, called the Ratings Delivery Service ("RDS"). RDS is sold by Moody's to clients who require regular access to the ratings through an electronic file transfer protocol. Upon information and belief, Moody's sells its RDS product to a number of federal and state agencies and receives substantial fees from these sales.

78.    RDS is an electronic file published primarily by file transfer protocol (FTP). Users receive a file that includes an individual record for each rating. In addition to the rating, each record also includes other critical data, such as CUSIP, coupon date, maturity date, rating date, date of last action and whether a security has been placed on the Moody's "watch list" (*i.e.*, under review for upgrade or downgrade).

79.    Subscribers were able to choose from two delivery schedules for changes in ratings information, which were delivered on either an intra-day basis or only at the end of each day. However, all ratings were published monthly in baseline files. The October 2007 Moody's RDS User Manual for public finance describes the purpose of the file, stating "monthly baseline files provides a current snapshot of ALL publishable ratings from Moody's database as of the first of the month. It should be used as a master refresh."

80.    By failing to deliver credit ratings that it believed to be true, Moody's knowingly presented false and fraudulent statements material to a claim for payment or approval and false or fraudulent claims for payment or approval pursuant to its RDS contracts with various agencies of the Government.

## V.     MOODY'S KNOWINGLY VIOLATED STANDARDS OF CONDUCT EMBODIED IN ITS NRSRO CERTIFICATIONS

81.    Moody's was aware of the increasing risks in the mortgage market in the years leading up to the financial crisis, including higher risk mortgage products, increasingly lax lending standards, poor quality loans, unsustainable housing prices, and increasing mortgage fraud. Yet for years, Moody's failed to heed warnings – even its own – about the need to adjust their processes to accurately reflect the increasing credit risk.

82.    The problem, however, was that Moody's had a financial incentive against assigning tough credit ratings to the very securities that increased its revenues, boosted its stock prices, and expanded executive's compensation. Instead, ongoing conflicts of interest made it possible for Moody's to ignore its own warnings about the U.S. mortgage market. Furthermore, Moody's had a strong financial incentive not to downgrade these securities to their true ratings since the very Issuers who paid Moody's would see their capital requirements increase. Guarantors of ABS CDOs, like AIG, would also see their posting requirements increase and would be forced to pay huge amounts of cash into escrow.

83.    If Moody's had acted as it had certified it would in its Form NRSRO, it would have heeded its own warnings of the massive meltdown of the financial markets, but Moody's failed to heed its own warnings because it was not in its short-term economic self-interest.

### A.     MOODY'S WIDESPREAD CONFLICTS OF INTEREST LED IT TO ISSUE FALSE CREDIT RATINGS

84.    A major factor which caused Moody's to issue inappropriate ratings is the conflict of interest inherent in its "Issuer-Pays" model. Under this system, the firm interested in profiting from an RMBS or CDO security (*i.e.,* the Issuer) is required to pay Moody's for the credit rating needed to sell the security. The model thus requires Moody's to obtain business from the very companies paying for its purportedly objective judgment. The result is a system that creates

24

strong incentives for Moody's to inflate its ratings to attract business, and for the Issuers and arrangers of the securities to engage in "ratings shopping" to obtain the highest ratings for their financial products.

85. The conflict of interest inherent in an Issuer-Pays model is clear: Moody's was incentivized to offer the highest ratings, as opposed to offering the most accurate ratings, in order to attract business. Moreover, these very same Issuers used the threat of withholding future business to pressure Moody's to keep these ratings inflated thus keeping risk-based capital costs low for themselves and their clients.

86. Moody's assured the SEC in its NRSRO certification that it could "manage" these conflicts, but the evidence indicates that the drive for market share and increasing revenues, ratings shopping, and investment bank pressures undermined the ratings process and the quality of Moody's ratings themselves. Even though it had certified to the SEC in its Form NRSRO that its Code made clear its credit ratings would "not be affected by the existence of, or potential for, a business relationship" between Moody's and the Issuer, this was simply not true.

87. In the years leading up to the 2007-09 financial crisis, gaining market share, increasing revenues, and pleasing investment bankers bringing business to Moody's assumed a higher priority than issuing accurate RMBS and CDO credit ratings.

88. The materiality of structured finance to Moody's – and, in turn, to Moody's revenues and income – cannot be overstated. At all times material hereto, Moody's provision of structured finance ratings was (1) the single largest source of its revenues and earnings; (2) the single largest source of *growth* of Moody's revenues and earnings; and (3) Moody's most profitable line of business.

89.     As structured finance accounted for ever-greater proportions of Moody's ratings revenues, and worked their way to the bottom line, Moody's operating margins increased to exceed 54% through 2004-2006. These margins made Moody's the third-most profitable large public company in the United States.

### B.     MOODY'S CDO GROUP ENGAGED IN FRAUDULENT PUBLICATION OF CDO CREDIT RATINGS BEGINNING IN OCTOBER 2007

90.     Between 2004 and 2007, while taking in increasing revenue from Wall Street firms, Moody's issued investment grade credit ratings for the vast majority of the RMBS and CDO securities issued in the United States, deeming them safe investments even though many relied on subprime and other high risk home loans. In late 2006, high risk mortgages began to go delinquent at an alarming rate. Despite signs of a deteriorating mortgage market, Moody's continued to issue investment grade ratings for numerous subprime RMBS and CDO securities.

91.     In October 2007, as mortgage defaults intensified, Moody's had no choice but to abruptly reverse course and begin downgrading at record numbers hundreds and then thousands of its RMBS and CDO ratings, some less than a year old. However, the Moody's CDO group deliberately failed to adequately take into account the impact that massive RMBS downgrades would have on its published CDO ratings.

92.     The subprime RMBS market initially froze and then collapsed, leaving investors and financial firms around the world holding unmarketable subprime RMBS securities that were plummeting in value. At the same time, the CDO market collapsed as well, but Moody's CDO group engaged in extraordinary efforts to prop up the CDO ratings as long as possible, because Moody's knew the effect the downgrades would have on its own profits.

93.     Traditionally, investments holding Moody's Aaa ratings had a less than 1% probability of incurring losses. But in the financial crisis, the vast majority of RMBS and CDO

securities with Moody's Aaa ratings incurred substantial losses; some formerly Aaa rated securities failed to return even a single penny of principal. Investors and financial institutions holding those Aaa securities lost significant value. Those widespread losses led, in turn, to a loss of investor confidence in the value of the Aaa rating, in the holdings of major U.S. financial institutions, and even in the viability of U.S. financial markets. Inaccurate Aaa credit ratings introduced systemic risk into the U.S. financial system and constituted a key cause of the financial crisis.

94.     If Moody's had made public its true opinion of the creditworthiness of CDOs in late 2007 and early 2008, as it had certified it would do in its Form NRSRO, it would have exposed the increasing risk in subprime mortgage market and appropriately adjusted existing ratings in those markets. This would have resulted in the prompt downgrading of banks, AIG and the Monolines at a time when their capital position was sufficiently liquid, such that they could have time to adequately negotiate with counterparties regarding their exposures.

95.     Because Moody's had become increasingly reliant on the fees generated by issuing a large volume of structured finance ratings, it shored up its profits by failing to downgrade its ratings and lying in its Form NRSRO certification.

### C.     MOODY'S MASS RMBS CREDIT RATING DOWNGRADES BEGINNING IN OCTOBER 2007

96.     In the years leading up to the financial crisis, Moody's issued investment grade ratings for tens of thousands of RMBS and CDO securities, earning substantial sums for issuing these ratings. In late 2007, however, Moody's suddenly reversed course and began downgrading hundreds, then thousands of RMBS and CDO ratings. These mass downgrades shocked the financial markets, contributed to the collapse of the subprime RMBS and CDO secondary

markets, and damaged holdings of financial firms worldwide. The downgraded securities also required regulated financial institutions to put up more capital.

97.     However, there had been grave concerns expressed inside Moody's. For example, in August 2007, Relator Kolchinsky had sent an urgent email to his superiors about the pressures to rate still more new CDOs: "[E]ach of our current deals is in crisis mode. This is compounded by the fact that we have introduced new criteria for ABS CDOs. Our changes are a response to the fact that we are already putting deals closed in the spring on watch for downgrade. This is unacceptable and we cannot rate the new deals in the same away [sic] we have done before. ... [B]ankers are under enormous pressure to turn their warehouses into CDO notes."

98.     In March 2007, Moody's reported internally that CDOs with high concentrations of subprime mortgage–backed securities could incur "severe" downgrades. In an internal email sent five days after the report, Group Managing Director of U.S. Derivatives Yuri Yoshizawa explained to Moody's Chairman McDaniel and to Executive Vice President Noel Kirnon that one managing director at Credit Suisse First Boston "sees banks like Merrill, Citibank, and UBS still furiously doing transactions to clear out their warehouses. . . . He believes that they are creating and pricing the CDOs in order to remove the assets from the warehouses, but that they are holding on to the CDOs . . . in hopes that they will be able to sell them later."

99.     Several months later, in a review of the CDO market titled "Climbing the Wall of Subprime Worry," Moody's noted, "[s]ome of the first quarter's activity [in 2007] was the result of some arrangers feverishly working to clear inventory and reduce their balance sheet exposure to the subprime class."

100.     In July 2007, CEO McDaniel gave a presentation to the board on the Company's strategic plan. His slides had such bleak titles as "Spotlight on Mortgages: Quality Continues to

Erode," "House Prices Are Falling . . . ," "Mortgage Payment Resets Are Mounting," and "1.3 MM Mortgage Defaults Forecast 2007-08."

101.   Moody's had hoped that rating downgrades could be staved off by mortgage borrowers obtaining modifications—*i.e.,* if their monthly payments became more affordable, borrowers might stay current. However, in mid-September, Relator Kolchinsky learned that a survey of servicers indicated that very few troubled mortgages were being modified. As a result, the RMBS group had concluded that the current credit ratings were no longer accurate and began the process which would eventually lead to the massive downgrades in October 2007. Worried that continuing to rate CDOs without adjusting for known deterioration in the underlying securities could expose Moody's to securities law liability, Relator Kolchinsky advised his manager, Yuri Yoshizawa, that Moody's should stop rating CDOs until the RMBS downgrades were completed. However, Relator Kolchinsky was admonished by Yoshizawa for making the suggestion. Kolchinsky took the matter to the Chief Credit Officer at the time, Andrew Kimball, and his concerns were resolved. Nevertheless, several weeks later, he was dismissed from his position as Managing Director of the CDO group and would lose his job unless he found another position at Moody's.

### 1.   Moody's Failed to Publish True Credit Ratings for ABS CDOs

102.   The huge CDO market had reached its peak by 2007, and Moody's ignored obvious warnings and engaged in fraudulent practices to delay necessary downgrades for as long as possible. Moody's voluntarily assumed the obligation to monitor its CDO ratings, and received monitoring fees from Issuers in each transaction to do so, but knowingly failed in this obligation.

103.   At the end of 2007, there were approximately $623 billion of Moody's rated structured finance CDOs outstanding, consisting of 1,288 transactions and 5,543 tranches. By the

end of 2008, these numbers dropped to $564 billion, consisting of 1,186 transactions and 5,105 tranches, primarily due to events of default and liquidations. Of this number, 2,229 tranches consisting of $527 billion were originally rated Aaa at the end of 2007. By the end of 2008, these numbers were $459 billion and 2,039, respectively. The reduction was once again due primarily to defaults and liquidations rather than repayment in full to investors.

104.    On October 11, 2007, Moody's announced unprecedented downgrades of over 3,000 tranches of 2006 vintage subprime RMBS. Furthermore, Moody's announced that "a review of the 1st half of the 2007 vintage [RMBS] is forthcoming" stating that "[d]owngrades are expected to be concentrated on obligations rated A or below." Downgrades of these RMBS ratings would necessarily require downgrades to the ratings of the CDOs that held these RMBS in their collateral pools. The common practice of CDOs cross-holding tranches of other CDOs in their collateral pools complicated matters and exponentially increased the impact of an RMBS downgrade.

105.    A public teleconference was held on the following day, October 12, 2007, to discuss the downgrades and their effects on CDOs, with approximately half the teleconference allotted to discussion of RMBS and half to CDOs. The CDO portion was led by Ms. Yoshizawa, during which she announced to the market changes to Moody's CDO rating methodology and the CDO monitoring process to take into account changes to CDO ratings required by the RMBS ratings downgrades. Moody's, however, subsequently failed to implement the changes Ms. Yoshizawa announced, without disclosing to the market that it was failing to do so.

106.    During the public conference call, Moody's discussed methodology changes to be applied immediately, which were triggered by poor performance of RMBS. The methodology changes that were promised during the October 12, 2007 conference call included changing

specific assumptions regarding the correlation of assets, but Moody's did not make any of the changes that they promised. Moody's also did not publicly disclose that it was not making any of these changes. Instead, Moody's secretly corrupted its published practices to maintain CDO ratings until the end of 2008 to protect its revenues for as long as possible.

107.    Moody's longstanding monitoring process was laid out in a paper titled "Moody's Approach: CDO Monitoring Process," which was published on September 30, 2002. It describes the CDO monitoring process and assures the reader that "Moody's continuously monitors its CDO ratings." Following publication of that paper, Moody's CDO group has largely automated and accelerated this ratings monitoring process, and the Moody's CDO monitoring group no longer needed to wait for CDO trustee reports to spot red flags.  Beginning at least in September 2007, Moody's CDO monitoring group was typically provided an advance list of downgrades by the Moody's RMBS group.  Accordingly, Moody's had no reason to delay CDO downgrades following the October 2007 downgrades of RMBS.

108.    Not only did Moody's fail to publicly disclose its failure to follow the steps it publicly promised during the October 12, 2007 teleconference, Moody's failed to disclose in its Form NRSRO application widespread failures in its ongoing monitoring of credit ratings. In its application, Moody's certified to the SEC that it "will monitor the credit rating, as deemed appropriate, on an ongoing basis and will modify the credit rating as necessary in response to changes in our opinion of the creditworthiness of the Issuer or issue." This was a lie.

109.    Instead of following through with the steps it promised the market to take during the October 12, 2007 telephone conference, Moody's CDO group, led by Ms. Yoshizawa, decided not to follow the public methodology, in violation of Moody's Code. Only a few days after Ms. Yoshizawa announced to the market that Moody's would respond to the October 2007

RMBS downgrades with downgrades of CDO ratings, an internal meeting of the Moody's Structured Finance Credit Committee ("SCC") was held on October 18, 2007 (the SCC held regularly scheduled meetings of Moody's senior managers in the Structured Finance business line, and Ms. Yoshizawa attended this meeting), and the SCC was told that "the CDO team is holding off further rating actions." Despite the fact that Moody's had promised the market that it would review CDO ratings, this statement took place before any actual rating committees took place to review CDO ratings. The purported reason for the hesitation was that "the combined impact of increased correlation assumptions and RMBS downgrades may result in overly conservative ratings." However, whether a rating is "conservative" is not a relevant factor for a credit rating, particularly CDO ratings that are derived from RMBS ratings that had already been downgraded.

110.    There was no reason why the methodology just announced on October 12, 2007 and the RMBS downgrades that had already occurred would produce purportedly "overly conservative" ratings. Even if this were a legitimate concern, which it was not, the failure to adopt the changes to the CDO ratings methodology that Moody's announced on October 12, 2007 was not made public, as required by the Code. Labeling ratings as "overly conservative" was a pretext for not taking action.

111.    Moody's was aware of the impact the CDO downgrades would have in the market. For example, during the October 18, 2007 meeting of the SCC, the committee was also informed that "a CDO downgrade may force a P-1 SAV obligation to default" and meeting notes stated that "SCC members felt that CDO analysts should be aware of the ramifications on their rating downgrades." The SCC was trying to protect Wall Street banks, which Moody's considered to be its clients, from having to provide liquidity in the event of a downgrade under

the terms of a certain type of asset-backed commercial paper called Securities Arbitrage Vehicles ("SAVs").

112.    As a result of its concern for maintaining the overinflated structured finance market, Moody's failed to publish its true credit ratings for ABS CDOs, and it did not even take into account the downgrades on 2006 subprime RMBS that had just occurred on October 11, 2007. Moody's also failed to publish the results required by the announced methodology changes. Moody's false ratings on CDOs did not actually reflect its opinion of the credit worthiness of the securities in question.

113.    Before the October 11, 2007 downgrades to the 2006 vintage RMBS were announced, Moody's was aware of the impact downgrades to RMBS would have on the ratings of CDOs. In a paper titled, *"The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review"* (March 23, 2007), Moody's predicted various hypothetical results of downgrades that approximated what would later occur in October 2007.

114.    Moody's took extraordinary steps to maintain its overinflated ratings and conceal its true opinion of the credit worthiness of ABS CDOs. Moody's performed a review of thousands of CDO tranches following the RMBS downgrades in October 2007, but ignored the results of its analysis. Internally, Moody's personnel referred to the effort to review existing CDO credit ratings in October and November 2007 to reflect the changes to RMBS ratings in October 2007 as the "ratings marathon." Although Moody's analysts performed the calculations necessary to complete the promised CDO downgrades and actually calculated the true credit ratings, Moody's management and the CDO group leadership, including Ms. Yoshizawa,

maintained inflated CDO ratings to prevent the loss of revenues from the structured finance business and placate the Wall Street institutions that it considered to be its important clients.

115.    Moody's management knew that the RMBS downgrades had already caused substantial damage to CDOs ratings, but it hid the true extent of that damage by disregarding the results of their own rating methodologies and analysis without publicly disclosing that they were doing so and without any legitimate basis for doing so.

116.    During the October 2007 ratings marathon, junior analysts received detailed instructions on every aspect of the monitoring process from senior management. In this review, no distinction was made between managed and static transactions. As a result, the monitoring committees that were held in response to the October 2007 RMBS downgrades had all of the information necessary to analyze the downgrades to RMBS collateral that had occurred or might be downgraded in the near future. There was no need for Moody's to delay the related CDO downgrades.

117.    During the Moody's ratings marathon, Moody's management directed analysts in the Moody's CDO group to analyze all ABS CDOs under detailed modeling assumptions and to run three scenarios, referred to internally as Run A, Run B and Run C. These three runs incorporated additional information in a new rating that, in most cases, required downgrades to existing Moody's CDO ratings. Moody's completed this analysis, but chose not to publish these results. If it had published these results, Moody's CDO ratings would have been downgraded much sooner. Moody's kept these true ratings secret and did not conform most of the public ratings to their true values until approximately the end of 2008.

118.    Publishing the results of Run A would have incorporated the actual downgrades to 2006 vintage RMBS that were published on October 11, 2007.

119.     Publishing the results of Run B would have incorporated (a) the results of Run A; (b) the new correlation assumptions that Moody's said it would use during the public teleconference on October 12, 2007; and (c) additional adjustments that were agreed upon internally for 2005 and 2007 vintage RMBS to reflect downgrades that Moody's CDO group knew would be forthcoming shortly.

120.     Publishing the results of Run C would have incorporated (a) the Results of Run B; and (b) addressed the impact of CDO cross-holdings by using an adjustment for CDOs that were being downgraded concurrently.

121.     All three of these scenarios required downgrades for many CDOs, depending on the quality of the collateral pool, but none of the results were published. The results of Run A usually required a less severe downgrade than Run C, and the results of Run B typically fell in between Run A and Run C. Each of these three scenarios incorporated changes that were based on valid credit criteria. Run A incorporated information that was already known, specifically the ratings downgrades of the 2006 vintage RMBS that occurred on October 11, 2007. The other two runs varied only with respect to whether additional information should be estimated before it was known with complete certainty, in order to incorporate as much relevant information as possible regarding the creditworthiness of the collateral underlying the CDOs. Far from being "overly conservative," as reported to the Moody's SCC, the results of this analysis satisfied the requirements of the Moody's Code.

122.     In many respects, publishing the results of Run A would not have gone far enough to accurately reflect the credit worthiness of the CDOs, which was recognized during the October 12, 2007 teleconference when Moody's announced it would use new correlation assumptions. Run A only captured the ratings of the 2006 RMBS vintage after the October 11,

2007 downgrades, but not the announced methodology changes or the in-progress rating changes on RMBS or CDOs. Because Run A did not incorporate the publicly announced methodology, it did not meet the requirements of an NRSRO credit rating.

123.     Run B was slightly more comprehensive than Run A, because it incorporated the correlation changes announced during the October 12, 2007 teleconference, but Run B was also limited in that it ignored the rating downgrades to CDO collateral that was necessarily going to happen as a result of the contemplated CDO downgrades. The impact of downgrades to CDO collateral on other CDOs could be dramatic (generally, "High Grade" CDOs held about 20-30% of the collateral pool as tranches of other CDOs, and "Mezzanine" CDOs held 5-10%), and these were known risks that needed to be taken into account for the ratings to be accurate, because downgrades of CDOs with cross-holdings of other CDOs were being calculated in parallel by the same Moody's monitoring group at the same time. Under fair and impartial criteria, Run C was the most comprehensive analysis because it took the most relevant information into account.

124.     While publishing the results of Run C would typically have resulted in a larger downgrade and lower rating, it took additional factors into consideration and was in line with Moody's established methodologies. Only the results of Runs B and C qualified as NRSRO credit ratings, with Run C being the most accurate. However, Moody's generally failed to publish the results of Runs A, B or C without a legitimate reason for doing so. Despite performing the three runs, Moody's fraudulently ignored the results of its ratings marathon.

### 2.     "Half-Way" Downgrades

125.     Instead of publishing the results of the ratings marathon, Moody's took extraordinary steps to conceal its actual opinion regarding the credit worthiness of ABS CDOs. One of the new, undisclosed practices created by Moody's management during the ratings marathon to protect overinflated CDO ratings was the unprecedented practice of a so-called

"half-way" downgrade. Senior management in the Moody's CDO group distributed new purported "assumptions" to junior analysts, which were essentially "cheat sheets" for junior analysts to use during the ratings marathon.

126.    One such cheat sheet distributed on October 22, 2007 instructed junior analysts to downgrade certain tranches of CDOs less severely than the objective methodology demanded. For example, a CDO tranche that required a six-notch downgrade pursuant to Run B was instead to receive a three-notch downgrade and be placed "on watch" ("WD" or "Watch for Downgrade"). The instructions regarding half-way downgrades generally applied to tranches with single-A ratings and lower, and they stated, in part, the following:

> For Single A and below rated tranches that look 6 notches or worse with current ratings and 2005/2007 adjustments (ABS CDO adjustments excluded):
> - Downgrade half way (i.e. if tranche looks 6 notches worse, downgrade 3 notches and keep on WD)

127.    Not only was this practice unprecedented, it had no relationship to the credit worthiness of ABS CDOs. It was an attempt to "slow-walk" ratings downward, rather than publishing the rating required by Moody's objective methodology. Because the market expected CDO downgrades, Moody's attempted to have the downgrades be less severe than its procedures required. Keeping the rating on watch for downgrade did not correct this error. Instead, it was an additional misrepresentation and misuse of the "watch for downgrade" designation.

### 3.    Misuse of "Watch for Downgrade" Designation

128.    According to its own methodologies, Moody's should have only placed securities "on watch" to notify the market that an analysis was then currently pending on a given rating. During the ratings marathon, however, Moody's began placing senior CDO tranches (Aaa and Aa) on watch rather than publishing the downgraded ratings that had already been determined.

Moody's desired to create an appearance that it was actively responding to the RMBS downgrades, but, in fact, it was concealing its true credit rating.

129.    Generally, if an Aaa- or Aa-rated tranche required a downgrade pursuant to the analysis performed during the ratings marathon, these tranches were, instead, merely placed on watch. In the past, the watch for downgrade designation was used to warn the market of a potential downgrade that would be forthcoming only while the rating agency performed the calculations necessary to determine the new rating. Beginning in October 2007, however, Moody's fraudulently used the watch for downgrade designation to delay disclosure to the market and regulators the true credit ratings for these securities.

130.    This practice prevented the full impact of the RMBS downgrades on CDO ratings from being disclosed to CDO investors, regulators and even Moody's own analysts in other groups (such as the Global Insurance group, which evaluated credit risks of companies that guaranteed CDO transactions). There was no justifiable basis for downgrading a rating halfway or the misuse of the watch for downgrade designation, and this new policy was a departure from a number of Moody's requirements in the Code, including one to consider only "factors relevant to the credit assessment" when performing rating actions. None of these actions were performed according to the Code requirements and the published information did not constitute true credit ratings.

### 4.    Special Committees to Protect Aaa CDO Ratings

131.    The most senior (or "super-senior") CDO tranches with Aaa ratings, which were frequently retained on the books of the issuing bank and often guaranteed by AIG or the Monolines, were the most heavily protected during the ratings marathon in contravention of Moody's policies. In order to ensure that Aaa tranches were protected, Moody's convened unprecedented committees of senior managers to overrule standard ratings committees that

concluded a downgrade of a Aaa-rated CDO tranche was necessary. These "Aaa committees" did not consider new information and did not consider information relevant to the assessment of credit risk. In many cases, Moody's deliberately failed to downgrade CDOs even when downgrades were required (as a matter of methodology and mathematical calculation) by the October 11, 2007 RMBS downgrades (Run A). Also, many of the affected tranches were not even placed on watch for downgrade, which Moody's improperly decided to do for tranches that were less senior. Instead, the Aaa committees left the ratings as they stood before the massive downgrades to RMBS ratings without any basis for doing so. None of these actions were performed according to the Code requirements, and the published information following Aaa committees did not constitute true credit ratings.

132.    The Aaa committees generally met in the morning to review the work of initial rating committees that had met the previous night. The Aaa committees did not conclude that the model calculations were performed incorrectly, and they did not review any new information. Instead, the Aaa committees ignored the true credit ratings. Their decisions whether to downgrade a CDO rating were based solely on management's desire to protect the Aaa ratings and, consequently, Moody's market share and revenues. The members of these committees included the CDO group's most senior managers and team leaders. As a senior member of the CDO group, Relator Kolchinsky was invited to the first Aaa committee meeting. However, when it became clear to Moody's management that he would not acquiesce by reversing the decisions of the initial rating committees or otherwise protect Aaa ratings that were not deserved, Relator Kolchinsky was not invited to participate in subsequent Aaa committee meetings. The existence of the Aaa committees violated the Code and was not made public.

### 5. Example of "Aaa committee" Influence – Glacier Funding IV

133. One example of a CDO transaction with a Aaa-rated super senior tranche that should have been downgraded during the rating marathon in October 2007 was Glacier Funding IV (Cusip 37638NAA9). Glacier Funding IV was an ABS CDO issued by Merrill Lynch in April 2007 and managed by Terwin Money Management. The super-senior tranche was insured by BluePoint Re. BluePoint Re was a Bermuda based insurer owned by Wachovia Corporation, the bank holding company. BluePoint filed for bankruptcy in August 2008, forcing a $330 million charge for Wachovia.

134. On information and belief, the results of Run A, Run B and Run C during the ratings marathon for the super-senior Aaa-rated Class A-1 tranche of Glacier Funding IV were as follows:

| Deal Name | Original Rating | New Rating | Run A | Run B | Run C |
|---|---|---|---|---|---|
| Glacier Funding IV | Aaa | Aaa | Aa1 | A3 | A3 |

135. The excerpt of Moody's spreadsheet copied below shows the results of Moody's analysis during the ratings marathon for certain CDO tranches, including the Glacier Funding IV Class A-1 tranche (CUSIP: 37638NAA9):

| deal_id | deal_name | Cusip | Tranche NPO (should aggregate to "Net Par") | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 500018050 | Madison CDO | | 12,880,383.00 | Aaa | Aaa | Aaa | | | |
| 500038383 | Manasquan CDO 2005-1 | 561765AA6 | 167,144,856.00 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 500041072 | Millstone II CDO Ltd. | 601313AC3 | 193,803,212.50 | Aaa | Aaa | Aaa | - | - | Aaa |
| 500041072 | Millstone II CDO Ltd. | 601313AB5 | 914,113,125.00 | Aaa | Aaa | Aaa | - | - | Aaa |
| 500045015 | Millstone III CDO Ltd. | 60129WAA7 | 987,123,200.00 | Aaa | Aaa | Aaa | - | - | Aaa |
| 500045015 | Millstone III CDO Ltd. | 60129WAB5 | 71,500,000.00 | Aaa | Aa2 | - | - | - | Aa2 |
| 500020262 | Oceanview CBO I | 67551MAB9 | 14,791,692.32 | Aaa | Baa2 | Baa2 | Baa2 | Baa2 | Baa2 |
| 500026281 | Pinnacle Point Funding II | | 1,455,002,000.00 | P-1 | P-1 | | | | |
| 820225806 | Robeco High Grade CDO I Ltd. | 77029QAF4 | 370,562,500.00 | Aaa | Aaa(WD) | Aa3 | - | - | A3 |
| 500029196 | Saturn Ventures 2004 | 80410JAA2 | 107,553,840.10 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 820131800 | Silver Marlin CDO I | 827899AF2 | 420,945,497.00 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 500040969 | Tazlina Funding CDO I | 878046AA9 | 1,260,600,000.00 | Aaa | Aa1 | Aaa | | | Aa1 |
| 820203621 | Tazlina Funding CDO II | 878047AB5 | 433,125,000.00 | Aaa | Aaa(WD) | Baa2 | Aa1 | Aa3 | Baa2 |
| 500032321 | Tricadia CDO 2004-2 | 89608RAA7 | 148,500,000.00 | Aaa | Aaa | Aaa | | | |
| 500036063 | Tricadia CDO 2005-3 | 89608QAA9 | 155,000,000.00 | Aaa | Aaa | Aaa | | | |
| 814993545 | West Trade Funding CDO II | 956316AC7 | 360,716,127.00 | Aaa | Aaa(WD) | Baa2 | Aa1 | A2 | Baa2 |
| 820184330 | West Trade Funding CDO III | 95631QAH2 | 601,501,811.00 | Aaa | Aa2 | Aaa | Aaa | Aaa | Aa2 |
| 500042518 | STILLWATER ABS CDO 2006-1 | 860722AA5 | 517,866,929.00 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 500044586 | Static Residential CDO 2006-B | 85768XAA8 | 250,000,000.00 | Aaa | Aaa(WD) | Ba1 | Baa3 | Ba1 | - |
| 500044595 | Mainsail CDO 1 | 56063DAA5 | 235,000,000.00 | Aaa | Aaa | Aaa | | | |
| 500041518 | Static Residential CDO 2006-A | 85768VAJ3 | 199,263,568.00 | Aaa | Aaa | Baa1 | Aaa | Baa1 | - |
| 500043144 | Glacier Funding IV | 37638NAA9 | 92,298,026.00 | Aaa | Aaa | A3 | Aa1 | A3 | A3 |
| 500040232 | Grand Avenue CDO I | 38521PAA2 | 148,291,514.00 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 500040642 | Vertical 2006-1 | 925345AC4 | 200,000,000.00 | Aaa | Aa2 | Aa1 | Aa1 | A1 | A2 |
| 500032479 | Trainer Wortham 2004-5X CBO | | 111,000,000.00 | Aaa | Aaa | Aaa | | | |
| 500040232 | Grand Avenue CDO I | 38521PAB0 | 86,464,644.00 | Aaa | Aaa | Aaa | Aaa | Aaa | Aaa |
| 820169397 | Ridgeway Court Funding II Ltd | 766174AN6 | 660,000,000.00 | Aaa | Aaa (WD) | Aa3 | Aaa | - | Aa3 |
| 820169397 | Ridgeway Court Funding II Ltd | 766174AQ9 | 450,000,000.00 | Aaa | Aaa (WD) | Aa3 | Aaa | - | Aa3 |

(Highlighting added and certain cells hidden from view.)

136.     The results show that even under the most optimistic scenario (Run A, which incorporates only the actual October 11, 2007 downgrades of 2006 vintage RMBS) the rating should have been downgraded from Aaa to Aa1. Other Glacier Funding IV tranches had ratings actions taken on or about of October 25, 2007 (typically all tranches are analyzed at the same time and rating actions for all tranches are typically made at the same time) and the Aaa tranche should have been downgraded on that date. Yet this tranche was not downgraded on October 25, 2007 and was not placed on watch for downgrade. On information and belief, a Aaa committee decided not to downgrade the Aaa tranche even though a downgrade was required by the analysis performed during the ratings marathon.

137.     Moody's chart and table copied below show the history of Moody's published ratings for the Class A-1 tranche of the Glacier Funding IV transaction (CUSIP: 37638NAA9):



138.    The super-senior Glacier Funding IV tranche was finally downgraded for the first time on March 27, 2008, but it was only downgraded to A3. An A3 rating would have been appropriate on October 25, 2007, pursuant to either Run B or Run C (in this example, the results were the same for Run B and Run C) during the ratings marathon, but at the time of the downgrade, a full five months later, the credit quality of the deal's portfolio was twice as bad as it was at the end of October and it should have been downgraded much lower. Currently, its rating is C, the lowest rating used by Moody's.

### 6.    Additional Examples of CDO Tranches that were not Properly Downgraded

139.    In addition to the Glacier Funding IV tranche described above, there are many additional CDO tranches that were improperly rated. The bulk of Moody's published ratings for structured finance CDOs after October 2007 were false. Additional examples of Moody's failure to timely downgrade CDO tranches abound.

140.    Moody's CDO group used the "half-way" downgrades and "Aaa committees" to delay downgrading ratings of CDOs, even though Moody's had completed its review of those

credit ratings following the downgrades of thousands of RMBS ratings in late October and early November 2007. Moody's prepared a spreadsheet of certain information relating to CDO tranches that were insured by monoline insurance companies. This spreadsheet was named the "FIG Sheet" because it was prepared for a special project conducted for the Moody's Financial Institutions Group. It is important to note that the tranches listed on the FIG Sheet only represent a small subset of the CDO securities rated by Moody's. The FIG Sheet covers about 3% of all structured finance CDO tranches and approximately 7% of all CDO tranches that Moody's originally rated Aaa.

141.    The FIG Sheet has ratings results for 162 CDO tranches in one or more of the three columns corresponding to Run A, Run B and Run C. Of those 162 tranches, seven tranches are either explicitly wrapped (which means the public rating of the tranche depended on the rating of a financial guarantor) or were not publicly rated. Of the remaining 155 tranches, 77, or approximately 50%, should have been downgraded more steeply and much sooner. At a minimum, 25 of the 155 tranches, or approximately 16%, should have been downgraded to the results of Run A to reflect the ratings downgrades to the 2006 vintage RMBS that occurred on October 11, 2007. However, Moody's ignored the results of its own analysis to maintain inflated ratings.

142.    Exhibit A attached hereto excerpts information from the FIG Sheet and lists 25 CDO tranches that had a "New Rating" that was higher than the results of "Stressed Rating (A)" (which, upon information and belief, means the published rating is higher than the result of Run A calculated during the ratings marathon). Exhibit B attached hereto lists 77 CDO tranches that had a "New Rating" that was higher than the results of any of the "Stressed Ratings" (which,

upon information and belief, means the published rating is higher than the result of any of Run A, Run B or Run C calculated during the ratings marathon).

143.    The FIG Sheet is limited only to those tranches that were insured by monoline insurance companies rated by Moody's. As a result, it excludes all the tranches insured by AIG and held outright by banks, pension funds, insurance companies and other investors.  Upon information and belief, nearly all of Moody's ratings on structured finance CDO tranches that were not included in the FIG Sheet were also false after the ratings marathon.

**7.    Moody's Failure to Monitor Had Cumulative Effects**

144.    The "half-way" downgrades, Aaa committee decisions and other delay tactics resulted in false and misleading ratings, with far-reaching implications. An incorrect rating is misleading for investors in a given CDO and for investors in the many other CDOs that potentially held or referenced a CDO with a false rating. Additionally, the false ratings of CDOs affected the ratings of AIG, the Monolines and other financial institutions that had a massive exposure to CDOs. The ratings of other securities insured by AIG and the Monolines were also affected.

145.    Moody's continued to knowingly publish false credit ratings on the vast bulk of structured finance CDOs at least through the end of 2008. Because Moody's made claims of continuous monitoring and other assurances to the market, Moody's gave the false impression that its ratings were accurate at least every month. To buttress these claims, Moody's even published a monthly "Structured Finance CDO Surveillance Brief" from August 2007 until June 2008 to give the false impression that surveillance and monitoring activities were being performed on CDOs and that its credit ratings were true.

146.    However, the need for Moody's to downgrade its CDO ratings was not a one-time event and was not limited to October 2007. Even if Moody's had downgraded CDO ratings as a

result of the October 11, 2007 downgrades of 2006 vintage RMBS, that alone would not have been sufficient to accurately reflect the deterioration of credit quality of these securities. Because RMBS ratings were continually downgraded by Moody's in 2007 and 2008, Moody's CDO ratings necessarily needed to be downgraded pursuant to Moody's own methodology and the Code. During the course of 2007 and 2008, nearly $1 trillion of RMBS were downgraded by Moody's. By February 2008, the amount of downgraded RMBS quadrupled from the amount outstanding at October 2007. Yet, Moody's CDO group knowingly and deliberately failed to keep pace with these downgrades. The following chart shows the cumulative and monthly amounts of RMBS downgrades between October 2007 and June 2008:



147.    The deliberate failure of Moody's CDO group to keep pace with downgrades announced by the Moody's RMBS group exacerbated the impact of the financial crisis. Among other consequences, Moody's false credit ratings were used to set risk-based capital and FDIC insurance premiums for federally insured depository institutions, and these false ratings affected the financial health of several types of financial institutions, including banks, credit unions, the Monolines, AIG, Fannie Mae and Freddie Mac (Fannie Mae and Freddie Mac had large holdings

of RMBS guaranteed by the Monolines). Additionally, Moody's false credit ratings were used by AIG to tout its financial health and the quality of its CDO portfolio.  A public presentation prepared by AIG for a quarterly earnings call held on May 9, 2008, reporting AIG's financial results for the quarter ended March 31, 2008 stated in part the following:



## Conclusions From Fundamental Risk Assessment & Stress Testing

- All three major rating agencies continued to rate 82% of AIGFP's $60.6 billion "Super Senior" credit derivative multi-sector CDO portfolio with subprime RMBS collateral at AAA levels as of March 31, 2008 (69% as of April 30, 2008). This is despite a significant number of CDO downgrades since 2007.

As part of its August 7, 2008 conference call reporting its financial results for the quarter ended June 30, 2008, AIG similarly relied on Moody's inaction and touted the high credit ratings of its portfolio, stating in part the following:



## Rating Agency Actions

- At June 30, 2008 all applicable rating agencies continued to rate 37% of AIGFP's $57.8 billion super senior credit derivative multi-sector CDO portfolio with subprime RMBS collateral at AAA levels. This is despite a significant number of CDO downgrades during 2007 and the first half of 2008.  At July 27, 2008, this percentage was 36%.

### 8.    Moody's Excludes Certain CDO Tranches from the Ratings Charade

148.    Moody's was aware of, and highly sensitive to, criticism of its CDO ratings. To cover up its fraudulent acts, a subset of highly transparent CDOs were downgraded properly during the ratings marathon. These transactions were based on the TABX (Tranched ABX)

synthetic subprime RMBS indices. The TABX was a series of indices maintained by the Mark-It Group, and the transactions that were properly downgraded were based on the performance of an indexed set of RMBS securities. Information about the TABX indices was available on the Mark-It website along with daily prices. The transparency of the TABX ratings was due to (a) the public nature of the portfolio; (b) the use of a public model to derive the ratings; and (c) publicly declared ratings assumptions.

149.    Prior to the RMBS downgrades in October 2007, Moody's rated approximately $1 billion of TABX CDOs. Following the October 2007 RMBS downgrades, the credit ratings on these securities were downgraded promptly – there were no "half-way" downgrades or Aaa committees for these transparent securities. As Ms. Yoshizawa admitted in an email, this was because "they will most likely be singled out by the press."

### D.    MOODY'S PUBLISHES FALSE RATINGS ON TRUPS CDOS.

150.    TruPS CDOs were CDOs with collateral typically composed of bank trust preferred securities, insurance company surplus notes and REIT junior debt. By 2007, Moody's rated 103 TruPS CDO transactions backed by $55 billion in assets. "Over 300 FDIC-insured institutions reported investment in TruPS CDOs in their September 30, 2010 Call Reports." FDIC Supervisory Insight (Winter 2010).

151.    Moody's reaction to the deterioration in the TruPS CDO portfolio was the same as its reaction to structured finance CDOs. When taking action on TruPS CDOs, Moody's published ratings it knew to be false. Specifically, Moody's avoided taking action on senior Aaa tranches, even if its methodology required it. Other Aaa and Aa tranches were improperly placed on watch for downgrade when actual downgrades were required. Lastly, for tranches rated single-A and below, Moody's only announced partial downgrades similar to the "half-way" downgrades.

152.    For example, ALESCO Preferred Funding IX, Ltd. ("Alesco IX"), a 2005 TruPS CDO underwritten by Merrill Lynch that was backed by a combination of bank and insurance company TruPS should have been downgraded much sooner. Riverside National Bank ("Riverside"), a small Florida bank bought $8.5 million of the Class C-3 Notes issued by Alesco IX. The notes purchased by Riverside were originally rated A3. By 2008, Riverside had accumulated over $300 million of various TruPS and was seized by the Office of the Comptroller of Currency on April 16, 2010. Riverside's failure is expected to cost $491.8 million.

153.    The Alesco IX portfolio had a substantial exposure to IndyMac Bank – $20 million (over 3%). IndyMac Bank was heavily involved with risky mortgage lending, and on May 12, 2008 IndyMac announced that it would defer payments on its trust preferred securities.

154.    Under the relevant Moody's methodology, a deferral is considered a default with a loss of 90%. The IndyMac action would bring the total of deferring or defaulted collateral in the transaction to $45 million. Yet, Moody's took no rating action on the Alesco IX or any other bank TruPS CDOs at the time.

155.    On July 11, 2008, the Government seized IndyMac Bank and its TruPS became worthless. The seizure apparently prompted Moody's to action. Like the structured finance CDOs, Moody's decided to "slow walk" the ratings downgrades; eleven days after the seizure of IndyMac, Moody's merely placed 182 tranches across 72 TruPS CDOs on watch for downgrade when actual downgrades were required. The bulk of the securities placed on watch for downgrade were rated single-A or below. However, as of June 30, 2013, over $1.5 billion of bank TruPS were deferring or defaulted and much greater downgrades are required.

156. Because of the losses in its portfolio, Alesco IX stopped paying interest on the Class C-3 Notes in July 2008. At the end of July 2008, Alesco IX had a ratio of assets over liabilities that stood below parity – at 97.87%, which meant that there was not enough collateral to pay off the Class-C Notes in full.

157. The first real downgrades by Moody's of Alesco IX took place on August 14, 2008. Moody's conduct with respect to TruPS follows its treatment of structured finance CDOs. The tranches placed on watch in July 2008 were downgraded a few notches and left on watch for downgrade, but the tranches of Aaa and Aa securities were merely placed on watch for downgrade at this time. The Alesco IX Class C-3 tranche held by Riverside Bank was gently lowered three notches from A3 to Baa3(WD). Despite the fact that the tranche stopped paying periodic interest and was underwater, its rating astonishingly remained investment grade. Moody's purportedly kept "watching" for another seven months as the tranche kept deferring payments. Only on March 27, 2009 was the tranche lowered to Ca – Moody's second lowest rating.

158. Among other investors, Moody's false ratings on TruPS CDOs affected the approximately 300 federally insured institutions that held them. The false ratings also affected the ability of regulators to monitor the risk taken by those institutions and to take prompt corrective action.

## VI.   MOODY'S RATINGS ON AIG AND THE MONOLINES VIOLATED STANDARDS OF CONDUCT EMBODIED IN ITS NRSRO CERTIFICATIONS

159. Moody's systematically disregarded the conflicts of interest which resulted in the publication of false credit ratings for the Monolines and AIG.

### A.   AIG Built a Massive Portfolio of Sub-Prime Related Securities

160.   At its peak, AIG was one of the largest and most successful companies in the world, boasting a Moody's Aaa credit rating, over $1 trillion in assets and 76 million customers in more than 130 countries.

161.   AIG's downfall stemmed in large part from its CDS on structured finance CDOs, which exposed the company to the massive decline in value in the subprime mortgage market. While many counterparties purchased CDSs to hedge or minimize credit risk, AIG frequently took the other side, effectively placing a long-term bet on the health of the U.S. subprime mortgage market.

162.   During 2008, AIG faced increasing demands from its CDS customers for cash security—known as collateral calls—totaling tens of billions of dollars. On March 17, 2008, AIG posted $3 billion; on May 28, 2008, it posted $4.9 billion; on September 15, 2008, it posed $19.5 billion; and on September 16, 2008, it posted $22.5 billion.

163.   Moody's played an exceptionally important role in AIG's collapse and the subsequent Government rescue. Moody's false credit ratings were a key factor in AIG's financial difficulties, and Moody's conduct significantly constrained the Government's options in the rescue of AIG.  Moody's demands and false statements under the threat of a potential downgrade led to an underpayment to the Government of over $3.3 billion.

164.   AIG had been a Moody's Aaa-rated company as recently as late 2004. Although Moody's had downgraded AIG as its vulnerabilities became more apparent in 2008, AIG still entered September 2008 with relatively strong, high investment-grade ratings. On Monday, September 15, 2008, the day Lehman Brothers failed, after the extent of AIG's liquidity problems became known, AIG was downgraded by Moody's. These downgrades prompted

collateral calls that brought AIG to the brink of bankruptcy, and ultimately resulted in the $182.5 billion rescue by the United States.

165.     Moody's material misrepresentations in its Form NRSRO certification regarding its conflicts of interest and serious flaws in its ratings would cause the United States' $182.5 billion bailout of AIG. Considerations about credit rating agencies (and, in particular, Moody's ratings) were central to the oversight of AIG by the Office of Thrift Supervision and the decisions by the Federal Reserve Bank of New York ("FRBNY"), and later the U.S. Treasury Department, to assist AIG. Moody's false ratings shaped many of the decisions that had to be made during the course of the rescue. Indeed, concerns about rating downgrades drove Government policy in regard to AIG during the rescue. As the market's most widely followed judges of financial soundness, Moody's wielded immense power.

### B.    MOODY'S KNOWINGLY FALSE RATINGS FOR THE MONOLINES AND AIG

166.     While Moody's credit ratings for the Monolines and AIG were materially affected by Moody's failure to properly downgrade the CDOs that were guaranteed by CDSs, Moody's went further and improperly altered its ratings process for AIG and the Monolines to ensure that it would not be necessary to downgrade their corporate ratings and to prevent its true credit ratings from being published.

167.     Moody's failure to properly downgrade CDOs affected the capital models used in the ratings of AIG and the Monolines. These models used credit ratings as inputs to determine the risk to these companies. The ratings were critical in the calculation of Portfolio Characteristics, Capital Adequacy and other metrics used by the Moody's Insurance Group. The false CDO ratings caused the Insurance Group to maintain false ratings for AIG and the Monolines.

168.    In addition to the false CDO ratings Moody's published during the 2007-09 financial crisis, Moody's management forced its analysts to use a new model for AIG and the monoline insurers that was developed for the sole purpose of allowing these institutions to keep their high ratings. The results produced by the new model defied basic credit analysis. Incomprehensibly, this new model showed negligible CDO losses even in scenarios contemplating catastrophic losses on the mortgage pools that indirectly formed the CDO collateral.

169.    Moody's maintained the overinflated ratings because it knew that lowering the ratings of AIG and the Monolines would affect its bottom line because of their critical role in the structured finance market. AIG and the Monolines were enormously important to the financial system. Numerous banks, state pension funds and insurance companies sought insurance written by these institutions or held securities insured by them.

170.    Moody's Insurance Group assigned ratings to insurance companies like AIG and to the Monolines. The Insurance Group was concerned about exposure to structured finance and knew the risks presented by subprime mortgages to the insurance entities it rated. In September 2007, Moody's published a report titled "*Financial Guarantor's Subprime Risks: From RMBS to ABS CDOs*" (the "FG Paper"), and the author of the FG Paper, Stanislas Rouyer, developed a model that took credit quality into account to calculate the risks to these companies from CDOs and RMBS subprime exposure (the "Rouyer Model"). The Rouyer Model gained acceptance within Moody's Financial Institutions Group and, for a time, served as the basis for Moody's analysis of the Monolines and AIG. Unfortunately, the Rouyer Model was supplanted by a model that did not have any basis for evaluating creditworthiness and was designed to show no losses to the Monolines and AIG.

171.    The FG Paper demonstrates that Moody's knew the risks to the Monolines and, by extension, to AIG even before the massive October 2007 downgrades of RMBS securities. The FG Paper cautioned that the bond insurers would take significant losses if the assumptions on losses of underlying mortgage pools were increased slightly from 10% to 12% or 14%, stating, "[i]f we increase the current 10% assumption for subprime RMBS cumulative expected loss to 12% or 14%, material increases in expected claims could develop for some guarantors."

172.    Over the course of the 2007-09 financial crisis, the expected losses on underlying mortgage pools would increase dramatically, but Moody's failed to reflect those changes in the corporate rating of AIG or the Monolines.

173.    In the FG Paper and the Rouyer Model, Rouyer assumed that the benchmark mortgage losses would be a relatively low 10%. Because the Rouyer Model assumed that Baa-rated RMBS had at least 10.5% of protection, CDOs that held mostly RMBS tranches rated Aa to Baa would not be impacted by those assumed losses.

174.    The FG Paper also discussed two other scenarios that were characterized as stress scenarios, specifically a "Stress Scenario" with 12% losses and an "Extreme Stress Scenario" with 14% losses. Under these stress scenarios, the loss assumptions would cause certain financial guarantors to have a "Hard Capital Ratio" below 1.3, which would cause them to lose their Aaa ratings. The following graph excerpted from the FG Paper shows the impact of the relatively low "Stress Scenario" with 12% losses and an "Extreme Stress Scenario" with 14% losses on the underlying mortgage pool:



As the FG Paper showed, even the 12% Stress Scenario would cause some of the Monolines to lose their Aaa credit ratings. This effect would only worsen as the financial crisis progressed because Moody's dramatically increased its loss assumptions for the "Stress Scenario" in the beginning of 2008 from 12% losses on the underlying mortgage pool to 21%. Even increasing the loss assumptions to 21% was artificially low. Currently, the expected losses on 2006 subprime mortgages are approximately 38-40% of the pool.

### 1. Moody's Model for the Monolines and AIG is Designed to Show No Losses

175.    As soon as the FG Paper was published, the implications of the Rouyer Model were clear – any increases in mortgage loss projections above 10.5% would have shown losses on CDOs and the Monolines and AIG, which insured them. Aware that the 10% benchmark mortgage loss assumptions were artificially low and were being revised upwards, Moody's management reacted by substituting the Rouyer Model with a model for rating AIG and the Monolines that was not created through the normal channels and was in violation of the Moody's Code, because Moody's did not want to harm its most profitable customer relationships. Even after the financial crisis, Moody's management did not have a legitimate basis for changing this

model. During the investigation by the Financial Crisis Inquiry Commission ("FCIC"), Ms. Yoshizawa admitted that Moody's did not want "to lead people to the conclusion that losses on Aaa would be widespread."

176.   Moody's management replaced the Rouyer Model with one that would not show losses even in the most catastrophic scenarios. The job of creating a new model that would ignore credit factors was given to the Credit Policy group, which had little experience with structured finance products. This model was known as the "Chris Mann" or "CP" model and was developed with senior members of Moody's CDO group and Moody's management. Chris Mann was a highly respected analyst but had no prior experience with structured finance.  As a result, his work was susceptible to influence by Moody's structured finance group and Moody's management.

177.   The Chris Mann model failed to take credit factors into account, and the use of this model was a deliberate policy designed to prevent publication of accurate ratings of financial institutions. Using the Chris Mann model violated a number of Code provisions and was inconsistent with the issuance and publication of a true credit rating.

178.   The Chris Mann model was designed to obscure losses to the Monolines and AIG and was announced in a December 5, 2007 press release, which stated in part: "These additional refinements are intended to provide greater confidence in the results and enable Moody's to better assess a guarantor's ability to withstand a range of stresses related to the ultimate performance of mortgage risk." This statement was knowingly false.

179.   In early 2008, Relator Kolchinsky was asked by the Moody's Global Insurance group to value a sample set of CDOs because of concerns this group had about the exposure that the insurance companies it rated had to these products. In particular, the Insurance Group was

concerned that AIG and the Monolines were at risk due to substantial exposure to structured finance CDOs. On information and belief, analysts in the Moody's Insurance group were also concerned that the Chris Mann model showed very low losses in comparison to the Rouyer Model, which was developed by analysts in the Insurance group.

180.    In addition, the Insurance group wanted Relator Kolchinsky to help them understand "mark-to-market" valuation (*i.e.*, the market's valuation of the potential losses of these assets or liabilities). Among other things, the "mark-to-market" analysis was critical to understanding the amount of cash collateral that AIG needed to post under the terms of the CDSs it sold.

181.    The analysts in the Moody's Insurance group selected three representative CDO transactions for Relator Kolchinsky to analyze to understand insurance company exposure: (a) Davis Square 7, (b) Ipswich, and (c) Silver Marlin. All three deals were CDOs backed primarily by mortgage-related securities originally rated Aa and A. To perform his analysis, Relator Kolchinsky applied market valuation approaches commonly known among Wall Street bankers.

182.    Relator Kolchinsky concluded there were much higher expected losses than those predicted by the Rouyer Model or the Chris Mann model. The final results of Relator Kolchinsky's analysis were as follows:

|  | Exposure | Portfolio Value | Tranche Value |
|---|---|---|---|
| Davis Square 7 | Sup-Senior | 41% | 52% |
| Silver Marlin | 15-50% (Class A-2) | 42% | 0% |
| Ipswich Street | 15-50% (w/i tranche) | 54% | N/A |

183.    Based on Relator Kolchinsky's mark-to-market approach, Davis Square had a portfolio value of 41 cents on the dollar (conversely, it was expected to lose 59 cents on the

dollar). Because the insurance companies' CDS exposure was to the super-senior tranche that had other tranches for support, the tranche at issue had a value of 52 cents on the dollar (and was expected to lose 48 cents on the dollar).

184.   The Silver Marlin exposure was not super senior; the insurance company bore all the losses from 15% to 50%. As a result, even though the value of the Silver Marlin underlying portfolio was similar to Davis Square (compare 42% with 41%), the value of the tranche was much less (compare zero with 52%).

185.   Lastly, the value of the Ipswich Street portfolio showed similarly severe losses (54% portfolio value with an expected loss of 46%) (Relator Kolchinsky did not perform an analysis of the tranche value).

186.   After conducting his evaluation, Relator Kolchinsky sent his results in a February 7, 2008 email to the senior members of the Insurance group and the CDO group.

187.   Relator Kolchinsky's analysis was forwarded to Ms. Yoshizawa by one of her subordinates in the CDO group. Upon seeing Relator Kolchinsky's analysis of the CDOs' underlying collateral, Ms. Yoshizawa understood the implications for the structured finance market, and she personally intervened and wrote an extensive email minimizing the issues surrounding the potential losses on CDOs. Ms. Yoshizawa forwarded a comparison of the results calculated by Relator Kolchinsky to those of the Chris Mann model (the model developed by Moody's management to conceal the massive losses caused by defaulting mortgages) and an analysis performed by the CDO group. At this point, the stress scenario used by the Chris Mann model assumed losses of 21% on the underlying mortgage pool, but Ms. Yoshizawa's response showed how Moody's ignored the impact such losses would have on ABS CDOs, AIG and the Monolines. Losses of 21% on the underlying mortgage pool (which assumed that subprime

mortgage pools would only have 79 cents on the dollar to pay off investors) should have required extensive downgrades of the Monolines and AIG.

188.    The Rouyer Model, the Chris Mann model and the analysis performed by Relator Kolchinsky can all be compared using the same 21% stress scenario, because calculating the loss on a tranche of RMBS and CDOs is a deterministic process (*i.e.*, a matter of mathematical calculation) given loss assumptions on a mortgage pool. In fact, once a catastrophic loss scenario, like the 21% stress scenario, is chosen, the mortgage losses are generally allocated among RMBS tranches exactly as described in the RMBS operating documents. The resulting loss on RMBS is an objective and verifiable quantity. Although complex, these RMBS losses can be followed through to the ratings of the CDOs that hold them and the entities, such as the Monolines and AIG, that guaranteed the CDOs. Each approach differs only with respect to the number of "shortcuts" taken to account for the complexity, but they should not result in wildly different results. However, as shown in the table below, the CDO tranche losses calculated by each method were vastly different and Moody's chose the corrupted Chris Mann model that was deliberately produced to provide implausibly low results that were knowingly false:

| Model | Davis Sq. VII Cl A1a Loss | Ipswich Cl A1 (15-50%) Loss |
|---|---|---|
| Chris Mann model | 0% | 0.06% |
| Rouyer Model | at least 20% | at least 31% |
| Relator Kolchinsky | 48% | approx. 90% |

189.    These models provided three radically different results. The expected losses for each relevant tranche ranged from zero loss to 48% for the Davis Square CDO tranche and from 0.06% to approximately 90% loss for the Ipswich CDO tranche under the various analytical methods. With respect to the Davis Square tranche, the Chris Mann model shows no loss at all. While the Rouyer Model, which Moody's discarded in favor of the Chris Mann model, shows at

least 20% loss. Relator Kolchinsky's analysis shows a loss of almost half the principal of the tranche. Moody's used the Chris Mann model, which was created with the input of Moody's management. It was designed to show minimal or no losses. If Moody's Insurance group had used either the Rouyer Model (developed by Moody's insurance analysts themselves) or Relator Kolchinsky's model, the credit ratings for AIG and the Monolines would have been downgraded in the first quarter of 2008.

190.    Instead, the Chris Mann model and its 21% stress scenario were used by Moody's to justify overinflated ratings for AIG and the Monolines. As part of its analysis, Moody's compared the assets remaining in the 21% stress scenario to the capital available to AIG and the Monolines. If the ratio of the assets to capital fell below 1.0, the Aaa rating would be lost. In a January 2008 paper entitled "Moody's Financial Guaranty: Frequently Asked Questions," Moody's described its use of the 21% stress scenario and the use of the model as follows:

> Under the second approach (the "stress-case"), Moody's employs a separate stochastic simulation model for the ABS CDO portion of the risk portfolio, to examine potential sensitivity in those leveraged structures to unexpectedly extreme negative performance of underlying collateral. … A 19% baseline scenario was used for the December analysis and we are now going to use 21%. In this stress model, a capital shortfall was estimated relative to the minimum ratio (1.0x the modeled tail risk).

191.    Instead of downgrading the ratings for AIG and the Monolines, Moody's affirmed their overinflated ratings. On or about February 26, 2008, Moody's issued a press release confirming MBIA's Aaa rating (albeit changing the outlook to negative) based on the 21% Stress Scenario and the Chris Mann model, but should have downgraded MBIA significantly if the requirements in the Code been followed. In March 2008, Moody's also confirmed Ambac's Aaa rating, based on the 21% Stress Scenario and the Chris Mann model, but, as with MBIA, the rating for Ambac should have been downgraded significantly.

192.   In spite of Relator Kolchinsky's warnings about the impending losses, Moody's issued a press release on February 12, 2008, describing AIG's potential losses as being "materially smaller than estimated market valuations might suggest" and stating that AIG had "sufficient capital strength and earnings power to support the existing ratings."

193.   On March 3, 2008, Moody's once again affirmed AIG's rating, stating "that AIG's ultimate economic losses [on the structured finance CDO portfolio] may be materially smaller than estimated market values would suggest." Nevertheless, in just over seven months' time, despite Moody's statement that AIG's losses would be "materially smaller than market valuations would suggest," AIG would require $184 billion of Government support in order prevent a default.

194.   Moody's March 3, 2008 affirmation of AIG's rating was based on a rating committee memorandum dated February 29, 2008 showing its use of the Chris Mann model. That rating committee memorandum states, in part, that "we believe that a majority of these losses and write-downs are temporary and subject to recovery. Following are summary results of economic stress tests applied to these exposures, similar to tests that have been used for the financial guarantors." Unbelievably, the Chris Mann model predicted that the losses on AIG's $65 billion portfolio were zero in the Base Case Scenario and only $50 million in the 21% Stress Scenario.

195.   Six months later, Moody's could no longer maintain this farce. On September 15, 2008, Moody's finally downgraded AIG (from Aa3 to A2), attributing its decision to the impact on AIG's "liquidity and capital position" of the "continuing deterioration in the U.S. housing market." It also signaled that "further downgrades [of AIG] . . . are likely if the immediate liquidity and capital concerns are not fully addressed." Moody's downgrade, coming only six

months after its rosy picture of AIG's liquidity in March 2008, caused the Treasury Department on September 16, 2008 to authorize an immediate bailout by the FRBNY.

196.    The need for a downgrade was known by Moody's in March 2008 and earlier. The different result is due solely to the fraudulent interference with the ratings process by Moody's management. Moody's desire to protects its large clients from the 2007-09 financial crisis at the expense of the Government led Moody's to substitute a properly developed ratings model with an illegitimate model that is not based on creditworthiness. The Chris Mann model did not produce Moody's actual opinion regarding the relative future creditworthiness of an AIG or the Monolines. Instead, it merely protected Moody's pecuniary interests. The faults of the Chris Mann model were reinforced and compounded by the false credit ratings on structured finance CDOs published by Moody's.

197.    Management's interference with the rating process is prohibited by numerous sections of the Code. As a result, Moody's ratings on AIG and the Monolines, and all the ratings of municipal and structured securities guaranteed by these entities, did not meet the requirements of a NRSRO credit rating.

### 2.    Moody's Assists AIG in Negotiating an "Upside"

198.    In addition to falsely rating CDOs and using the improper Chris Mann model, Moody's interfered with the Government bailout of AIG. Moody's had taken fraudulent measures to protect AIG's credit rating for as long as possible during the 2007-09 financial crisis.  Moody's only downgraded AIG after the bankruptcy of Lehman Brothers in September 2008. This downgrade also came on the heels of Fannie Mae and Freddie Mac entering conservatorship. Instead of performing its monitoring function properly and in a timely manner, Moody's only downgraded when the Government was under immense time pressure to fund

bailouts for several large financial institutions. In light of these pressures, the Government was forced to intervene to rescue AIG.  As reported by the Financial Crisis Inquiry Commission:

> AIG was so interconnected with many large commercial banks, investment banks, and other financial institutions through counterparty credit relationships on credit default swaps and other activities such as securities lending that its potential failure created systemic risk. The government concluded AIG was too big to fail and committed more than $180 billion to its rescue. Without the bailout, AIG's default and collapse could have brought down its counterparties, causing cascading losses and collapses throughout the financial system.

199.    Moody's failure to properly monitor AIG resulted in a "fire dill" rescue attempt. Extra time would have allowed the Government to negotiate reasonable terms with AIG and its CDS counterparties. FRBNY officials were forced to intervene immediately due to their concern that AIG's credit rating might be downgraded further after the September 15, 2008 downgrade.

200.    Indeed, after the initial September 2008 rescue, Government actions were driven by the whims of the rating agencies, as stated by the Congressional Oversight Panel as part of its investigation:

> It is clear from the analysis in this report that considerations about credit rating agencies were central to FRBNY's, and later Treasury's, decisions to assist AIG, and shaped many of the decisions that had to be made during the course of the rescue. Indeed, it is no exaggeration to say that concerns about rating downgrades drove government policy in regard to AIG.

201.    In the aftermath of the 2007-2009 financial crisis, the Government Accountability Office (the "GAO") issued a report examining the losses associated with the crisis, and recognized that the FRBNY acted to avoid a downgrade which would cause the Government to lose its investment in AIG: The GAO stated in part the following:

> Although the performance of credit rating agencies during the financial crisis has drawn criticism, Federal Reserve System officials said AIG's credit ratings were central to decisions about assistance because rating downgrades could have triggered billions of dollars in additional liquidity

demands for the company. Downgrades could also have jeopardized AIG's asset sales plan and repayment of government aid, if a downgrade led to events that significantly reduced the value of AIG assets. As a result, FRBNY joined with AIG to address rating agency concerns throughout the course of government assistance to the company.

Information we reviewed further indicates that leading up to the announcement of restructuring of government assistance in November 2008, FRBNY and Federal Reserve Board officials were concerned about ratings and whether options they were considering would prevent a downgrade. October 26 briefing slides from an FRBNY advisor detailed various rating agency concerns, including ongoing liquidity and capital problems at AIGFP, the parent company's debt levels following the Revolving Credit Facility, and risks associated with executing AIG's asset sales plan. When the Federal Reserve Board considered authorization of the restructuring package, a key factor was rating agency concerns.

### 3.     Moody's Forced Concessions from the Government to Benefit AIG

202.    Although the Government was required to satisfy Moody's concerns to avoid a further downgrade of AIG's credit rating after the initial Government rescue, Moody's failed to follow its own methodologies in an attempt to enrich AIG and itself at the Government's expense.  Moody's threats of a downgrade should never have been made after the Government's commitment to AIG's bailout in September 2008.  Moody's had a longstanding methodology, called "Joint-Default Analysis" ("JDA"), which should have protected AIG's credit rating from any further downgrade following the Government's September 2008 intervention. JDA is a methodology by which an issuer receives a rating benefit from a third party – typically a national or local government. The Moody's methodology was first published in April 2005, in a paper titled "The Application of Joint Default Analysis to Government Related Issuers" and updated in August 2006 in "Revised Methodology for Government Related Non-Bank Financial Institutions."  According to Moody's, a Government Related Issuer ("GRI") is "an entity with full or partial government ownership or control, a special charter, or a public policy mandate from the national or local government," and "partial ownership" is greater than 20%.

203.    The benefits of the JDA support from a government is based on "the <u>likelihood</u> that the government will step in and bail out a GRI if it were to experience a catastrophic loss." That is, the issuer gets a ratings uplift based solely on the possibility that the Government will intervene. In the case of AIG, the intervention already occurred and the <u>likelihood</u> of support was a certainty.

204.    In the past and during the 2007-09 financial crisis, Moody increased the ratings of most major banks as well and Fannie Mae and Freddie Mac using the JDA, based solely on the possibility that the Government may intervene to prevent losses, but without any explicit guarantees.  In the case Fannie Mae and Freddie Mac, their ratings were raised 15 levels from B2 to Aaa after the Government's bailout in August 2008.  The Government's ownership of Fannie Mae and Freddie Mac was identical to its 79.9% ownership in AIG.

205.    Yet, according to its own credit memoranda, Moody's failed to apply this methodology to AIG despite the fact that the government support had actually occurred rather than being probabilistic and theoretical. Even as Moody's was threatening to downgrade AIG in November 2008, it was aware that the Government had a nearly 80% ownership stake in AIG.

206.    If Moody's applied its own JDA methodology, there would have been no need for a downgrade and no reason to threaten the Government with the same. Instead, the threat of a further downgrade was used to extract concessions from the Government.

### 4.    November 2008 Restructuring

207.    As part of the November 2008 restructuring of the terms of the Government's bailout of AIG, Moody's made false statements causing AIG to underpay the Government by approximately $3.3 billion.

208.    After the Government's initial rescue of AIG in September 2008, the Government's decision making process with respect to AIG was driven in large part by Moody's demands.

209.    As noted by the Congressional Oversight Panel ("COP"), a bipartisan organization created by Congress in 2008 to monitor the Troubled Assets Relief Program ("TARP"), in its June 2010 report:

> The credit rating agencies advised AIG that the company's upcoming November 10 report of third quarter results would likely trigger a ratings downgrade in the absence of a "parallel announcement of solutions to its liquidity problems." AIG was having difficulty selling assets to pay down debt from the RCF and meet anticipated liquidity needs, particularly in light of continuing collateral calls under its CDS contracts. Consequently, in the days leading up to AIG's [November 2008] earnings announcement, the Federal Reserve and Treasury hurried to put together additional financial assistance from the federal government that would address AIG's growing debt burden.
>
> On November 10, 2008, FRBNY and Treasury announced a comprehensive multipronged plan to address AIG's liquidity issues, create a "more durable capital structure," and provide AIG with more time and increased flexibility to sell assets and repay the government. This restructuring was intended to stabilize AIG"s businesses and address rating agency concerns in order to allow an orderly restructuring. As Secretary Geithner later stated, "[a]voiding any downgrade of AIG's credit rating was absolutely essential to sustaining the firm's viability and protecting the taxpayers" investment.

Congressional Oversight Panel, *June Oversight Report, The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* at 86 (June 10, 2010).

210.    In part due to Moody's concerns about the amount that AIG had to spend to repay the loan from the Federal Reserve, the Government agreed to lower the interest rate on the loan from LIBOR plus 8.5% to LIBOR plus 3% as part of the November 2008 restructuring.  This substantially lowered the amount that AIG was required to pay the Government. In addition to the straightforward process of lowering the interest rate on the Government's loan, the FRBNY

also took extraordinary steps to ease the strain on AIG by creating two special purpose vehicles that would purchase AIG's toxic assets.

211.    The Federal Reserve Board authorized the FRBNY under Section 13(3) of the Federal Reserve Act to form two limited liability companies to facilitate lending in support of specific institutions: Maiden Lane II LLC ("ML II LLC"), and Maiden Lane III LLC ("ML III LLC").  ML II LLC was created to bailout AIG's securities lending program by purchasing $20.5 billion in RMBS from several of AIG's U.S. insurance subsidiaries.  ML III LLC was created to bailout AIG's CDS contracts written by AIGFP by purchasing $29.3 billion in multi-sector CDOs from certain AIGFP counterparties, enabling AIGFP to terminate the associated CDSs.

212.    The New York Fed lent ML II LLC approximately $19.5 billion, with a 6-year and interest at 1-month LIBOR plus 100 basis points. The AIG insurance subsidiaries agreed to defer receipt of $1 billion of the purchase price of the purchased securities. The fixed deferred purchase price accrued at 1-month LIBOR plus 300 basis points. Monthly loan repayment commenced in January 2009, and ML II LLC sold all remaining securities on February 28, 2012. Net proceeds from sales of all the securities, as well as cash flow the securities generated while held by ML II LLC, enabled the repayment of the loan to the FRBNY and AIG while also providing a net gain of approximately $2.8 billion for the benefit of the Government.  The gain, however, should have been approximately $4 billion higher if Moody's had not interfered in the restructuring of this transaction.

213.    The New York Fed lent ML III LLC approximately $24.3 billion, with a 6-year term and interest at 1-month LIBOR plus 100 basis points. AIG borrowed an additional $5 billion from the FRBNY to contribute as "equity" to ML III LLC, and AIG's equity interest

accrued interest at 1-month LIBOR plus 300 basis points.  On June 14, 2012, ML III LLC repaid the loan made by the New York Fed.  On July 16, 2012, net proceeds from additional sales of securities in Maiden Lane III LLC enabled the repayment of AIG's equity contribution plus accrued interest and provided residual profits to the FRBNY. On August 23, 2012, ML III LLC sold all remaining securities. Subsequent to the repayment of ML III LLC's liabilities to the FRBNY and AIG, net proceeds from sales of the securities, as well as cash flow the securities generated while held by ML III LLC, provided a net gain of approximately $6.6 billion for the benefit of the Government.  The gain, however, should have been approximately $6.5 billion higher if Moody's had not interfered in the restructuring of this transaction.

214.    The FRBNY created ML II LLC to purchase AIG's RMBS while ML III LLC purchased the CDOs to which AIG was exposed.  Both structures were capitalized by a Senior Loan from FRBNY and an "equity" interest from AIG. However, in order to get the funds for its contribution, AIG had to borrow additional funds from the FRBNY. As a result, ML III LLC was funded entirely with Government money.

215.    Even though the Government provided all of the financing, Moody's demanded that AIG have an "upside" upon completion of the transactions. Moody's had no legitimate basis for making its decision whether to downgrade AIG contingent on AIG receiving a financial gain from its bailout.  After the FRBNY's senior loan and AIG's equity were paid off, the remaining residual was split between FRBNY and AIG. The distribution of the residual amounts were split five-sixths (5/6) to FRBNY and one-sixth (1/6) to AIG for MLII and two-thirds (2/3) to FRBNY and one-third (1/3) to AIG for MLIII.  As an FRBNY vice-president stated, "the split between the residual … was motivated by the desire of the credit rating agencies to see AIG maintain a portion of the upside of the assets being put into the SPV, so that the losses in the assets were not

being crystalized at the bottom of the market without any hope for any recovery." E-mail from James Mahoney to Joyce Hansen (Nov. 17, 2008).

216.    Moody's threats succeeded despite FRBNY's initial decision that AIG receive "no upside" from ML III LLC.  Email from Paul Whynott (October 10, 2008).

217.    The FRBNY's decision to split the residual amount with AIG was made after Moody's threat to downgrade AIG and after the Government made its initial investment in AIG of approximately $85 billion.  A downgrade of AIG's credit at that time would have caused the Government to lose most if not all of that money.  At the time, the staff of the Federal Reserve Board believed that:

> A downgrade of AIG's senior unsecured debt would pose significant new liquidity problems for AIG and likely would adversely impact the ratings, value and operations of the company's principal insurance subsidiaries. For example, it is estimated that a downgrade to BBB would require an additional $42 billion in liquidity to meet collateral calls and termination events on the exposures held by AIGFP alone. The liquidity pressures resulting from a downgrade could well lead to the insolvency and bankruptcy of AIG. … A bankruptcy by AIG also likely would significantly reduce the value of AIG's assets, including the stock of its regulated insurance subsidiaries, which currently serve as collateral for the September [2008 FRBNY bailout] Facility.

Memorandum from the Staff of the Federal Reserve to the Board of Governors of the Federal Reserve at 5 (Nov. 6, 2008) (footnote omitted).

218.    Not only did the Government face the prospect of losing its initial $85 billion investment, AIG would face bankruptcy, frustrating the purpose of the Government's bailout.

219.    During an October 31, 2008 call, Moody's communicated to the FRBNY that a downgrade of AIG's credit rating was likely. Despite the dire condition of the U.S. financial system, Moody's primary concern was benefitting itself and AIG. A FRBNY official informed her colleagues about Moody's concerns, stating, in part, the following:

> The RMBS and CDO portfolio solutions (the FRBNY SPVs) lock in losses, forcing the company to absorb a substantially greater loss relative to what Moody's expected the

ultimate losses on this portfolio to be. Over the weekend, we will be reviewing our options here, including the upside sharing arrangements in the structure.

E-mail from Sarah Dahlgren to Tony Ryan, *et al.* (Nov. 1, 2008).

220.    Moody's statement that it expected the losses on AIG's portfolio to be much lower was knowingly false.  The Moody's credit committee memorandum for AIG showed that Moody's calculation of the "expected ultimate losses" on AIG's portfolio were derived using the discredited Chris Mann model to determine the expected losses on the AIG portfolio, and Moody's knew that the expected losses were much higher.  Moody's recklessly disregarded a number of realistic evaluations of CDO expected losses used by Moody's which were similar to or greater than the 50% losses AIG would "lock in" through ML II LLC an ML III LLC.  In all, Moody's knowingly disregarded four other internal sources of more accurate analyses of expected losses in order to justify an "upside" for AIG.

221.    For example, Moody's Banking Group had a much more realistic view of the impact that RMBS and CDOs could have on financial institutions with exposure to these securities.  Shortly before the AIG bailout in September 2008, Moody's affirmed the ratings of Merrill Lynch & Co., Inc. ("MER") and its subsidiaries on July 28, 2008, after a transaction where MER recorded losses of approximately 50% on its CDO portfolio, because "the amount of loss associated with this transaction is within the range of loss tolerance that Moody's considered in its MER ratings" and "Moody's nonetheless views it as a positive step in de-risking MER's balance sheet and one that results in a significant reduction of its most problematic exposures." Moody's Financial Institutions Group stated that the "CDO sales and hedge unwinds reduce uncertainty regarding some of MER's riskiest positions, which benefits bondholders."  With respect to AIG, the Moody's Insurance Group, which along with the Banking Group was a subgroup under Moody's Global Financial Institutions Group, was taking an entirely different

approach.   In November 2008, AIG was "de-risking" its CDO and CDS portfolio to the Government, and there could be no clearer "reduction of its most problematic exposures."

222.    On information and belief the approach used to calculate the "tolerable" losses for MER, was also considered by the AIG credit committees until February 2008.   It was then abandoned as the Moody's Banking Group increased the loss projections it was using for RMBS and CDOs in favor of the Chris Mann model.

223.    The statement also ignored the fact that the ratings on AIG's CDOs were false, that the Rouyer Model provided much higher expected ultimate losses and that Relator Kolchinsky provided Moody's with loss estimates based on widely accepted market-based criteria.

224.    Additionally, Moody's also disregarded the warnings of Mark M. Zandi, the chief economist of Moody's Analytics, which is a subsidiary of Moody's Corp. In the September 2008 issue of Regional Financial Review, Moody's published a research paper entitled "When Will It End?" by Dr. Zandi.   The paper set out to calculate the losses to the financial system from a number of financial products.   For CDOs, the assumed loss rate was 64.5%, which is almost 15% higher than the losses being "locked in" by ML III LLC.   By Dr. Zandi's calculation, AIG was getting a sweetheart deal.

225.    Nevertheless, Moody's false statement, combined with a downgrade threat, forced the Government to receive approximately $3.3 billion less than it would have from the residual payments made by ML II LLC and ML III LLC.

226.    In addition to protecting AIG, one of its largest clients, Moody's positioned itself to earn additional fees at the height of the crisis.   Moody's failed to apply the JDA analysis, and conditioned its decision not to downgrade AIG's credit rating on the requirement that AIG use

one of Moody's ancillary services, called the Rating Assessment Service ("RAS"). RAS is designed to be "an accommodation to issuers who are considering a complex or significant transaction in a limited time frame and want us to devote more significant resources to the assignment than would normally occur." Moody's charges a separate fee for the service. Moody's forced AIG to engage it to perform a RAS to confirm the outcome of the November 2008 restructuring, rather than simply recognizing that, pursuant to the JDA analysis, the Government's equity ownership and credit facility was sufficient to maintain AIG's credit rating.

227.    "[T]hreatening to modify a credit rating or otherwise departing from its adopted systematic procedures and methodologies in determining credit ratings, based on whether the obligor … purchases any other service or product of the [rating agency]" is a "prohibited practice" for purposes of 15 U.S.C. § 78o-7(i)(1)(C) (2006).

228.    Moody's inability to manage its conflicts of interest related to a massive client – AIG – cost the Government billions in lost interest and upside. Moody's knowingly made and caused to be made false statements about its objectivity and credit ratings to decrease obligations to transmit money to the Government.

## VII.   MOODY'S MATERIAL MISREPRESENTATIONS CONCERNING ITS INDEPENDENCE AND LACK OF CONFLICTS OF INTEREST

### A.   DECEMBER 2004: INTERNATIONAL ORGANIZATION OF SECURITIES COMMISSIONS ("IOSCO") ADOPTS MODEL CODE OF CONDUCT

229.    As a result of the Enron and WorldCom debacles of 2001, the International Organization of Securities Commissions ("IOSCO"), of which the SEC is a member, published a model code of conduct for credit rating agencies, The IOSCO Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code"). The IOSCO Code was the outcome of "two years of collaborative effort by global authorities, the credit rating industry and credit market participants."

230.    As part of the process leading to what became the IOSCO Code, IOSCO surveyed/consulted with the credit rating agencies and issued a preliminary technical report on its findings in September 2003. The IOSCO September 2003 Technical Report stated:

> Perhaps the single greatest concern facing the CRAs [Credit Rating Agencies] is identifying and addressing potential and actual conflicts of interest that may inappropriately influence the rating process.

231.    At the same time, the IOSCO developed and published a "Statement of Principles Regarding the Activities of Credit Rating Agencies" (the "IOSCO Principles"). The IOSCO Principles put the issue of independence of credit rating agencies ("CRAs") front and center, and stated in relevant part:

**PRINCIPLES FOR THE ACTIVITIES OF CREDIT RATING AGENCIES**

**Quality and Integrity of the Rating Process**

**1.    CRAs should endeavor to issue opinions that help reduce the asymmetry of information among borrowers, lenders and other market participants.**

1.1    CRAs should adopt and implement written procedures and methodologies to ensure that the opinions they issue are based on a fair and thorough analysis of all relevant information available to the CRA, and that CRA analysts perform their duties with integrity. CRA rating methodologies should be rigorous, systematic, and CRA ratings should be subject to some form of validation based on historical experience.

. . . .

**Independence and Conflicts of Interest**

**2.    CRA ratings decisions should be independent and free from political or economic pressures and from conflicts of interest arising due to the CRA's ownership structure, business or financial activities, or the financial interests of the CRA's employees. CRAs should, as far as possible, avoid activities, procedures or relationships that may compromise or appear to compromise the independence and objectivity of the credit rating operations.**

2.1     CRAs should adopt written internal procedures and mechanisms to (1) identify, and (2) eliminate, or manage and disclose, as appropriate, any actual or potential conflicts of interest that may influence the opinions and analyses CRAs make or the judgment and analyses of the individuals the CRAs employ who have an influence on ratings decisions. CRAs are encouraged to disclose such conflict avoidance and management measures.

2.2     The credit rating a CRA assigns to an Issuer should not be affected by the existence of or potential for a business relationship between the CRA (or its affiliates) and the Issuer or any other party.

232.    At all times material hereto, Moody's represented to investors and the public that it was operating in accordance with the IOSCO Principles. For example, in a report Moody's published on April 12, 2006 on its own code of conduct, Moody's stated that "Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code. . . ." Moody's made similar misrepresentations in, *inter alia,* its Forms 10-K for 2005 and 2006, its annual reports for 2005 and 2006, and in its own Code discussed herein.

233.    Between September 2003 and December 2004, the IOSCO Principles were transformed with the input of credit rating agencies (including Moody's) into a code of conduct that would function as a "more specific and detailed code of conduct giving guidance on how the Principles could be implemented in practice." The first section of the IOSCO Code was devoted to principles and standards of business conduct intended to enforce "The Quality and Integrity of the Rating Process." To that end, the IOSCO Code stated that credit rating agencies

should adopt, implement and enforce written procedures to ensure that the opinions it disseminates are based on a thorough analysis of all information known to the CRA that is relevant to its analysis according to the CRA's published rating methodology.

234.    The second section of the IOSCO Code was devoted to principles and standards of business conduct intended to enforce "CRA Independence and the Avoidance of Conflicts of

Interest." As the IOSCO Code explained, maintaining independence from the Issuers (who paid the credit rating agencies for their ratings) was "vital" to ensuring "the integrity of the rating process":

> [T]he essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process. IOSCO members recognize that credit ratings, despite their numerous other issues, exist primarily to help investors assess the credit risks they face when making certain kinds of investments. Maintaining the independence of CRAs vis-á-vis the Issuers they rate is vital to achieving this goal.

235.    Moody's, however, misrepresented to investors and the public that at all times material hereto it was operating in accordance with the IOSCO Principles and Code. For example, a press release Moody's published on April 12, 2006 quoted Jeanne M. Dering, its Executive Vice President for Global Regulatory Affairs and Compliance:

> "Our support for the IOSCO Code stems, in large part, from our commitment to be a useful and responsible participant in the global capital markets and our belief that the IOSCO principles represent sound business practices for the rating agency industry," said Jeanne M. Dering, Executive Vice President, Global Regulatory Affairs and Compliance, Moody's Corporation. Ms. Dering added, "We also believe that greater transparency around what we do and how we do it will enhance market understanding of, and confidence in, our credit ratings."

**B.    MOODY'S FAILED TO COMPLY WITH ITS OWN CODE OF PROFESSIONAL CONDUCT**

236.    A material part of Moody's Form NRSRO application was its Code. The Code, first adopted in June 2005 and later revised in October 2007, purportedly described and governed Moody's conduct of its rating operations. Moody's Code states, in relevant part:

> In order to enhance market understanding and confidence in [Moody's] credit ratings, [Moody's] has adopted this Code of Professional Conduct (the "Moody's Code" or "Code"). **Through this Code, Moody's seeks to protect the integrity of the rating process. . . .**

## II.        What Are Credit Ratings?

. . . In the credit rating process, [Moody's] maintains independence in its relationships with Issuers and other interested entities. . . . Nor does Moody's act as an advisor to the Issuers it rates. [Moody's] may comment on the potential credit implications of proposed structural elements of a security, but [Moody's] does not participate in the actual structuring of any security under consideration for a Credit Rating.

As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, [Moody's] retains complete editorial control over the content of its Credit Ratings, credit opinions, commentary, and all related publications. . . .

## III.        The Provisions

## 1.        Quality and Integrity of the Rating Process

As described in the IOSCO Principles, [Moody's] will endeavor to provide forward-looking opinions in the relative creditworthiness of Issuers of debt and debt instruments in order to help reduce the information asymmetry that exists between those Issuers and potential purchasers of their debt.

. . . .

1.3        In assessing an Issuer or obligation's creditworthiness, Analysts involved in the preparation or review of any Credit Rating action will use [Moody's] methodologies. Analysts will apply a given methodology in a consistent manner, as determined by [Moody's].

**Quality of the Rating Process**

1.4        … Credit Ratings will reflect consideration of all information known, and believed to be relevant, by the applicable [Moody's] Analyst and rating committee, in a manner generally consistent with [Moody's] published methodologies. In formulating Credit Ratings, [Moody's] will employ Analysts who, individually or collectively, have appropriate knowledge and experience in developing a rating opinion for the type of credit being analyzed.

. . . .

1.6        [Moody's] and its Analysts will take steps to avoid issuing any credit analyses, Credit Ratings or reports that knowingly contain

misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation.

1.7 [Moody's] will invest resources sufficient to carry out high-quality credit assessments of Issuers or obligations. When deciding whether to rate or continue rating an obligation or Issuer, [Moody's] will assess whether it is able to devote sufficient personnel with appropriate skills to make a proper rating assessment, and whether its personnel likely will have access to sufficient information needed in order to make such an assessment.

1.8 [Moody's] will organize its rating committees to promote continuity and avoid bias in the rating process

**B.    Monitoring and Updating**

1.9    Except for Credit Rating that clearly indicates that they do not entail ongoing surveillance, once a Credit Rating is published, [Moody's] will monitor the Credit Rating on an ongoing basis and update it by:

1.9.1   periodically reviewing the creditworthiness of the Issuer or other relevant entity or debt or debt-like securities;

1.9.2   initiating a review of the status of the Credit Rating upon becoming aware of any information that might reasonably be expected to result in a Credit Rating action (including termination of the Credit Rating), consistent with the applicable rating methodology; and

1.9.3   updating on a timely basis the Credit Rating, as appropriate, based on the results of such review.

**C.    Integrity of the Rating Process**

. . . .

1.12    [Moody's] and its Employees will deal fairly and honestly with Issuers, investors, other market participants, and the public.

1.13    [Moody's] will hold its Employees to high standards of integrity. [Moody's] will not knowingly employ any individuals with demonstrably compromised integrity.

1.14    [Moody's] and its Analysts will not, either implicitly or explicitly, give any assurance or guarantee of a particular Credit Rating prior to a rating committee. This does not preclude [Moody's] from developing

provisional assessments used in structured financings or similar transactions.

1.15    The Office of Compliance will be responsible for assessing adherence to the various procedural provisions of this Code. . . .

## 2.    Independence and Avoidance of Conflicts of Interest

### A.    General

2.1    [Moody's] will not forbear or refrain from taking a Credit Rating based on the potential effect (economic, political, or otherwise) of the action on [Moody's], an Issuer, an investor, or other market participant.

2.2    [Moody's] and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3    The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.

2.4    The Credit Rating [Moody's] assigns to an Issuer or obligation will not be affected by the existence of, or potential for, a business relationship between [Moody's] (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship.

2.5    [Moody's] will separate, operationally and legally, its Credit Rating Services and Analysts from any other businesses . . . that may present a conflict of interest. . . .   For Ancillary Services that do not necessarily present conflicts of interest with [Moody's] Credit Rating Services, [Moody's] will have in place procedures and mechanisms designed to minimize the likelihood that conflicts of interest will arise, or to appropriately manage those conflicts that may arise. . . .

### B.    Procedures and Policies

2.6    [Moody's] will adopt written internal procedures and mechanisms to:

2.6.1    identify; and

2.6.2    eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses [Moody's] makes or the judgment and analyses of Employees who have an influence on Credit Ratings decisions.

2.7      [Moody's] disclosures of known actual and potential conflicts of interest will be complete, timely, clear, concise, specific and prominent. Such disclosures will be made through moody's.com.

. . . .

3.6      [Moody's] will publish sufficient information about its procedures, methodologies and any assumptions that deviate materially from information contained in the Issuer's published financial statements so that financial market professionals can understand how a Credit Rating assessment was made.

3.13      [Moody's] will publicly disclose via press release and posting on moodys.com any material modifications to its rating methodologies and related significant practices, procedures, and processes. Where feasible and appropriate, disclosure of such material modifications will be made subject to a "request for comment" from market participants prior to their implementation. [Moody's] will carefully consider the various uses of Credit Ratings before modifying its rating methodologies, practices, procedures and processes.

. . . .

### 4.      Enforcement and Disclosure of the Code of Conduct and Communication with Market Participants

4.1      Management will responsible for the implementation and the enforcement of the [Moody's] Code. The Office of Compliance will annually review and assess the efficacy of such implementation and enforcement.

4.2      The provisions of this Code are derived from the IOSCO Principles and the IOSCO Code. However, [Moody's] made certain modifications to more closely correspond with [Moody's] business mode and practices. Such modifications will be specifically identified and explained in a report that [Moody's] will publish annually outlining compliance with the [Moody's] Code and explaining any deviations that may exist between the [Moody's] Code and the IOSCO Code.

### C.      BREACHES OF THE MOODY'S CODE

237.   None of the above-quoted portions of Moody's Code representations were true, and together the misrepresentations created an impression of a state of affairs at Moody's that differed materially from the one that actually existed. With respect to the ratings of CDOs, AIG,

the Monolines, and securities guaranteed by AIG and the Monolines, the points below summarize multiple violations of Moody's Code, among others:

- Contrary to Moody's own definition of a "Credit Rating" in section 1 of the Code, Moody's did not publish its "current opinion regarding the relative future creditworthiness of an entity, a credit commitment, a debt or debt-like security, as determined by a rating committee and expressed using its established Aaa to C alpha-numeric rating scale…." The information publicized by Moody's during the relevant time period as purported "credit ratings" did not reflect its opinion of the credit worthiness of securities in question and were not "Credit Ratings" as defined in the Moody's Code.

- Contrary to the representations made at Moody's Code section 1.1, Moody's ratings did not always reflect "all information known and unknown and believe to be relevant," but in fact were materially-debased by extraneous considerations and pecuniary influences in structured finance so that Moody's ratings failed to consider or reflect relevant information actually known or in plain view to Moody's and were thus improperly inflated.

- Contrary to the representation made at Moody's Code section 1.2, the methodology for rating AIG, the Monolines and securities insured by the Monolines, was not rigorous and systematic due to the substitution of the Rouyer Model with the Chris Mann model.

- Contrary to the representation made at Moody's Code section 1.3, Moody's failed to use Moody's methodologies to assess CDOs' creditworthiness. Not only did Moody's ignore its published methodology on CDO surveillance, but it even failed to use the new assumptions it promised to use on its October 12, 2007 public teleconference. In relation

to the ratings of AIG after the Government's September 2008 rescue, Moody's failed to apply its JDA methodology.

- Contrary to the representations made at Moody's Code section 1.4, the ratings during the ratings marathon were not determined by a ratings committee. The committees that were convened did not have any discretion in determining the credit ratings. The results were determined by Moody's management and delivered to the committees to be "rubber-stamped." Furthermore, Moody's management held additional Aaa committees to protect the coveted Aaa ratings to overrule the initial ratings committee. Additionally, contrary to the representations made at Moody's Code section 1.4, Moody's credit ratings did not reflect consideration of all information known, and believed to be relevant, by the applicable Moody's analyst and rating committee, in a manner generally consistent with Moody's published methodologies. During the ratings marathon regarding ABS CDOs, any published ratings not consistent with Run C did not reflect all the known information about the ongoing downgrades in RMBS and CDOs. Additionally, the credit ratings with respect to AIG, the Monolines and securities guaranteed by the Monolines were not determined by a rating committee, but by Moody's management who forced the Insurance group to use a corrupted model that was developed outside the group. With respect to AIG, Moody's also failed to use relevant information about the potential losses on the AIG CDO portfolio developed by the Relator, the Rouyer model, the Banking Group and Moody's Analytics.

- Contrary to the representation made at Moody's Code section 1.6, the published purported credit ratings knowingly contained misrepresentations about the credit quality of the securities and were knowingly false and misleading. In addition, Moody's

statements to the Government about its expected losses on AIG's RMBS and CDO were knowingly false and misleading.

- Contrary to the representations made at Moody's Code section 1.9 (and many like representations in its Form NRSRO certification and elsewhere), Moody's failed to monitor credit ratings on an ongoing basis, and failed to update its rating methodology to reflect what were by then in plain view serious default risks in structured finance instruments laden with subprime mortgages. Not only were CDO credit ratings not updated on a timely basis during the ratings marathon, eventual downgrades were delayed and were not severe enough compared to the downgrades of the underlying RMBS, resulting in rating actions that were "slow–walked."

- Contrary to the representations made at Moody's Code section 1.12, Moody's had as a result of extraneous considerations and pecuniary influences, compromised its independence and capitulated to Issuers interests, thus causing Moody's to fail to "deal fairly and honestly with . . . investors, other market participants, and the public" by distributing to them inflated and deficient credit ratings that failed to consider or reflect information actually known to Moody's or in plain view to Moody's. In addition, with regard to AIG and the Monolines, Moody's failed to deal fairly and honestly when it failed to disclose that the real reason for substituting the Chris Mann model for the Rouyer Model was to artificially increase ratings. Moody's also failed to deal honestly with the Government after its September 2008 bailout of AIG, by failing to apply appropriate methodologies and by using the threat of a downgrade to extract concessions from the Government.

- Contrary to the representations made at Moody's Code sections 2.1, 2.3, and 2.4, Moody's credit rating actions on CDOs, AIG, the Monolines and securities insured by AIG and the Monolines were *not* influenced only by factors relevant to the credit assessment, but were *in fact* influenced by extraneous considerations and pecuniary influences; specifically, with respect to section 2.3, the tactics used by Moody's management in the ratings marathon – half-way downgrades, Aaa committees and other adjustments – had absolutely no factors relevant to a credit assessment of the relevant CDOs. Moreover, the ratings on AIG, the Monolines and securities guaranteed by AIG and the Monolines were influenced by management's desire to placate financial institutions that would be hurt by any downgrades.  Specifically, with respect to AIG, Moody's threatened to modify its ratings based on a deviation from its procedures and methodologies (JDA) unless AIG engages it in an ancillary service.

- Contrary to the representations made at Moody's Code section 2.2, Moody's maintained only the appearance of independence and objectivity in order to deceive those who would rely on its credit ratings, including the public and the Government.  With respect to AIG, Moody's did not act in an objective and independent manner, instead choosing to advocate for its client – AIG.  Moody's placed itself in a position where it was directly demanding concessions from the Government on behalf of AIG.

- Contrary to the representations made at Moody's Code section 2.5, Moody's did not appropriately manage the conflicts of interest with respect to the provision of RAS to AIG.

- Contrary to the representations in Moody's Code sections 1.15 and 4.1, neither Moody's "Office of Compliance" nor Moody's "Management" implemented the elements embodied in the Code into Moody's actual business conduct.

- Contrary to the representations in Moody's Code section 3.6, Moody's did not publish sufficient information about its procedures, methodologies and any assumptions that deviate materially from information contained in Issuers' published financial statements so that financial market professionals can understand how a Credit Rating assessment was made, because the half-way downgrades, Aaa committees and other adjustments used in the ratings marathon as well as Moody's failure to use its published methodology were not disclosed.

- Contrary to the representations in Moody's Code section 3.13, Moody's did not publicly disclose material modifications to its rating methodologies and related significant practices, procedures, and processes, because the half-way downgrades, Aaa committees and other adjustments used in the ratings marathon were not disclosed and neither was the true rationale and impact of the substitution of the Chris Mann model for the Rouyer Model.

- Contrary to the representations made at Moody's Code section 4.3, Moody's failed to use "good faith efforts" to implement Code standards into its actual business conduct.

- Contrary to the representations made in the preamble to Moody's Code, Moody's did not seek through the Code "to protect the integrity of the rating process," but rather only gave the appearance of such integrity with no intention that this would be how it actually conducted its business.

- Contrary to the representation made at Moody's Code section 1.13, Moody's did "knowingly employ any individuals with demonstrably compromised integrity."

### D.  MOODY'S FURTHER MISREPRESENTATIONS

238.   At various times during the relevant period, Moody's detailed a variety of documents that contained numerous representations as to, *inter alia,* Moody's independence, objectivity, trustworthiness, high standards, high-quality credit ratings, reputation, code of conduct, adherence to its code of conduct and to the IOSCO Code and Principles, which gave the impression of how Moody's conducted its business which differed materially from the truth.

### 1.   Moody's Annual Report for 2005

239.   On or about March 23, 2005, Moody's published and distributed its Annual Report to Shareholders for 2005 (the "2005 Annual Report"). The 2005 Annual Report stated, in relevant part:

> Dear Shareholders:
>
> PRESERVING TRUST AND PURSUING INNOVATION FOR CONTINUED GROWTH
>
> First, however, I wish to address these important questions briefly at a more fundamental level.
>
> If one considers the "raw materials" that support our business, two stand out: the proliferation of credit risk-sensitive instruments in the global marketplace, and the market's trust in and reliance upon Moody's. It is not venturesome to predict that forces such as globalization and disintermediation of financial markets, together with advances in information and financial technology will drive continued growth in the supply and diversity of credit instruments.
>
> **That leaves trust. Moody's is committed to reinforcing among all relevant stakeholders – debt Issuers, the investment community, employees, governmental authorities and shareholder – a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business...**

Our operating, financial and regulatory strategies must, in essence, be strategies of trust that flow from the talent of our employees and the culture of our company. Talent in analyzing credit risk is the essential ingredient for competing in our industry, serving markets, and developing products and services that meet the ever-increasing expectations for our business. When combined with our commitment to transparency in what we do and how we do it, talent and culture form a basis for trust in Moody's that will be deserved and durable.

Operating Strategy. Our core operating strategy is to position Moody's to take advantage of growth in credit markets driven by globalization, disintermediation and financial technology.

• Globalization and disintermediation of financial markets introduce new borrowers and investors to each other. Moody's independent and authoritative credit opinions, research and analytical tools serve as important catalysts for creating efficiency in this capital formation process.

• The adoption of structured finance technology in credit markets globally increases the range of financial options for debt Issuers, permitting less creditworthy borrowers to issue high-quality securities. Moody's plays an essential role in assessing the risks and protections associated with these complex transactions and communicating this information to the investment community.

. . . .

• Regulatory Strategy. . . . **The principal concerns of both U.S. and international authorities are the levels of independence, transparency and compliance with regulatory expectations practiced by major rating agencies. In July 2005, Moody's adopted its Code of Professional Conduct in response to the model international code. We also announced our intention to report annually on our implementation of our Code of Professional Conduct for review by relevant authorities and market participants. . . . [W]e believe that Moody's has responded appropriately to regulatory interests and concerns.** We continue to seek mechanisms and opportunities to enhance our communications with regulators, and to satisfy authorities that the position of trust occupied by Moody's . . . is well placed and well serves global capital markets.

. . . .

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer.

240.   McDaniels' statement in the 2005 Annual Report were materially false and misleading in creating the impression of a state of affairs at Moody's – including its fundamental

business conduct and business strategies – that differed materially from the one that actually existed. In particular,

- Contrary to the representations concerning the fundamental importance of "independence" in Moody's business conduct, business strategy and regulatory affairs, as a result of extraneous considerations and influences introduced by operation of the Issuer pays model in structured finance, Moody's independence was systematically undermined and its rating methodologies systematically debased so that it failed to consider or reflect in its rating information actually known to Moody's, in plain view to Moody's. As a result, its credit ratings did not reflect credit realities that ultimately caused the financial meltdown and the Government's bailout of AIG.

- Contrary to the representations concerning the adequacy of the steps Moody's had taken to respond to regulator concerns over its independence, such as the formulation and adoption of the Moody's Code, the steps it took were inadequate and themselves false and misleading because its actual business conduct differed materially from the Code representations. Moody's failures with respect to its independence were undisclosed and misrepresented at all times material hereto.

### 2.     Moody's Form 10-K for 2005

241.    On March 1, 2005, Moody's filed with the SEC its Form 10-K (the "2005 Form 10-k"). The 2005 Form 10-K stated, in relevant part:

> **The Company**
>
> Moody's Investors Service publishes rating opinions on a broad range of credit obligors and credit obligations issued in domestic and international markets, including various corporate and governmental obligations, structured finance securities and commercial paper programs. . . . Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities. **Such independent credit ratings**

**and research also contribute to efficiencies in markets for other obligations, such as insurance policies and derivative transactions, by providing credible and independent assessments of credit risk**. . . .

242.    The 2005 Form 10-K was materially false and misleading for the same reasons the 2005Annual Report was false and misleading. Namely, Moody's representations that its credit ratings were "independent" and "credible" were false and misleading. In truth, Moody's ratings were neither of these.

### 3.    Moody's April 12, 2006 Report on the Implementation of its Code of Conduct

243.    On April 12, 2006, Moody's published on its website the annual implementation report, required by Section 4.2 of Moody's Code (the "Implementation Report"). The report stated, in relevant part:

### II.    Implementation of Moody's Code

Through the implementation of the Moody's Code, we seek to protect the quality, integrity and independence of the rating process, to ensure that investors and Issuers are treated fairly . . . . We believe that this will enhance market understanding of and confidence in Moody's Credit Ratings.

. . .

### B.    Independence and Management of Conflicts of Interest

In 2005, Moody's derived approximately 87% of our revenue from Issuer payments for Credit Ratings. . . . [W]e recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process . . . . To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee. . . .

. . .

These restrictions further reinforce Moody's objective to avoid any actual or apparent conflicts of interest.

244.    The Implementation Report was false and/or misleading, for all the same reasons as were its 2005 Annual Report and 10-K, and created the impression of a state of affairs at Moody's that differed materially from the one that actually existed at Moody's.

### 4.    Moody's Form 10-K for 2006

245.    On March 1, 2007, Moody's filed with the SEC its Form 10-K for 2006 (the "2006 Form 10-K"). The 2006 Form 10-K made the identical representations concerning, *inter alia*, Moody's' provision of purportedly "independent," "credible" credit ratings. These representations, as were the representations in the 2005 Form 10-K were materially false and misleading. The 2006 Form 10-K created the false and misleading impression that Moody's had, through implementation of its Code and/or through other means, addressed objectives of the IOSCO Code, when in fact the opposite was the case.

### 5.    Moody's Annual Report for 2006

246.    On March 22, 2006, Moody's published and distributed its Moody's Annual Report Shareholders for 2006 (the "2006 Annual Report"). The 2006 Annual Report stated, in relevant part:

**ETHICS, ATTITUDE, INVESTMENT AND INNOVATION**

Last year I wrote that preserving and reinforcing the trust that stakeholders – debt Issuers, the investment community, employees, governmental authorities and shareholders – have in Moody's is the foundation for our long-term success.

Moody's is a "standards" business: public and private sector organizations worldwide rely on the accuracy, stability, consistency and independence of our opinions and services for the contribution they make to fair and efficient financial markets. For Moody's to continue to meet or exceed these expectations requires that we embrace the demand for trust from several perspectives:

**Ethics and Attitude.** Moody's must demonstrate expertise in developing its credit opinions, and must apply those opinions consistently, fairly and objectively. These attributes are points on the compass of ethics for this

business and traits, I am proud to observe, that are comprehensively embodied by Moody's employees . . . [S]ome will not find independence and "customer focus" to be an intuitive pairing. The nature of an independent expert is to communicate information that will be influential and that, from time to time, recipients will not welcome. To do so with the highest degree of professionalism and with attention to and respect for the perspectives of stakeholders being served is, however, both intuitive and good business. . . .

**I firmly believe that Moody's business stands on the "right side of history"** in terms of the alignment of our role and function with advancements in global capital markets. . . .

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer

## MOODY'S IS AN ESSENTIAL COMPONENT OF GLOBAL CAPITAL MARKETS

We provide opinions, research and analysis about the creditworthiness of bonds and other debt obligations issues by companies, financial institutions, governments and other borrowers worldwide. The commitment and expertise that Moody's brings to credit analysis contributes to stable, transparent and integrated financial markets. **What we strive to accomplish is straight-forward: to protect the integrity of credit.**

**Moody's have benefitted and should continue to benefit from favorable long-term capital market trends, including . . . increased adoption of financial technology, primarily through asset securitization. . . .**

## REGULATORY AND COMPLIANCE STRATEGY

In addition to communicating with regulatory authorities and policymakers, Moody's also must develop, implement and demonstrate appropriate policies and compliance standards to meet regulatory expectations. These challenges particularly affect our credit ratings business. **Consequently, we are concentrating appropriate resources and effort on reinforcing our processes and infrastructure to respond to new reporting and compliance requirements associated with additional oversight. . . .**

**. . . The [Moody's] Code of Professional Conduct, which Moody's introduced in 2005 pursuant to the model international code, seeks to**

**enhance marketing understanding and confidence in our credit ratings by setting out:**

**• Moody's commitment to maintaining the quality and integrity of the rating process; [and]**

**• The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest. . . .**

247.    The 2006 Annual Report was, in substance, identical to the representations made in the 2005 Annual Report, and materially false and/or misleading for the same reasons

## VIII.  MOODY'S LIED ON ITS APPLICATION FOR CERTIFICATION AS A NATIONALLY RECOGNIZED STATISTICAL RATING ORGANIZATION ("NRSRO")

248.    The failures with respect to Enron and WorldCom, among other U.S. companies, brought scrutiny on the credit rating agencies, leading to the signing into law of the Credit Rating Agency Reform Act of 2006 ("CRARA"), 15 U.S.C. § 78o-7, enacted on September 29, 2006.

249.    Consistent with SEC's concern that credit rating agencies like Moody's must voluntarily qualify to ensure that they would issue credible and reliable ratings, CRARA required credit rating agencies to register application materials with the SEC in order to be considered for designation as Nationally Recognized Statistical Rating Organizations ("NRSROs") (15 U.S.C. § 78o-7(a)). "Required information" included "the procedures and methodologies that applicant uses in determining credit ratings" (15 U.S.C. § 78o-7a(1)(B)(ii)), "whether or not the applicant has in effect a code of ethics, and if not, the reasons therefore" (15 U.S.C. § 78o-7a(1)(B)(v)), "any conflict of interest relating to the issuance of credit ratings by the applicant" (15 U.S.C. § 78o-715 U.S.C. § 78o-7a(a)(B)(v)), and, on a confidential basis, the credit rating agency's 20 largest paying customers (15 U.S.C. § 78o-7a(1)(B)(viii)).

250.    The NRSRO certifications were required to be materially correct (15 U.S.C. § 78o-7(b)). Registrants also were required to submit annual certifications of the accuracy of their

registration materials, and, should their materials become "materially inaccurate", registrants were required to amend their registrations to ensure material accuracy. 15 U.S.C. § 78o-7(b).

251.    CRARA also required that NRSROs were to "establish, maintain and enforce written policies and procedures reasonably designed . . . to address and manage any conflicts of interest":

> (h) Management of conflicts of interest
>
> (1) Organization policies and procedures
>
> Each nationally recognized statistical rating organization shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of the business of such nationally recognized statistical rating organization and affiliated persons and affiliated companies thereof, to address and manage any conflicts of interest that can arise from such business.

### A.    MOODY'S JUNE 26, 2007 FORM NRSRO APPLICATION

252.    On or about June 26, 2007, Moody's voluntarily filed with the SEC, on Form NRSRO pursuant to CRARA, its Application for Registration as an NRSRO (the "NRSRO Application").

253.    On September 24, 2007 Moody's became a registered NRSRO pursuant to the new CRARA rules.

254.    Moody's furnished an NRSRO registration application that contained the information concerning the procedures and methodologies it used to determine credit ratings. Moody's Form NRSRO Application stated, in relevant part:

> **Moody's Investors Service**
> **Exhibit 2**
> **Procedures and Methodologies Used to Determine Credit Ratings**
>
> **1. Credit Rating Process**
>
> ….

c.     **Interacting with the Management of an Issuer**

… As discussed in Exhibits 6 and 7, MIS recognizes that the "Issuer Pays" model creates a potential conflict of interest that must be effectively managed. One important measure we have adopted in this regard is to prohibit analysts without management responsibility from discussing fees or payment matters with Issuer. . . .

g.     **Monitoring of Credit Ratings**

Once a credit rating has been published, MIS will monitor the credit rating, as deemed appropriate, on an ongoing basis and will modify the credit rating as necessary in response to changes in our opinion of the creditworthiness of the Issuer or issue…

h.     **Withdrawal of Credit Ratings**

If MIS believes we have inadequate information to provide an informed credit rating to the market, we will exercise our editorial discretion and will either refrain from publishing a rating or withdraw an outstanding rating. . . .

**Moody's Investors Service**
**Exhibit 5**
**Code of Ethics**

MIS has following policies to establish standards of ethical behavior for employees of MIS. These policies can be found on our website via the web addresses listed below

- MIS Code of Professional Conduct
        www.moodys.com/professional_conduct

**Moody's Investors Service**
**Exhibit 6**
**Conflicts of Interest Related to Issuance of Credit Ratings**

Moody's has identified the following types of conflicts related to the issuance of credit ratings:

1.     MIS is paid by Issuers or underwriters to determine credit ratings with respect to securities or money market instruments they issue or underwrite.

2.     MIS is paid by obligors to determine credit ratings of the obligors.

3.      MIS is paid for services in addition to determining credit ratings by Issuers, underwriters, or obligors that have paid MIS to determine a credit rating. . . .

### 3. Rating Methodologies

. . . .

b.      <u>Insurance Companies</u>

Relevant qualitative factors are tailored to the specific type of insurer . . . and may include: strategy, market position, brand and distribution; product focus; ease of access to capital; management quality, governance and risk management; accounting policy and disclosure; and the sovereign and regulatory environment.

Relevant quantitative factors are also specific to the type of insurer and may include: portfolio diversification (by geography, product/risk type, and distribution channel); asset quality (as reflected by, for example, the proportion of high risk investments and reinsurance assets); capital adequacy (as measured by capital ratios appropriate for the type of insurance and including estimates of catastrophe risk); profitability (as reflected by, for example, returns on equity, loss and expense ratios, and earning volatility); financial flexibility (as indicated by coverage and leverage ratios); reserve adequacy (as implied by ratio analysis and actuarial analysis); and liquidity risk (assessing asset and liability matching). . . .

**Moody's Investors Service**
**Exhibit 7**
**Policies to Address and Manage Conflicts of Interest**

MIS has the following policies to address and manage conflicts of interest related to the issuance of credit ratings. These policies can be found on our website via the web addresses listed below:…

● <u>MIS Code of Professional Conduct</u>
    www.moodys.com/professional_conduct

### B.   MOODY'S FORM NRSRO APPLICATION FAILED TO DISCLOSE WIDESPREAD CONFLICTS OF INTEREST AND OTHER FAILURES

255.   Moody's represented in its Form NRSRO application that (a) it was an "independent" and "objective" provider of credit ratings; (b) it had adequately disclosed, managed, and/or eliminated (as per, *inter alia,* its own Code) the potential conflicts of interest in

its Issuer-pays business model; (c) its credit ratings reflected all information known and believed to be relevant; (d) its credit ratings were influenced *only* by factors relevant to the credit assessment and *not* affected by the existence of, or potential for, a business relationship between Moody's and the entities that paid it to provide credit ratings; and (e) Moody's responses to regulators' concerns over its independence had been adequate and had sufficed to allay any concerns.

256.    None of these representations in its Form NRSRO application were true and together they created an impression of a state of affairs at Moody's that differed materially from the one that actually existed. In truth, (a) Moody's was not operating as an "independent" and "objective" provider of credit ratings; rather, Moody's independence had been systematically compromised; (b) Moody's had declined to manage, let alone eliminate, its conflicts of interest and had declined to disclose them; (c) Moody's credit ratings failed to reflect all information known and believed to be relevant, including information in plain view; (d) Moody's credit rating failures were the result of Moody's failure to consider information in plain view rather than information that would have required due diligence; and (e) Moody's credit ratings were *not* influenced only by factors relevant to the credit rating assessment and *were* affected by the existence of, or potential for, a business relationship between Moody's and the entities that paid Moody's to provide credit ratings.

257.    The "policies to address and manage conflicts of interest" mentioned in Moody's Form NRSRO were its Code, which was materially false and misleading, as well as ineffective in managing Moody's widespread conflicts of interest.

258.    Moody's Form NRSRO certification materials were thus materially inaccurate and misleading in at least the following ways: (a) Moody's failed to adequately disclose the

extent and effects of its conflicts of interest in its structured finance ratings; (b) Moody's failed
to disclose in its NRSRO certification with regard to its account of the procedures and
methodologies it used in determining credit ratings that it had omitted mention of the actual
effects that the "Issuer Pays" model had on the credit ratings it issued, and the actual link
between ratings awarded and the fees paid; (c) Moody's failure to disclose that it was routinely
failing to monitor credit ratings on an ongoing basis; (d) Moody's, in contravention of 15 U.S.C.
§ 78o-7(h), falsely certified that its Code was reasonably designed to address and manage the
conflicts of interest that arose in its business; and (e) Moody's failed to disclose that it routinely
published ratings which it did not believe to be true.

259.   17 C.F.R. § 240.17g1-6., Rule 17g-5, 240 CFR § 240.17g-5 (eff. on or about June
26, 2007), "requires an NRSRO to disclose and manage those conflicts of interest that arise in
the normal course of business of issuing credit ratings." *See* SEC Release No. 34-55857
("Oversight of Credit Reporting Agencies Registered as Nationally Recognized Statistical Rating
Organizations"). Moody's conduct in rating structured finance securities, and its certifications
concerning the same, have placed Moody's in violation of Rule 17g-5, 240 CFR § 240.17g-5.

260.   Absent a truthful Form NRSRO certification, Moody's would not have been able
to rate any of these securities. Furthermore, Moody's ratings would not have been used for
regulatory purposes such as setting risk-based capital. If it had been honest in conducting its
business, as it had certified it would be in its Form NRSRO certification, Moody's would have
published accurate ratings on hundreds of thousands of CDOs and securities guaranteed by AIG
and the Monolines.

261.   As the housing market collapsed in late 2007, in the face of criticisms about how
its ratings could have so completely missed the impending financial collapse, Moody's

responded by purging analysts and executives who warned of trouble and promoting those who helped Wall Street plunge the country into its worst financial crisis since the Great Depression. Moody's punished executives, including Relator Kolchinsky, who had questioned why the Company was risking its reputation by putting its profits ahead of providing trustworthy ratings for investment offerings. Instead, Moody's promoted executives who had headed its "structured finance" division, which assisted Wall Street in packaging loans into securities for sale to investors. It also stacked its compliance department with the people who had awarded the highest ratings to pools of mortgages that soon were downgraded to junk.

262.    Relator Kolchinsky on numerous occasions had warned the Company that its conflicts of interest in the CDO group caused its ratings to be materially inaccurate and therefore misleading. Rather than heed his warnings, the Company forced him out of his position as head of the structured finance CDO ratings unit. He was eventually constructively discharged when he refused to acquiesce to Company pressure.

263.    It was not in the short-term economic self interest of Moody's to provide accurate credit ratings for these high risk instruments because doing so would have hurt its revenues and its market share. Instead, Moody's lied to the Government to protect its business interests which had become increasingly reliant on the fees generated by issuing a large volume of structured finance ratings.

264.    Absent a truthful NRSRO eligibility certification, ratings from Moody's could not have been used for numerous regulatory purposes. Moody's false NRSRO certification caused the United States to incur billions of dollars of losses in bailing out financial institutions and in the underpayment of FDIC insurance premiums.

## IX.   MOODY'S KNOWINGLY CAUSED THE SUBMISSION OF FALSE, FRAUDULENT OR MISLEADING CLAIMS, OR FALSE RECORDS OR STATEMENTS, CONTAINED IN BANKS' REPORTING TO THE FDIC AND OTHER REGULATORS

265.    In order to fulfill their mission of prudent supervision of the banking system, federal and state agencies require banks to provide periodic reporting regarding their financial condition that depend on Moody's credit ratings. In the United States, banking is regulated by a number of federal agencies. The OCC is the primary regulator of nationally chartered banks and thrifts. During the relevant period, the OTS was the primary federal regulator of savings and loan associations. The Federal Reserve is the primary regulator of bank holding companies and state chartered banks that are members of the Federal Reserve System. Lastly, the FDIC is the primary federal regulator of all other state banks. The FDIC's primary role, however, is to insure the deposits of U.S. banks to maintain the stability of the financial system. The FDIC collects deposit insurance premiums through quarterly assessments from insured depository institutions ("IDIs") to fund the Deposit Insurance Fund ("DIF").

266.    The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), passed in the aftermath of the Savings and Loan crisis, required the FDIC to establish a risk-based assessment system, and, to implement this requirement, the FDIC adopted by regulation a system that placed institutions into risk categories based on capital levels and supervisory ratings. NSRSO-certified credit ratings are material to the determination of the applicable risk categories. The amount of deposit insurance premiums that the FDIC collects is based, in large part, on the NRSRO-certified credit ratings for the assets held by the IDI. Many IDIs held enormous positions in CDOs and included Moody's false credit ratings of those assets in their reported capital levels. These institutions also held securities issued or guaranteed by AIG and the Monolines and other entities with Moody's credit ratings that were knowingly false.

Moody's knew that IDIs relied on its credit ratings when reporting their capitalization to the FDIC and other federal regulators. Moody's credit ratings were also relied upon by state banking and insurance regulators.

267.    Moody's conduct, concealed by its false NRSRO certifications and false credit ratings, caused IDIs to hold much less capital than required by regulation, caused these institutions to file false statements with the FDIC and other regulators and caused the FDIC to collect much less in deposit insurance premiums than it would have received if the assets of IDIs were properly rated by Moody's and if Moody's disclosed its true opinion of the creditworthiness of those assets.

268.    One of the most crucial reports submitted to federal agencies is a Report of Condition and Income (also known as a "Call Report"), with requirements established by the Federal Financial Institutions Examination Council (the "FFIEC"). The FFIEC is an interagency body empowered to prescribe uniform principles, standards and report forms for the federal examination of financial institutions by the Federal Reserve, the FDIC, the OCC as well as the National Credit Union Administration ("NCUA") to make recommendations to promote uniformity in the supervision of financial institutions. Every national bank, state member bank, and insured state nonmember bank is required to file consolidated Call Reports normally as of the close of business on the last calendar day of each calendar quarter. The specific reporting requirements depend upon the size of the bank and whether it has any foreign offices. During the relevant time period, Call Reports were filed on various forms, such as Form FFIEC 031 (Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices) and Form FFIEC 041 (Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only). Together with their schedules, these forms included information that relied on

Moody's credit ratings. Additionally, bank holding companies ("BHCs") are required to submit form FR Y 9LP (parent-company-only statements) and FR Y 9C (consolidated statements) to the Federal Reserve (together, "Form FR Y 9"), which include information that is substantially similar to Forms FFIEC 031 and 041. In September 1990, several schedules were added to Form FRY 9 to allow the calculation of risk-based capital measures that relied upon Moody's credit ratings.

269.    The FDIC is an agency of the federal government, which was created in 1933 in response to the thousands of bank failures that occurred in the 1920s and early 1930s. Today the FDIC preserves and promotes public confidence in the U.S. financial system by insuring over $9 trillion in deposits. The FDIC is also the primary federal regulator of over 4,500 state chartered banks.

270.    Like any other insurance organization, the FDIC charges a premium for its insurance. Consistent with 12 C.F.R. Part 327, the assessment rate charged for deposit insurance premiums during the relevant time period ranged between 5 and 77.5 basis points of an IDI's domestic deposits, depending on an IDI's assessment risk assignment determined by the FDIC. The assessment risk assignment depended, in large part, on the IDI's Capital Group (either Capital Group 1 (Well Capitalized); Capital Group 2 (Adequately Capitalized) or Capital Group 3 (Under Capitalized)). The determination of a filer's Capital Group was not discretionary; it was based on ratios reported on Schedule RC-R (Regulatory Capital) to Form 031 or 041. During the relevant period, these ratios were based on an IDI's risk weighted assets ("RWA"), which depended on NRSRO credit ratings that were, in most cases, issued by Moody's. Publication of Moody's ratings was critical to this process because changes to an IDI's risk assignment

resulting from a change in a long-term debt issuer rating became effective as of the date the change was announced by the rating agency.

271.   Additionally, during the relevant time period, the determination of an IDI's supervisory category for large financial institutions depended in part on the long-term credit rating of the IDI itself, which, upon information and belief, would have been downgraded for many IDIs if Moody's true credit ratings regarding the risks presented by CDOs, AIG, the Monolines and municipal securities during the relevant time period had been made public.

272.   The Board of Governors of the Federal Reserve System has described the risk-based capital rules with respect to asset-backed securities, such as CDOs, in part, as follows:

> Under the general risk-based capital rules, asset-backed securities that are rated by an NRSRO are risk-weighted according to the level of the external ratings. For instance, an asset-backed security that has a long-term rating in the highest or second-highest investment grade, such as AAA or AA, receives a 20-percent risk weight; an asset-backed security that has a long-term rating one category below investment grade, such as BB, receives a 200-percent risk weight.

Board of Governors of the Federal Reserve System, *Report to the Congress on Credit Ratings* (July 2011).

273.   The Instructions for Forms FFIEC 031 and 041 issued in June 2007 provide, in part, the following:

> The risk-based capital guidelines include a ratings-based approach that sets the risk-based capital requirements for asset-backed and mortgage-backed securities and other positions in securitization transactions (except credit-enhancing interest-only strips) according to their relative risk *using credit ratings from nationally recognized statistical rating organizations*, i.e., rating agencies, to measure the level of risk…. In general, under the ratings-based approach, the risk-based capital requirement for a position in a securitization is computed by multiplying the face amount of the position by the risk weight appropriate for the external credit rating of the position.

Instructions for Preparation of Consolidated Reports of Condition and Income (FFIEC 031 and 041) at RC-R-16 (June 2007) (emphasis added).

274.   If two or more ratings of a security were available, the banks filing these forms were instructed to use the lowest rating.

275.   Moody's publication of false credit ratings on approximately $600 billion of CDOs and over $1.7 trillion of guaranteed securities beginning in fourth quarter of 2007 materially understated the riskiness of the balance sheets of IDIs such as Citibank, Bank of America, Wachovia, Regions Financial, Zions National Bank, federally insured subsidiaries of investment banks (e.g., Merrill Lynch Bank) and many others.

276.   For example, Citibank was heavily exposed to ABS CDOs and securities insured by the Monolines. On information and belief, if Moody's had published its true credit ratings for the assets held by Citibank, Citibank's capital group during the relevant period would have dropped from the "Well Capitalized" category that it reported to either "Adequately Capitalized" or "Under Capitalized."

277.   For example, changing Citibank's capital group from Capital Group 1 (Well Capitalized) to Capital Group 2 (Adequately Capitalized) in 2008 would have meant an estimated increase in annualized payments of deposit insurance premiums to the FDIC of over $100 million in one year, and changing Citibank's capital group from Capital Group 1 (Well Capitalized) to Capital Group 3 (Under Capitalized) in 2008 would have meant an estimated increase in annualized payments of deposit insurance premiums to the FDIC of over $500 million in one year.

278.   In November 2008, despite the fact that Citibank reported itself as "Well Capitalized," Citibank received extraordinary financial assistance from the Government. In order to prevent the bank from failing, the Government provided Citibank with over $300 billion in asset guarantees and subsequently provided another $20 billion infusion.

279.    Moody's not only knew and understood how its ratings were to be used by IDIs and federal regulators, Moody's worked to ensure that federal banking regulators relied only on ratings from SEC-designated NRSRO credit rating agencies. In its comments to a Notice of Proposed Rulemaking "Risk-Based Capital Guidelines; Capital Adequacy Guidelines; Capital Maintenance: Domestic Capital Modifications" by certain federal agencies, namely the OCC, the Board of Governors of the Federal Reserve System, the FDIC and the OTS (collectively, the "Agencies"), Moody's stated the following:

> The Agencies' existing risk-based capital rules permit the use of external credit ratings issued by a nationally recognized statistical rating organization ("NRSRO") for assigning risk weights to recourse obligations, direct credit substitutes, residual interests, and asset- and mortgage-backed securities, and the Basel IA NPR would extend such use to additional types of exposures.

Letter from Jeanne Dering, Moody's Executive Vice President Regulatory Affairs and Compliance, to the Board of Governors of the Federal Reserve System, the FDIC, the OCC and the OTS (Mar. 26, 2007).

280.    Moody's concern was that the Agencies would set their own rules as to what constitutes an NRSRO and urged reliance on the SEC-issued designation. For example, Moody's argued the following:

> [W]e do not believe that the Agencies should redefine the term NRSRO. Further, we recommend that in deciding to use NRSRO ratings, the Agencies should refrain from introducing additional oversight measures with respect to NRSROs. Such additional oversight would be redundant, given that NRSROs will voluntarily submit to the SEC regulatory regime, and would unnecessarily expose NRSROs to multiple and potentially conflicting regulatory regimes.

*Id.*

281.    Moody's desired the Agencies (including the FDIC) to rely on the NRSRO designation.

282.    Moody's was aware of the distinction and the benefits of obtaining an NRSRO designation. Because certain Moody's subsidiaries with operations outside the United States are not certified as NRSROs, disclosures by at least one of those subsidiaries have stated that a credit rating it issues is not a NRSRO credit rating. Therefore, Moody's understands that it publishes both NRSRO and explicitly non-NRSRO credit ratings with differing regulatory requirements. Nevertheless, Moody's transmitted hundreds of thousands of purported NRSRO credit ratings to the Government, investors and regulators with the knowledge that those rating did not meet NRSRO standards.

283.    Accordingly, among other violations of the False Claims Act, Moody's knowingly caused to be made false records and statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, and knowingly made or caused to be made false records or statements material to an obligation to pay or transmit money or property to the Government.

## X.    MOODY'S KNOWINGLY CAUSED THE SUBMISSION OF FALSE, FRAUDULENT OR MISLEADING CLAIMS, OR FALSE RECORDS OR STATEMENTS, CONTAINED IN REGISTRATION STATEMENTS FILED WITH THE SEC

284.    The Securities Act of 1933 (the "1933 Act"), often referred to as the "truth in securities" law, has two basic objectives: To require that investors receive financial and other significant information concerning securities being offered for public sale; and to prohibit deceit, misrepresentations, and other fraud in the sale of securities. Thus, before a security can be marketed and sold to investors, the seller must comply with certain statutory and regulatory requirements involving "registering" the securities – which includes filings with the SEC.

285.    RMBS are typically marketed and sold through a "shelf registration" process. The SEC allows for the shelf registration of investment grade-rated RMBS so that the Issuer can offer

RMBS from time to time after the registration statement becomes effective, without getting SEC approval of the offering document for a specific RMBS transaction.

286.    For RMBS, sellers must complete and file a formal Registration Statement and related documents, such as SEC Form S-3 Registration Statements. Form S-3 also contains a certification, which states that the seller certifies that as to the investment grade ratings for RMBS.

287.    By virtue of the certification and filing of the Form S-3, the seller represents to potential investors, like Government Sponsored Enterprises (such as Fannie Mae and Freddie Mac), the seller's compliance with the 1933 Act's prohibition on deceit, misrepresentations, and other fraud in the sale of securities, including the investment grade quality of the security.

288.    For purposes of this Complaint, the securities marketed and sold under the Registration Statements are referred to as "Certificates."

289.    The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated. The Shelf Registration Statement is the collection of documents which comprise the registration of securities under Sections 5, 6 and 10 of the 1933 Act. The principal document in the registration statement is the prospectus, as defined by Section 10 of the Securities Act, which contains most of the disclosure that the SEC requires be contained in the registration statement.

290.    Users of Shelf Registration Statements are required to notify potential investors that the securities are rated investment grade by at least one credit rating agency that is a NRSRO. The information contained in the Shelf registration statements are material to potential investors' decisions to purchase the described securities.

291.    As described in this Complaint, by virtue of Moody's non-compliance with its SEC-certified role as a NRSRO, Moody's caused the filing of false certifications contained in SEC Shelf Registration and related documents, upon which investors relied in making reasonable purchasing decisions.

292.    The false certifications contained in the Shelf Registration Statements and related documents caused state and federal governments hundreds of millions of dollars in damages.

## XI.    DEFENDANTS' RETALIATION AGAINST RELATOR KOLCHINSKY

293.    As described herein, Defendants' retaliation against Relator Kolchinsky exemplifies Defendants' disregard for NRSRO standards and highlights its false certifications to the Government.

294.    In 2007, Relator Kolchinsky (at the time when he was a Managing Director in Moody's Derivatives Group) raised concerns about the serious potential deficiencies in Moody's ratings. At the time, due to the subprime mortgage crisis, Moody's revenue from rating RMBS had begun to dry up, and so revenues generated from rating CDOs became of paramount importance to the Company. As a result, Moody's policies subordinated the integrity of its ratings to chasing a larger share of the ratings market.

295.    Relator had learned of severe rating downgrades coming from the RMBS group in the face of rapid credit deterioration, as was being experienced in the RMBS markets in 2007.

296.    The downgrades would have a material impact on the CDOs being rated by Moody's. Immediately after learning of the coming downgrades, Relator Kolchinsky complained to his supervisor Yuri Yoshizawa about potential violations of securities laws. When Yoshizawa failed to respond, Relator Kolchinsky took his case to Andrew Kimball, Moody's Chief Credit Officer.

297.    In retaliation for his whistle blowing activity (and contrary to Moody's Code as embodied in its Form NRSRO certification), Moody's discharged Relator Kolchinsky from his Managing Director position at the rating agency and gave him a lower paying role at Moody's Analytics.

298.    In addition to Moody's misconduct alleged herein, here are additional instances of serious compliance violations about which Relator Kolchinsky warned Moody's, which led to his discharge:

### A.    PROBLEM CDO PORTFOLIO RATINGS POST AIG: NGFII

299.    Relator Kolchinsky warned Moody's that its ratings and internal policies were creating financial "time bombs" which potentially endangered its status as a rating agency. Moody's ignored his warning, and then constructively discharged him for his whistle-blowing activities.

300.    Nine Grade Funding II ("NGFII") is a transaction rated by the Derivatives Group in October 2008 on behalf of Guggenheim Partners LLC, a privately held financial services firm involved in investment banking, capital markets services, investment management, and investment advisory. NGFII had originally been rated on October 15, 2008 by a team from the Derivatives Group using the relevant ABS CDO methodologies, as well as Moody's ABS CDO Methodology. The governing NGFII documents allowed the sponsor to substitute underlying collateral with rating agency approval, also called a "Rating Agency Consent" or "RAC." Several such substitutions were made since closing and two were subjects of Relator Kolchinsky's complaints, the "January Substitution" and "May Substitution."

301.    The sole NGFII tranche had originally been rated Baa2 on October 15, 2008. On January 15, 2009, the deal was "upsized" and additions were made to the portfolio (the "January

Substitution"). Moody's Derivatives Group blessed this upsizing and again rated NGFII Baa2 through a RAC.

302.    The January Substitution involved upsizing the NGFII transaction through the addition of several CLOs and issuance of additional notes with Moody's investment grade ratings. However, prior to the January Substitution, the Derivatives Group had already approved the changes in the methodology with which it would rate corporate (CLO and synthetic) CDOs the impact of which would be to cause severe downgrades of the entire universe of CLO ratings. This methodology was even implemented in the relevant rating tools such as CDOROMv2.5. In fact, even the rating impact of the CLO Methodology was known to the Derivatives Group. For example, an analysis on a sample deal run by the Derivatives Group in early December showed that a current Aa2 rating would fall to Baa1 under the new CLO Methodology and a current Baa2 rating would fall to B1.

303.    The very same day that the January Substitution had occurred, Moody's publicly announced future changes to the "CLO methodology." These changes included updating key assumptions for rating CDOs, including a 30% increase in the assumed likelihood of default for all corporate credits in synthetic CDOs and default probability assumptions for corporate credits (including financials) in reference pools of synthetic CDOs.

304.    However, Moody's made no adjustments to the analysis of NGFII for the January Substitution to compensate for the application of the new CLO Methodology. This resulted in Moody's knowing or reckless issuance of a rating it knew to be false, in contravention of Moody's NRSRO standards.

305.    Just four months after the January Substitution, on May 8, 2009, the rating on NGFII was placed on watch for possible downgrade due to portfolio deterioration. The

Derivatives Group already knew this downgrade was going to occur during the January Substitution. In effect, the positive January 2009 Baa2 rating was a sham, since Moody's expected to downgrade the securities from the outset.

306.    On May 13, 2009 another portfolio substitution (the "May Substitution") was approved by the Derivatives Group, again via a RAC. And, again, two of the portfolio's deals were downgraded to junk status within two months.

307.    Relator Kolchinsky had warned that the "January Substitution" violated the Code and was potentially illegal. In a January 13, 2008 email, Relator Kolchinsky stated that, "potential [10b-5] liability stems from the severe and dramatic downgrades we are still seeing in the ABS world and is identical to the one I described in my [September 2008] complaint.... It would be disappointing if 10b-5 concerns were not incorporated into the new CDO methodology given the prior incident."

308.    Relator Kolchinsky also warned the Company that the May Substitution demonstrated the Derivatives Group's reckless disregard for the truth. The May Substitution involved the removal by the Issuer of many of what were recently downgraded securities and their replacement with two tranches from another transaction known as Valleriite CDO ("Valleriite").

**B.    RELATOR KOLCHINSKY IS CONSTRUCTIVELY DISCHARGED AFTER HE COMPLAINS TO MOODY'S CHIEF OF COMPLIANCE, MICHAEL KANEF**

309.    In the aftermath of Moody's rejection of Relator Kolchinsky's ratings challenges related to NGFII, Relator Kolchinsky again complained to Moody's that its ratings were unsound, unethical, and potentially illegal.

310.   On August 28, 2009, Relator Kolchinsky wrote a detailed Memorandum to Michael Kanef (the "Kanef Memo"), Moody's head of compliance. Kanef was formerly the head of Moody's Asset Backed Finance Rating Group, responsible for the seriously flawed ratings.

311.   The Kanef Memo reiterated Relator Kolchinsky's view of Moody's unethical and illegal conduct in its ratings policies and methodologies, and cited Relator Kolchinsky's repeated warnings regarding the quality and the veracity of the ratings issued by the Derivatives Group. And, the Kanef Memo reiterated the fact that Relator Kolchinsky had complained to his managers as early as 2007.

312.   Among the issues Relator Kolchinsky raised in the August 28, 2009 Kanef Memo were the following:

- In September 2007, Relator Kolchinsky stopped what he believed to be violations of securities laws in the Derivatives Group. As a direct consequence of these actions, he was illegally retaliated against and lost his position and pay. He filed a formal complaint relating to this retaliation on September 12, 2008.

- During 2008, the Derivatives Group was working on modifications for all of their methodologies in light of their obvious errors. ABS CDOs rated 'Aaa', for example, had caused hundreds of billions of losses for the world's financial institutions. The Derivatives Group prepared the new ABS CDO methodology for use with any transaction (including structured notes) with other structured finance securities as underlying collateral (the 'ABS CDO Methodology'). Once this was complete, Relator Kolchinsky was asked by the Credit Policy group ('CP') to submit his comments regarding the new correlations. These comments were contained in a series of emails between Relator Kolchinsky, members of the CP and the head of Structured Finance between October 30 and November 4, 2008.

- Relator Kolchinsky was asked by the CP to submit comments, because he was the former head of ABS CDOs at Moody's and the CP felt that it needed an unbiased expert opinion regarding the work which was produced by the Derivatives Group. He was highly critical of the proposal and thought that it was irresponsible. He recommended that in light of their credit performance that ABS CDOs should not be rated at all. Unfortunately, this correlation approach was approved in substantially the same form reviewed by Relator Kolchinsky and would later be used in NGFII.

- Additionally, the Derivatives Group was working on a new CLO methodology (the 'CLO Methodology'). The general scope of this new methodology, including documented comments from CP was laid out by the late summer of 2008. The Derivatives Group resisted the CP's more reasonable approach and counter-proposals were discussed by the two groups during the fall of 2008. On December 16, 2008, the two groups reached final agreement on all the major details of the CLO Methodology. The main change that would drive the rating downgrades was a 30% increase in the assumed likelihood of default for all corporate credits. Frequent analytics were performed during the course of the negotiations between the Derivatives Group and CP, so the management of the Derivatives Group had explicit knowledge of the effect of the CLO Methodology on current CLO ratings. The new approach was even incorporated into the new version (v2.5) of CDOROM (a CDO rating tool commonly used across a spectrum of transactions). This new version of CDOROMv2.5 was operational by late December 2008, included all the relevant methodology adjustments and was broadly available internally.

313.    As a direct result of the Kanef Memo, Relator Kolchinsky was constructively discharged by Moody's.

314.    Defendants' retaliation against Relator Kolchinsky exemplifies Defendants' disregard for NRSRO standards and highlights its false certifications to the Government.

## XII.   CLAIMS FOR RELIEF

### COUNT I
### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(A))
### Causing False Claims

315.    Relator Kolchinsky incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

316.    Relator Kolchinsky seeks relief against Moody's under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

317.    As set forth above, Moody's knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer

or employee of the Government, false and fraudulent claims for payment or approval in connection with its delivery of false ratings, pursuant to its RDS contracts with various agencies of the Government, and by submitting false certifications and making false representations to the Government with respect to its qualifications for NRSRO status.

318.   The Government paid claims and incurred losses because of Moody's false certifications and wrongful conduct.

319.   By reason of the false claims of Moody's, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

### COUNT II

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(2) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**

320.   Relator Kolchinsky incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

321.   Relator Kolchinsky seeks relief against Moody's under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), or, in the alternative, under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006).

322.   As set forth above, Moody's knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with its NRSRO status and the wrongful conduct described herein.

323.   The Government paid claims and incurred losses because of Moody's wrongful conduct.

324.     By reason of the false records and/or statements of Moody's, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT III

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(3) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(C))**
**Conspiracy**

325.     Relator Kolchinsky incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

326.     As set forth above, Defendants Moody's and John Does #1-100, fictitious names, who are individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, who are unknown co-conspirators, conspired with and among each other to make, use or cause to be made or used, false records and/or statements to the United States.

327.     By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

## COUNT IV

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(7) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(G))**
**Making or Using False Record Or Statement to Avoid an Obligation to Pay or Refund**

328.     Relator Kolchinsky incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

329.     Relator Kolchinsky seeks relief against Moody's under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), or, in the alternative, under Section 3729(a)(7) of the False Claims Act, 31 U.S.C. § 3729(a)(7) (2006).

330.    As set forth above, Moody's knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with its NRSRO status and the wrongful conduct described herein.

331.    The Government paid claims and incurred losses because of Moody's wrongful conduct.

332.    By reason of the false records and/or statements of Moody's, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

**WHEREFORE**, Relator Kolchinsky prays for judgment against Defendants as follows:

A.      That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, *et seq.*;

B.      That judgment be entered in Relator Kolchinsky's favor and against Defendants in the full amount of damages suffered by the United States trebled, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such damages and penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendants, and to deter future misconduct;

C.      That Relator Kolchinsky be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.      That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E.      That judgment be granted for Relator Kolchinsky against Defendants for all costs, including, but not limited to, court costs, expenses, expert fees and all attorneys' fees incurred by Relator Kolchinsky in the prosecution of this suit; and

F.      That Relator Kolchinsky be granted such other and further relief as the Court deems just and proper.

## XIII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: New York, New York                              Respectfully submitted,
       May 27, 2014

                                              SEEGER WEISS LLP

                                              By: /s/ Stephen A. Weiss
                                                Stephen A. Weiss
                                                Asa R. Danes
                                                77 Water Street
                                                New York, NY 10005
                                                Telephone: (212) 584-0700
                                                Facsimile: (212) 584-0799
                                                E-mail:  sweiss@seegerweiss.com
                                                              adanes@seegerweiss.com

                                            *Attorneys for Plaintiff/Relator*

**EXHIBIT A TO AMENDED COMPLAINT**

Excerpts from FIG Sheet – CDO tranches that had a "New Rating" higher than "Stressed Rating (A)"

| | deal_id | deal_name | Cusip | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 820003386 | 888 Tactical Fund | 28248EAC6 | Aaa | Aaa(WD) | Ba3 | Aa1 | - | Ba3 |
| 2. | 500041902 | ACA ABS 2006-1 | 00082WAA8 | Aaa | Aaa(WD) | Baa1 | Aa3 | Baa1 | Baa1 |
| 3. | 500041902 | ACA ABS 2006-1 | 00082WAA8 | Aaa | Aaa(WD) | Baa1 | Aa3 | Baa1 | Baa1 |
| 4. | 820004324 | Adams Square Funding II | 006369AC6 | Aaa | Aaa(WD) | Ba2 | Baa3 | Ba2 | Ba2 |
| 5. | 500036278 | Belle Haven 2005 | 078451AA9 | Aaa | Aaa | Aaa | Aa1 | Aa1 | - |
| 6. | 500043076 | C-Bass CBO XVI Ltd. | 12498YAA7 | Aaa | Aaa(WD) | Baa2 | A3 | Baa2 | - |
| 7. | 820003400 | Class V Funding III, Ltd. | 18272FAB5 | Aaa | Baa1(WD) | B2 | Ba2 | B1 | B2 |
| 8. | 500046430 | Coldwater CDO | 193067AA3 | Aaa | Aaa(WD) | Baa1 | Aa2 | A3 | Baa1 |
| 9. | 500047231 | Fortius II Funding | 34957YAB3 | Aaa | Aaa(WD) | A2 | Aa3 | A2 | A2 |
| 10. | 500043144 | Glaicer Funding IV | 37638NAA9 | Aaa | Aaa | A3 | Aa1 | A3 | A3 |
| 11. | 500041885 | Ischus Mezzanine CDO III | 46426XAA4 | Aaa | Aaa(WD) | A3 | Aa2 | A3 | A3 |
| 12. | 500046880 | Ischus Synthetic ABS CDO 2006-2 Ltd. | | Aaa | Aaa(WD) | Baa1 | A1 | Baa1 | - |
| 13. | 815076372 | Kleros Preferred Funding IV | 49858BAS4 | Aaa | Aaa(WD) | Baa1 | A2 | A3 | Baa1 |
| 14. | 815129011 | Kleros Preferred Funding VI, Ltd. | 49858XAB3 | Aaa | Aaa | A2 | Aa1 | - | A2 |
| 15. | 815058317 | Libertas Preferred Funding II | 53014NAA0 | Aaa | Aaa(WD) | Baa3 | A3 | Baa3 | Baa3 |
| 16. | 500042919 | Longstreet CDO I | 543175AA1 | Aaa | Aaa(WD) | Baa1 | A1 | Baa1 | Baa1 |
| 17. | 815129048 | Newbury Street CDO | 651015AU3 | Aaa | Aaa(WD) | A3 | A1 | A3 | A3 |
| 18. | 500046016 | Pine Mountain CDO II | 722691AA0 | Aaa | Aaa(WD) | Baa3 | Baa1 | Baa3 | Baa3 |
| 19. | 500044939 | Pyxis ABS CDO 2006-1 Ltd. | | Aaa | Aaa(WD) | Baa2 | Aa3 | A3 | Baa2 |
| 20. | 820225806 | Robeco High Grade CDO I Ltd. | 77029QAF4 | Aaa | Aaa(WD) | A3 | Aa3 | - | A3 |
| 21. | 500046793 | STACK 2006-2 Ltd. | | Aaa | A3(WD) | Ba3 | Ba2 | Ba3 | Ba3 |

| | deal_id | deal_name | Cusip | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 22. | 500044586 | Static Residential CDO 2006-B | 85768XAA8 | Aaa | Aaa(WD) | Ba1 | Baa3 | Ba1 | - |
| 23. | 820203621 | Tazlina Funding CDO II | 878047AB5 | Aaa | Aaa(WD) | Baa2 | Aa1 | Aa3 | Baa2 |
| 24. | 500040642 | Vertical 2006-1 | 925345AC4 | Aaa | Aaa | A2 | Aa1 | A1 | A2 |
| 25. | 814993545 | West Trade Funding CDO II | 956316AC7 | Aaa | Aaa(WD) | Baa2 | Aa1 | A2 | Baa2 |

**EXHIBIT B TO AMENDED COMPLAINT**

Excerpts from FIG Sheet – CDO tranches that had a "New Rating" higher than any "Stressed Rating"

| | deal_id | deal_name | Cusip | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 820003386 | 888 Tactical Fund | 28248EAC6 | Aaa | Aaa(WD) | Ba3 | Aa1 | - | Ba3 |
| 2. | 820004324 | Adams Square Funding II | 006369AC6 | Aaa | Aaa(WD) | Ba2 | Baa3 | Ba2 | Ba2 |
| 3. | 500036278 | Belle Haven 2005 | 078451AA9 | Aaa | Aaa | Aaa | Aa1 | Aa1 | - |
| 4. | 820005914 | CITATION | 17289LAA7 | Aaa | Aaa | Aa2 | Aaa | Aaa | Aa2 |
| 5. | 820003400 | Class V Funding III, Ltd. | 18272FAB5 | Aaa | Baa1(WD) | B2 | Ba2 | B1 | B2 |
| 6. | 820169401 | Class V Funding IV | | Aaa | Aaa(WD) | Baa1 | Aaa | Aaa | Baa1 |
| 7. | 500040660 | Duke Funding High Grade IV, Ltd. | 264413AA3 | Aaa | Aaa | Aa2 | Aaa | Aa1 | Aa2 |
| 8. | 815129011 | Kleros Preferred Funding VI, Ltd. | 49858XAA5 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 9. | 815129011 | Kleros Preferred Funding VI, Ltd. | 49858XAB3 | Aaa | Aaa | A2 | Aa1 | - | A2 |
| 10. | 500039712 | Lancer Funding, Ltd. | 514615AB9 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 11. | 815106170 | McKinley Funding III Ltd | 58162QAA2 | Aaa | Aaa | Aa1 | Aaa | Aaa | Aa1 |
| 12. | 500044255 | RIDGEWAY COURT FUNDING I, LTD. | 766167AA8 | Aaa | Aaa | Aa1 | - | - | Aa1 |
| 13. | 500044255 | RIDGEWAY COURT FUNDING I, LTD. | 766167AB6 | Aaa | Aaa | Aa1 | - | - | Aa1 |
| 14. | 820169397 | Ridgeway Court Funding II Ltd | 766174AA4 | Aaa | Aaa (WD) | A3 | Aa1 | - | A3 |
| 15. | 500041902 | ACA ABS 2006-1 | 00082WAA8 | Aaa | Aaa(WD) | Baa1 | Aa3 | Baa1 | Baa1 |
| 16. | 500041902 | ACA ABS 2006-1 | 00082WAA8 | Aaa | Aaa(WD) | Baa1 | Aa3 | Baa1 | Baa1 |
| 17. | 500047528 | ACA ABS 2006-2 | 00389PAA3 | Aaa(WD) | Baa3(WD) | B2 | B2 | - | - |
| 18. | 500046430 | Coldwater CDO | 193067AA3 | Aaa | Aaa(WD) | Baa1 | Aa2 | A3 | Baa1 |
| 19. | 500047231 | Fortius II Funding | 34957YAB3 | Aaa | Aaa(WD) | A2 | Aa3 | A2 | A2 |
| 20. | 500044428 | Hamilton Gardens CDO | 40737RAA4 | Aaa | Aaa | Aa3 | Aaa | Aa2 | Aa3 |
| 21. | 500041885 | Ischus Mezzanine CDO III | 46426XAA4 | Aaa | Aaa(WD) | A3 | Aa2 | A3 | A3 |
| 22. | 815076372 | Kleros Preferred Funding IV | 49858BAS4 | Aaa | Aaa(WD) | Baa1 | A2 | A3 | Baa1 |
| 23. | 815058317 | Libertas Preferred Funding II | 53014NAA0 | Aaa | Aaa(WD) | Baa3 | A3 | Baa3 | Baa3 |
| 24. | 500042919 | Longstreet CDO I | 543175AA1 | Aaa | Aaa(WD) | Baa1 | A1 | Baa1 | Baa1 |

| | deal_id | deal_name | Cusip | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 25. | 500040643 | Montauk Point CDO II | 612181AA5 | Aaa | Aaa(WD) | Aa3 | Aaa | A2 | Aa3 |
| 26. | 500040448 | Neptune CDO III | 64069PAC2 | Aaa | Aaa | Aa1 | Aaa | Aaa | Aa1 |
| 27. | 500046016 | Pine Mountain CDO II | 722691AA0 | Aaa | Aaa(WD) | Baa3 | Baa1 | Baa3 | Baa3 |
| 28. | 500046793 | STACK 2006-2 Ltd. | | Aaa | A3(WD) | Ba3 | Ba2 | Ba3 | Ba3 |
| 29. | 500041518 | Static Residential CDO 2006-A Ltd. | 85768VAJ3 | Aaa | Aaa | Aaa | Aaa | Baa1 | |
| 30. | 500040447 | C-Bass CBO XV Ltd. | 124670AA8 | Aaa | Aaa | A2 | Aaa | A2 | - |
| 31. | 500043076 | C-Bass CBO XVI Ltd. | 12498YAA7 | Aaa | Aaa(WD) | Baa2 | A3 | Baa2 | - |
| 32. | 500047232 | Davis Square Funding VII, Ltd. | 23911AAB3 | Aaa | Aaa | Aa2 | Aaa | Aaa | Aa2 |
| 33. | 820025983 | Grand Avenue CDO III, Ltd.. | 38521QAA0 | Aaa | Aaa | Aa1 | Aaa | Aaa | Aa1 |
| 34. | 500046880 | Ischus Synthetic ABS CDO 2006-2 Ltd. | | Aaa | Aaa(WD) | Baa1 | A1 | Baa1 | - |
| 35. | 500042516 | Longshore CDO Funding 2006-2, Ltd. | 543165AA2 | Aaa | Aaa | Aa2 | Aaa | - | Aa2 |
| 36. | 500044939 | Pyxis ABS CDO 2006-1 Ltd. | | Aaa | Aaa(WD) | Baa2 | Aa3 | A3 | Baa2 |
| 37. | 500047048 | Raffles Place II Funding, Ltd. | 75062RAC1 | Aaa | Aaa(WD) | A2 | Aaa | Aa3 | A2 |
| 38. | 500047049 | Singa Funding, Ltd. | 82929VAC1 | Aaa | Aaa | Aa3 | Aaa | Aa2 | Aa3 |
| 39. | 500047049 | Singa Funding, Ltd. | 82929VAA5 | Aaa | Aaa | Aa3 | Aaa | Aa2 | Aa3 |
| 40. | 500043511 | ART CDO 2006-1 | 04288PAA7 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 41. | 815128071 | Broderick CDO 3 Ltd. | 11201NAE3 | Aaa | Aaa(WD) | A2 | Aaa | - | A2 |
| 42. | 500045023 | Broderick CDO II | 112018AJ5 | Aaa | Aaa | Aa2 | Aaa | - | Aa2 |
| 43. | 500045023 | Broderick CDO II | 112018AA4 | Aaa | Aaa | Aa2 | Aaa | - | Aa2 |
| 44. | 820029449 | Highridge ABS CDO I, Ltd. | 431138AA4 | Aaa | Aaa | A1 | Aaa | Aa1 | A1 |
| 45. | 820029449 | Highridge ABS CDO I, Ltd. | 431138AC0 | Aaa | Aaa | A1 | Aaa | Aa1 | A1 |
| 46. | 809951815 | Jupiter HG CDO V, Ltd. | 48206XAA6 | Aaa | Aaa(WD) | Baa2 | A1 | Baa1 | Baa2 |
| 47. | 500041872 | Logan CDO II | | Aaa | | A1 | | | A1 |
| 48. | 820211406 | Logan CDO III | | Aaa | Aaa | Aa1 | | | Aa1 |
| 49. | 820090396 | Longshore CDO Funding, 2007-3 | 543169AA4 | Aaa | Aaa | Aa2 | Aaa | Aa1 | Aa2 |
| 50. | 815129048 | Newbury Street CDO | 651015AA7 | Aaa | Aaa | Aa1 | Aaa | Aa1 | Aa1 |

| | deal_id | deal_name | Cusip | Original Rating | New Rating | Model_ratg | Stressed Rating (A) | Stressed Rating (B) | Stressed Rating (C) |
|---|---|---|---|---|---|---|---|---|---|
| 51. | 815129048 | Newbury Street CDO | 651015AU3 | Aaa | Aaa(WD) | A3 | A1 | A3 | A3 |
| 52. | 815136152 | Sagittarius CDO I Ltd. | | Aaa | Baa1(WD) | Ba1 | Baa1 | Ba1 | Ba1 |
| 53. | 820203621 | Tazlina II | 878047AA7 | Aaa | Aaa(WD) | Aa2 | Aaa | Aaa | Aa2 |
| 54. | 500041514 | Wadsworth | 930313AA9 | Aaa | Aaa(WD) | A2 | - | - | A2 |
| 55. | 814993545 | West Trade II | 956316AA1 | Aaa | Aaa | Aa3 | Aaa | Aa1 | Aa3 |
| 56. | 820111346 | Altius IV Funding Ltd. | 021493AD3 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 57. | 820111346 | Altius IV Funding Ltd. | 021493AB7 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 58. | 820111346 | Altius IV Funding Ltd. | 021493AC5 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 59. | 815004343 | Biltmore CDO 2007-1 | 090287AB9 | Aaa | Aaa(WD) | A1 | Aaa | Aaa | A1 |
| 60. | 500047797 | Blue Edge ABS CDO Ltd | 095475AA7 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 61. | 820259677 | HG-COLL 2007-1 Ltd. | 40419HAA1 | Aaa | Aaa | Aa3 | Aaa | Aa2 | Aa3 |
| 62. | 500042920 | Ipswich Street CDO | 46265BAA6 | Aaa | Aaa | Aa1 | Aaa | Aa1 | Aa1 |
| 63. | 815004323 | Jupiter High-Grade CDO VI LTD. | 48206FAH0 | Aaa | Aaa(WD) | A2 | Aaa | Aa1 | A2 |
| 64. | 500045015 | Millstone III CDO Ltd. | 60129WAB5 | Aaa | Aaa | Aa2 | - | - | Aa2 |
| 65. | 500020262 | Oceanview CBO I | 67551MAB9 | Aaa | Aaa (WD) | Baa2 | Baa2 | Baa2 | Baa2 |
| 66. | 820225806 | Robeco High Grade CDO I Ltd. | 77029QAF4 | Aaa | Aaa(WD) | A3 | Aa3 | - | A3 |
| 67. | 500040969 | Tazlina Funding CDO I | 878046AA9 | Aaa | Aaa | Aa1 | Aaa | - | Aa1 |
| 68. | 820203621 | Tazlina Funding CDO II | 878047AB5 | Aaa | Aaa(WD) | Baa2 | Aa1 | Aa3 | Baa2 |
| 69. | 814993545 | West Trade Funding CDO II | 956316AC7 | Aaa | Aaa(WD) | Baa2 | Aa1 | A2 | Baa2 |
| 70. | 820184330 | West Trade Funding CDO III | 95631QAH2 | Aaa | Aaa | Aa2 | Aaa | Aaa | Aa2 |
| 71. | 500044586 | Static Residential CDO 2006-B | 85768XAA8 | Aaa | Aaa(WD) | Ba1 | Baa3 | Ba1 | - |
| 72. | 500041518 | Static Residential CDO 2006-A | 85768VAJ3 | Aaa | Aaa | Baa1 | Aaa | Baa1 | - |
| 73. | 500043144 | Glaicer Funding IV | 37638NAA9 | Aaa | Aaa | A3 | Aa1 | A3 | A3 |
| 74. | 500040642 | Vertical 2006-1 | 925345AC4 | Aaa | Aaa | A2 | Aa1 | A1 | A2 |
| 75. | 820169397 | Ridgeway Court Funding II Ltd | 766174AN6 | Aaa | Aaa (WD) | Aa3 | Aaa | - | Aa3 |
| 76. | 820169397 | Ridgeway Court Funding II Ltd | 766174AQ9 | Aaa | Aaa (WD) | Aa3 | Aaa | - | Aa3 |
| 77. | 500032368 | HILLCREST CDO I | 43147XAE1 | Aaa | Aaa | Aa2 | Aa1 | Aa1 | Aa2 |