UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *ex rel.* ILYA ERIC
KOLCHINSKY,

               Plaintiff,

    -against-

MOODY'S CORPORATION, MOODY'S
INVESTORS SERVICE, INC., and JOHN DOES #1-
100,

             Defendants.

No. 12 Civ. 1399 (WHP)

---

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

SATTERLEE STEPHENS LLP

James J. Coster
Joshua M. Rubins
Glenn C. Edwards

230 Park Avenue, Suite 1130
New York, NY 10169
(212) 818-9200
(212) 818-9606/7 (fax)

*Attorneys for Defendants*

2254652_2

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 5

I.      REQUIREMENTS OF THE FALSE CLAIMS ACT ............................................ 7

II.     THE AMENDED COMPLAINT WAS NOT FILED PURSUANT TO
THE SEALING PROCEDURES UNDER THE FALSE CLAIMS ACT
AND MUST BE DISMISSED .............................................................................. 7

III.    THE AMENDED COMPLAINT IS BARRED BY THE STATUTE OF
LIMITATIONS ................................................................................................... 11

IV.    THE COMPLAINT IS BARRED BY THE PUBLIC DISCLOSURE BAR ........ 12

V.     ALLEGATIONS OF FALSE RATINGS DO NOT STATE A CLAIM .............. 16

VI.    THE FDIC CLAIMS ARE NOT SUFFICIENTLY PLED ................................. 17

       A.     The FDIC Claims are Not Pled With Particularity .................................... 17

       B.     The Complaint Does Not Allege that Moody's Made any False
Statement for the Purpose of Reducing FDIC Premiums ......................... 19

       C.     There is No Plausible Allegation of Materiality ....................................... 20

VII.   THE ALLEGATIONS RELATING TO THE AIG BAILOUT DO NOT
STATE A FALSE CLAIM .................................................................................. 20

       A.     Claims Relating to the AIG Collapse and Bailout are Not
Actionable ................................................................................................. 20

       B.     Claims Relating to November 2008 Restructuring are Not
Actionable ................................................................................................. 21

VIII.  THE CONSPIRACY CLAIM FAILS ................................................................. 25

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)...................................................................14

*Aronov v. Mersini*,
   2015 WL 1780164 (S.D.N.Y. 2015)...................................................................18

*ASARCO LLC v. Goodwin*,
   756 F.3d 191 (2d Cir. 2014)...............................................................................12

*Avile v. Feitell*,
   2008 WL 2139153 (S.D.N.Y. 2008).....................................................................8

*Connecticut Nat'l Bank v. Fluor Corp.*,
   808 F.2d 957 (2d Cir. 1987)...............................................................................16

*Connecticut v. Moody's Corp.*,
   2011 WL 63905 (D. Conn. 2011).......................................................................14

*Flynn v. McDaniel*,
   689 F. Supp. 2d 686 (S.D.N.Y. 2010)...............................................................14

*Gold v. Morrison-Knudsen Co.*,
   68 F.3d 1475 (2d Cir. 1995).................................................................................6

*In re Noah Educ. Holdings, Ltd. Secs. Litig.*,
   2010 WL 1372709 (S.D.N.Y. 2010)...................................................................12

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000).................................................................................6

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)...............................................................16

*Retirement Bd. of Policeman's Annuity & Benefit Fund v. Bank of N.Y. Mellon*,
   2014 WL 3858469 (S.D.N.Y. 2014)...................................................................23

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007).................................................................................8, 15, 16

*S.E.C. v. Egan*,
   994 F. Supp. 2d 558 (S.D.N.Y. 2014).................................................................6

*Starr Int'l. Co. v. United States*,
   121 Fed. Cl. 428 (2015).................................................................................14, 21

2254652_2

*United States v. Baylor Univ. Med. Ctr.*,
469 F.3d 263 (2d Cir. 2006)...................................................................11, 12

*United States v. N.Y. Soc. for the Relief of the Ruptured & Crippled*,
2014 WL 3905742 (S.D.N.Y. 2014)........................................................17, 25

*United States v. Richard Dattner Architects*,
972 F. Supp. 738 (S.D.N.Y. 1997) ...............................................................17

*United States v. Stevens-Henager College, Inc.*,
2014 WL 3101817 (D. Idaho 2014)................................................................9

*United States ex rel. Alcohol Found., Inc. v Kalmanovitz Charitable Found.*,
186 F. Supp. 2d 458 (S.D.N.Y.), *aff'd*, 53 Fed. App'x 153 (2d Cir. 2002)............21

*United States ex rel. Bahrani v. ConAgra, Inc.*,
624 F.3d 1275 (10th Cir. 2010) ...................................................................19

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
50 F. Supp. 3d 497 (S.D.N.Y. 2014)..............................................................17

*United States ex rel. Cunningham v. Millennium Labs.*,
2014 WL 309374 (D. Mass. 2014) .................................................................9

*United States ex rel. Davis v. Prince*,
766 F. Supp. 2d 679 (E.D. Va. 2011) ...........................................................8, 9

*United States ex rel. Finney v. Nextwave Telecom, Inc.*,
337 B.R. 479 (S.D.N.Y. 2006).....................................................................11

*United States ex rel. Grynberg v. Praxair, Inc.*,
389 F.3d 1038 (10th Cir. 2004) ...................................................................15

*United States ex rel. Hagerty v. Cyberonics, Inc.*,
__ F. Supp. 3d __, 2015 WL 1442497 (D. Mass. 2015)........................................9

*United States ex rel. Head v. Kane Co.*,
798 F. Supp. 2d 186 (D.D.C. 2011)...............................................................25

*United States ex rel. Joseph v. Brattleboro Retreat*,
2014 WL 3908432 (D. Vt. 2014)...................................................................19

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
360 F.3d 220 (1st Cir. 2004) .......................................................................16

*United States ex rel. Kester v. Novartis Pharms. Corp.*,
23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) ..............................................*passim*

iii

*United States ex rel. Kester v. Novartis Pharms. Corp.*,
   43 F. Supp. 3d 332 (S.D.N.Y. 2014)................................................................13

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F. 2d 1148 (2d Cir. 1993)........................................................................13

*United States ex rel. LeBlanc v. ITT Indus., Inc.*,
   492 F. Supp. 2d 303 (S.D.N.Y. 2007)..............................................................8

*United States ex rel. Monaghan v. N.Y.C Dep't of Housing*,
   2012 WL 4017338 (S.D.N.Y. 2012), *aff'd sub nom.Monaghan*
   *v. Henry Phipps Plaza West, Inc.*, 531 Fed. App'x 127 (2d Cir. 2013)..................6

*United States ex rel. Noviello v. Giuliani*,
   1997 WL 930176 (E.D.N.Y. 1997)....................................................................8

*United States ex rel. Osmose, Inc. v. Chem. Specialties, Inc.*,
   994 F. Supp. 2d 353 (W.D.N.Y. 2014).............................................................18

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
   736 F. Supp. 2d 804 (S.D.N.Y. 2010).................................................16, 22, 25

*United States ex rel. Pilon v. Martin Marietta Corp.*,
   60 F.3d 995 (2d Cir. 1995)..............................................................................8

*United States ex rel. Resnick v. Weill Med. College*,
   2010 WL 476707 (S.D.N.Y. 2010)..................................................................22

*United States ex rel. Silver v. Omnicare, Inc.*,
   2014 WL 4827410 (D.N.J. 2014).....................................................................11

*United States ex rel. Stevens v. State of Vt. Agency of Nat. Resources*,
   162 F.3d 195 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 765 (2000)...........8

*United States ex rel. Taylor v. Gabelli*,
   345 F. Supp. 2d. 313 (S.D.N.Y. 2004).......................................................16, 19

*United States ex rel. Wilson v. Bristol Myers Squibb, Inc.*,
   2011 WL 2462469 (D. Mass. 2011),
   *aff'd*, 750 F.3d 111 (1st Cir. 2014)..............................................................9, 10

*Williams v. Bank of N.Y. Mellon Trust Co.*,
   2015 WL 430290 (E.D.N.Y. 2015)....................................................................8

*Wood ex rel. U.S. v. Applied Res. Assocs., Inc.*,
   2008 WL 2566728 (S.D.N.Y. 2008), *aff'd*, 328 Fed. App'x 744 (2d Cir. 2009) ...............6, 18

iv

**Statutes & Rules**

False Claims Act, 31 U.S.C. § 3729-32 ............................................................... *passim*

Fed. R. Civ. P. 7(a) ..............................................................................................8

Fed. R. Civ. P. 12(b)(6)........................................................................................5

Fed R. Civ. P. 9(b) ................................................................................... *passim*

Fed. R. Civ. P. 15(c)(1)(B) .................................................................................12

Fed. R. Civ. P. 15(c)(2)..................................................................................11, 12

Fraud Enforcement and Recovery Act, Pub. L. 111-21...................................19

Patient Protection and Affordable Care Act, Pub. L. 111-148 .......................13

**Other Authorities**

*Credit Rating Agencies and the Financial Crisis*, 110th Cong. 155 (Oct. 22, 2008)...................14

Congressional Oversight Panel, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* (June 10, 2010) ............................................14

*The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) .......................................................................................14

Government Accountability Office, *Financial Crisis: Review of the Federal Reserve System Financial Assistance to American International Group, Inc.* (Sept. 2011)..........................................................................................14

Lawrence J. White, *Markets: The Credit Rating Agencies* 24 Journal of Economic Perspectives 211 (2010)......................................14

Mark Pitman, "S&P, Moody's Mask $200 Billion of Subprime Bond Risk," *Bloomberg.com* (June 29, 2007) ...............................................................14

*The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets*, 110th Cong. 931 (Sept. 26, 2007) ...........................................................14

Sam Jones, "How Moody's Faltered," *Financial Times* (Oct. 17, 2008) ......................14

U.S. Senate Permanent Subcommittee on Investigations, "Senate Investigations Subcommittee Releases Levin-Coburn Report on the Financial Crisis" (Apr. 13, 2011) ...............................................................................................14

v

Defendants Moody's Corporation ("MCO") and Moody's Investors Service, Inc. ("MIS," and together with MCO, "Moody's") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint ("Am. Compl.") of relator Ilya Eric Kolchinsky in its entirety, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b).

## PRELIMINARY STATEMENT

The Amended Complaint in this action asserts *qui tam* claims under the federal False Claims Act, 31 U.S.C. § 3729-32 (the "FCA").  While the FCA is intended to compensate the government for and to deter fraud that affects the government's coffers, a relator must do more than simply allege a false statement or some effect on the public fisc.  Rather, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'  Thus, the submission of a false claim is the *sine qua non* of a False Claims Act violation."  *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) (quotations omitted).  While the claims lodged in the Amended Complaint about Moody's ratings practices are meritless, they fail as a matter of law because, *inter alia*, the relator has failed to connect them up, in a plausible and specific fashion, with a "false claim."

Relator's sprawling, 114-page complaint seldom makes clear what "false claims" it is asserting (itself a fatal problem given the applicability of Rule 9(b) to FCA claims).  Kolchinsky's own introductory "Statement of the Case," however, is instructive.  *See* Am. Compl. ¶¶ 1-28.  The complaint centers on Moody's alleged failure to downgrade, in sufficiently precipitate fashion, various structured finance securities (specifically, collateralized debt obligations or CDOs),[1] monoline insurers,[2] and the municipal securities "wrapped" by those

---

[1] CDOs are asset-backed securities that pool together cash flow-generating assets and then use that cash flow to pay investors, who purchase notes, usually in tranches of varying risk. The two types of CDOs pled in the Amended Complaint are ABS CDOs (the collateral of which consists of residential mortgage backed securities ("RMBS") or other CDOs), and TruPS CDOs (the collateral of which consists of trust preferred securities).  *See* Am. Compl. ¶¶ 8, 48-52.

[2] Monolines are insurers such as MBIA or Ambac, which insure payment of debt obligations (often municipal bonds) to investors (or "wrap" the bonds). Am. Comp. ¶¶ 8, 68-69.

1

insurers.  Indeed, the complaint alleges (without specific support) that literally every Moody's rating for certain classes of securities beginning around the end of 2007 – some 466,700 ratings in all – were false.  *Id.* ¶¶ 4-10.  While the complaint does not allege that anyone purchased any of these securities in reliance on the supposedly false rating, it is nonetheless alleged that (somehow) "investors and financial institutions holding Moody's Aaa-rated securities lost billions of dollars," *id.* ¶ 22; and that they "caused the United States to pay billions of dollars to cover investor losses," *id.* ¶ 24.

The charge that Moody's alleged desire to please issuers had corrupted its ratings process, though untrue, has been frequently and publicly made, and is thus an improper basis for a FCA *qui tam* claim, which precludes suits base on publicly disclosed facts.  And even if the complaint had adequately and specifically alleged either the falsity of the ratings or their supposedly widespread effects, these allegations do not articulate a "false claim" actionable under the FCA, because they do not suggest that Moody's (or anyone else) falsely and fraudulently sought payment from (or sought to avoid payment to) the federal government.

The only allegations that even suggest – but do not come close to adequately pleading – false requests to the federal government for payment are (1) that "Moody's fraud significantly decreased the amount of premiums that federally insured bank were required to pay to the Federal Deposit Insurance Corporation ("FDIC")," *id.* ¶¶ 11, 25 (the "FDIC Claims"); and (2) that Moody's statements to the government affected the terms of the bailout of American International Group Inc. ("AIG"), in particular the additional support given in November 2008 following the initial September bailout, *id.* ¶ 26 (the "AIG Claims").  Neither set of allegations states a viable claim.

First, neither the FDIC Claims, nor the AIG Claims, were pled in the original complaint. Accordingly, the failure of relator to file the amended complaint under seal as per the FCA provisions requires dismissal. Second, because these claims were first lodged more than six years after the alleged claims accrued, and they do not relate back to the original complaint, they are

2

time-barred.  Third, the FCA public disclosure bar strips the Court of jurisdiction over all of the claims, because they are based on public information and Kolchinsky has not plausibly alleged, nor can he prove, that he is the original source of this information.

On the merits, these claims fail as well. First, the FDIC Claims are not pled with specificity under Rule 9(b); all Kolchinsky has done is allege – on information and belief – that because credit ratings are used in making a risk assessment on which FDIC premiums are partly based, then *some* financial institutions *must* have underpaid their premiums.  The complaint also fails to connect the allegedly false ratings to an actually false claim, i.e., by alleging, as required, that Moody's issued false ratings for the purpose of getting financial institutions' FDIC premiums reduced, or that these ratings were material to the FDIC premium of any institution.

As for the AIG claims, the complaint alleges that the AIG collapse was precipitated by ratings downgrades, which led to increasing collateral calls by AIG's credit default swap counterparties.[3]  Its conclusory allegation that the collapse could have been avoided if only Moody's had downgraded in a more rapid and more severe fashion is utterly implausible.  But even if it were not, AIG was not, and is not, a federal agency.  Statements, false or not, that caused AIG to lose money do not constitute "false claims" under the FCA.

The claims relating to the additional support provided to AIG by the Federal Reserve Bank of New York ("FRBNY") in November 2008 also fail because there is nothing plausibly alleged to be false about AIG's need for further support, or about any statement by Moody's that AIG's credit rating might not be sustainable.  The complaint's extensive reliance on Moody's Joint Default Analysis ("JDA"), by which Moody's takes government support into account in rating certain institutions, is a complete nonsequitur.  There is no allegation, nor anything in the JDA itself, that Moody's was required to apply the JDA to the AIG rating, to assume that further

---

[3] Credit default swaps (CDS) are instruments whereby the seller (AIG) "protects" the buyer by promising to pay if the "reference security," such as a CDO fails to pay as promised. CDS contracts often require the seller to put up increasing collateral based on a decreased credit rating of either the reference security or the seller itself.  *See* Am. Compl. ¶¶ 71-72.

government support for AIG was unlimited, or that is otherwise inconsistent with Moody's statements of concern about AIG.

At bottom, Kolchinsky's complaint is another salvo in his continuing quest to mischaracterize his disagreements with Moody's as "fraud" – and, not incidentally, to monetize that mischaracterization.  His attempt to create a federal false claim out of his allegations has now failed twice – first, in his original complaint, which Moody's demonstrated was inadequate, and now, in his completely rewritten amended complaint.  As discussed below, the complaint should be dismissed with prejudice and without leave to replead.

<b><u>BACKGROUND</u></b>

Relator Eric Kolchinsky is a former Managing Director at Moody's.  This is not his first attempt to extract payment from Moody's for what he claims were improper ratings practices.  In September 2010, following what he claims was his "unlawful termination" from Moody's in September 2009, he filed an action in this court asserting claims for defamation, emotional distress, and retaliation under the Sarbanes-Oxley Act.  *See Kolchinsky v. Moody's Corp., et al.*, No. 10 Civ. 6840 (S.D.N.Y.).  After the district court dismissed all but the Sarbanes-Oxley claim, Kolchinsky agreed, in December 2012, to voluntarily dismiss that claim with prejudice.

Ten months earlier, however, Kolchinsky had filed, under seal, the original complaint in this action.  *See* Dkt. # 11 ("Orig. Compl.").  The complaint mostly reiterated general, publicly aired accusations about how Moody's had allowed its independence in rating structured finance to be compromised, and asserted that this had rendered false Moody's certifications as a Nationally Recognized Statistical Rating Organization ("NRSRO").  The complaint did not assert any particular ratings were false.  Its apparent attempt to state an FCA claim was largely twofold: (1) that government-sponsored enterprises Fannie Mae and Freddie Mac (the "GSEs") had relied on Moody's (purportedly improper) NRSRO designation in purchasing RMBS which ultimately led to their bailout by the federal government; and (2) that Moody's overrating of AIG had (somehow) led to the necessity of a federal government bailout.  The complaint alleged

4

violations of the presentment, false statement, and conspiracy prongs of the FCA, 31 U.S.C. § 3730(b)(1)(A), (B), and (C), respectively.  The complaint also alleged that Kolchinsky had been terminated in retaliation for raising potential FCA claims, in violation of § 3730(h).

Following several extensions of the prescribed 60-day sealing period, the federal government declined intervention in this suit on May 28, 2014.  (Dkt. # 12.)  Moody's was served with the unsealed complaint on October 28, 2014.  (Dkt. #15.)  After Moody's filed a pre-motion letter with the Court (Dkt. # 18) outlining just some of the complaint's many inadequacies – among them, its failure to allege anything that could be a "false claim" under the FCA – Kolchinsky publicly filed the Amended Complaint on May 27, 2015.

The Amended Complaint retains many of the original complaint's general allegations about Moody's purported lack of independence, and how this allegedly rendered its NRSRO certifications false.  It added wholly new allegations, however, regarding Moody's supposed failure to downgrade CDOs in sufficiently quick or severe fashion.  The amended complaint also alleged for the first time that Moody's alleged failure to downgrade monoline insurers led to false municipal ratings (some 461,000 in all).

In terms of putative "false claims," the amended complaint continues to assert that the AIG bailout was somehow precipitated by Moody's failure to downgrade AIG faster.  Gone, however, are any reference to the GSEs.  The complaint adds two new sets of claims.  The FDIC Claims assert that, due to Moody's failure to downgrade ABS CDOs and the monolines in a more rapid fashion, federally insured financial institutions underpaid their FDIC premiums.  The AIG Claims assert that Moody's made false statements to the federal government in November 2008 regarding the possible further downgrade of AIG, statements that purportedly led to support for AIG under more favorable terms than the government would otherwise have provided.

## ARGUMENT

The standards for a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) have been concisely stated by this Court:

5

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [F]actual content that is merely consistent with, rather than suggestive of, a finding of liability will not support a reasonable inference. …[C]ourts must consider the complaint in its entirety, as well as ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.

*S.E.C. v. Egan*, 994 F. Supp. 2d 558, 563-64 (S.D.N.Y. 2014) (quotations omitted).

Because "[it] is self-evident the FCA is an anti-fraud statute," a complaint must comply with Fed. R. Civ. P. 9(b).  *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995). "To comply with Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Kester*, 23 F. Supp. 3d at 251-52. This particularly requirement extends to the pleading of a false claim submitted to the government, i.e., a plaintiff "must plead the submission of false claims with a high enough degree of particularity that defendants can reasonably 'identify particular false claims for payment that were submitted to the government.'"  *Id.* at 260 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)); *see United States ex rel. Wood v. Applied Research Assocs.*, 328 Fed. App'x 744, 747-50 (2d Cir. 2009) (allegations "plainly insufficient under Rule 9(b)" where complaint "do[es] not cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time.").

On a motion to dismiss for lack of subject matter jurisdiction, the district court may refer to evidence outside the pleadings.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff, as the proponent of subject matter jurisdiction, "has the burden of proving by a preponderance of the evidence that it exists."  *Id.*; *see also United States ex rel. Monaghan*

*v. N.Y.C Dep't of Housing*, 2012 WL 4017338, at *3 (S.D.N.Y. 2012), *aff'd sub nom. Monaghan*

*v. Henry Phipps Plaza West, Inc.*, 531 Fed. App'x 127 (2d Cir. 2013).

## I.   REQUIREMENTS OF THE FALSE CLAIMS ACT

The False Claims Act, 31 U.S.C. § 3729-32, provides for penalties against any person

who engages in any of a number of specific acts potentially affecting the federal treasury.

Specifically the current version of the FCA provides for liability for any person who

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) Conspires to commit a violation of [the substantive FCA provisions];  … or
>
> (G) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).  The FCA has been amended in certain ways that are material to this

action; to the extent that an earlier version is applicable, it will be discussed as necessary below.

The FCA's provisions may be enforced by a civil action brought directly by the United

States or, as here, as a *qui tam* suit by a relator such as Kolchinsky.  Two provisions of the FCA

specifically applicable to *qui tam* actions are pertinent to this suit.  First, "the complaint" must be

served on the federal government and filed under seal for a period of at least 60 days.

§ 3730(b)(2).  Second, a *qui tam* action is subject to the "public disclosure bar," i.e., the court

may not entertain an action where substantially the same allegations have been publicly

disclosed, unless the relator qualifies as an "original source" of the information.  § 3730(e)(4).

## II.   THE AMENDED COMPLAINT WAS NOT FILED PURSUANT TO THE SEALING PROCEDURES UNDER THE FALSE CLAIMS ACT AND MUST BE DISMISSED

The FCA requires that, in a *qui tam* action, "[t]he complaint shall be filed in camera, shall

remain under seal for at least 60 days, and shall not be served on the defendant until the court so

orders." *Id.*  The sealing provisions serve many purposes, but chiefly "to allow the Government

an adequate opportunity to fully evaluate the private enforcement suit." *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998 (2d Cir. 1995) (quotation omitted).

As both the Second Circuit has stated, and as this Court itself has recognized, "Failure to comply with these mandatory threshold requirements warrants dismissal of the *qui tam* complaint with prejudice …." *United States ex rel. Stevens v. State of Vt. Agency of Nat. Resources*, 162 F.3d 195, 200 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 765 (2000); *see Pilon*, 60 F.3d at 999-1000 (abuse of discretion for district court to dismiss without prejudice and modifying judgment to dismissal with prejudice); *Avile v. Feitell*, 2008 WL 2139153, at *2 (S.D.N.Y. 2008) (dismissing FCA claims not filed under seal).  Numerous courts have dismissed, with prejudice, attempted FCA claims filed without following the sealing requirements.  *See Williams v. Bank of N.Y. Mellon Trust Co.*, 2015 WL 430290, at *5 (E.D.N.Y. 2015);  *United States ex rel. LeBlanc v. ITT Indus., Inc.*, 492 F. Supp. 2d 303, 308 (S.D.N.Y. 2007); *United States ex rel. Noviello v. Giuliani*, 1997 WL 930176, at *2 (E.D.N.Y. 1997).

These "mandatory threshold requirements" apply to an amended complaint as well as the original.  The plain language of the statute – requiring that "the complaint" be filed under seal – most naturally encompasses *any* complaint, original or amended.  *See United States ex rel. Davis v. Prince*, 766 F. Supp. 2d 679, 683-84 (E.D. Va. 2011); *cf. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) ("absent some limitation" of FCA's reference to "allegations" to "the relator's *initial* complaint, we will not infer one."); Fed. R. Civ. P. 7(a) (only permitted pleadings listed include "complaint," which necessarily includes amended complaints).[4]

---

[4] As the *Davis* court noted, to interpret § 3730(b)(2) not to apply to amended complaints would allow a *qui tam* plaintiff to completely undercut the filing requirements, by "fil[ing] an initial complaint with minor fraud allegations, and then once the government declines to intervene, the relator could amend the complaint as of right to include additional claims for relief or new and substantially different allegations of fraud." *Davis*, 766 F. Supp. 2d at 684; *cf. Rockwell*, 549 U.S. at 473 (limiting public disclosure bar to initial complaint would allow relator to plead a "trivial" fraud to obtain jurisdiction then amend).  Indeed, whether that was relator's intention or not, that is precisely what has happened here.

8

In accordance with this plain language, a number of courts to have addressed the issue have concluded that the term "complaint" in § 3730(b)(2) is not limited to the initial filing. Thus, for example, in *United States ex rel. Wilson v. Bristol Myers Squibb, Inc.*, 2011 WL 2462469 (D. Mass. 2011), *aff'd*, 750 F.3d 111 (1st Cir. 2014), the relator sought leave to amend his complaint, which alleged that the defendants illegally sought to promote off-label uses of their drugs for which doctors improperly sought Medicaid reimbursement, to add new allegations regarding additional drugs and additional methods of promotion. *See id.* at *6. The relator filed the proposed amended complaint in the public file and did not serve the government. *See id.* at *4. The district court rejected the relator's argument that the FCA filing and service requirements did not apply to the amended complaint, *see id.* at *6, held that these provisions had been violated by the filing of the amended complaint, and denied leave to amend. *See id.* at *6-7. The First Circuit affirmed. *See* 750 F.3d at 120; *see also United States ex rel. Cunningham v. Millennium Labs.*, 2014 WL 309374, at *2 (D. Mass. 2014) (holding that FCA sealing provisions applied to proposed amended complaint).

A number of other courts have held that the sealing provisions apply to amended complaints, at least where the amended complaint introduces new claims or is not "substantially similar" to the original complaint. *United States ex rel. Hagerty v. Cyberonics, Inc.*, __ F. Supp. 3d __, 2015 WL 1442497, at *17 (D. Mass. 2015); *United States v. Stevens-Henager College, Inc.*, 2014 WL 3101817, at *3 (D. Idaho 2014); *Davis*, 766 F. Supp. 2d at 684.

Even assuming that compliance with the sealing requirements is only necessary where an amended complaint is not "substantially similar" to the original complaint, that condition is more than met here. The Amended Complaint here is vastly different from the one originally filed. It purports (unsuccessfully, as discussed *infra*) to allege an almost completely new set of claims – i.e., in the FCA sense of a false claim presented to the government.

While the original complaint claimed that Moody's had made false statements about its ratings process generally, the *sine qua non* of an FCA claim is the "false claim" or "reverse false

9

claim" to the government. *Kester*, 23 F. Supp. 3d at 253. The primary "claim" attempted to be alleged in the original complaint was the alleged sale of falsely rated RMBS to Fannie Mae and Freddie Mac. After Moody's pre-motion letter, however, the amended complaint replaced those with two entirely new sets of "claims," i.e., the FDIC Claims and AIG Claims.

The original complaint makes no allegation about representations or statements by Moody's to the Federal Reserve. It makes no allegation about the supposed effect of the Joint Default Analysis. There is no discussion about the "upside" residual in the Maiden Lane SPVs. While the original complaint may have arguably put Moody's on notice of Kolchinsky's claim that it had maintained too high a rating for AIG, and/or that Moody's ratings led to the AIG collapse, as discussed *infra* Section VII this does not state a "false claim." The original complaint simply made no accusation that Moody's lied to the Federal Reserve in order to affect the AIG bailout.

The FDIC Claims are also wholly new. There is absolutely nothing in the original complaint which even discusses the use of Moody's ratings in determining the risk portfolio of financial institutions for regulatory purposes. There is nothing whatsoever about FDIC premiums at all, much less a claim that they were underpaid due to Moody's failure to downgrade ratings in a timely fashion. Indeed, the original complaint did not assert a reverse false claim theory *at all*. *See* Orig. Compl. ¶¶ 338-353.

Moreover, while the original complaint largely alleged errors in Moody's initial ratings (of RMBS and CDOs), and largely discussed CDO downgrades in terms of the losses they caused to those who already held them, there was no allegation that Moody's had improperly "slow-walked" those downgrades. Nor was there anything at all in the original complaint about the rating of TruPS CDOs. And the original complaint nowhere suggested that 460,000+ municipal bonds were falsely rated due to supposed failure to downgrade the monoline insurers. These are more than simply adding new details to a previously described fraudulent scheme; these are wholly new claims. *See Wilson*, 2011 2462469, at *6.

10

The amended complaint, in short, was drastically revamped in order to avoid the fatal flaws that Moody's pointed out in its initial pre-motion letter.  The result is a complaint far different than the one the United States reviewed.  Because this filing has undercut the purpose of the FCA sealing provisions, it must be dismissed with prejudice.

## III.   THE AMENDED COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

Most, if not all, of the amended complaint is also barred by the statute of limitations.  The FCA provides that a civil action may not be brought "more than 6 years after the date on which the violation of section 3729 is committed." 31 U.S.C. § 3731(b)(1).[5]  Because the amended complaint was filed May 27, 2015, any claim based on an alleged violation of § 3729 occurring prior to May 27, 2009 is time-barred unless it relates back to the original complaint.

It is clear that both the AIG Claims and FDIC Claims fall within this time frame.  The AIG Claims all are alleged to have taken place, at the latest, in November 2008. Am. Compl. ¶¶ 207-25.  As for the FDIC Claims, the complaint alleges that the FDIC premiums were affected by the ratings on "approximately $600 billion of CDOs and over $1.7 trillion of guaranteed securities beginning the fourth quarter of 2007." Am. Compl. ¶ 275.  Elsewhere in the Complaint, it is alleged that the CDO ratings were false "from approximately October 2007 to approximately December 2008" and that the guaranteed securities (i.e., those wrapped by monolines) were misrated "from approximately December 2007 to approximately March 2009." Am. Compl. ¶ 8.  The FDIC claims, therefore, accrued at the latest in March 2009.

Nor are these claims saved by relating back to the original complaint in this case.  First, the Second Circuit has made clear that, because "the touchstone for relation back pursuant to Rule 15(c)(2) is notice, *i.e.,* whether the original pleading gave a party 'adequate notice of the conduct, transaction, or occurrence that forms the basis of the claim or defense,'" *United States*

---

[5] The FCA's alternative limitations period, § 3731(b)(2), applies only to claims brought directly by the United States.  *See United States ex rel. Silver v. Omnicare, Inc.*, 2014 WL 4827410, at *8 (D.N.J. 2014); *United States ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 486 (S.D.N.Y. 2006).

*v. Baylor Univ. Med. Ctr.*, 469 F.3d 263, 270 (2d Cir. 2006), it follows that "Rule 15(c)(2) does not permit relation back to a relator's *qui tam* complaint, which is filed under seal," *id.* at 268. Although the specific holding of *Baylor* – that a Government complaint-in-intervention does not relate back– has now been overturned by statute, *see* 31 U.S.C. § 3731(c), it has not been altered with respect to the ability of a later *qui tam* complaint to relate back to one filed under seal.

The AIG and FDIC Claims do not relate back in any case.  Under Rule 15(c)(1)(B), an amendment relates back when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  The appropriate inquiry is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014).

As discussed *supra* at 9-10, the original complaint makes no mention of FDIC premiums or their supposed underpayment due to Moody's purportedly false CDO or municipal bond ratings.  The original complaint has no discussion of Moody's purportedly false statements to the FRBNY regarding AIG.  The original complaint is not based on "slow-walking" CDO downgrades, or on TruPS CDOs at all.  The amended complaint does not merely "add more factual detail or clarification to the claims in the original complaint."  *In re Noah Educ. Holdings, Ltd. Secs. Litig.*, 2010 WL 1372709, at *9 (S.D.N.Y. 2010) (allegations of different false statements in prospectus did not relate back).  There is no fair notice in the original complaint of either the AIG or FDIC Claims.  Because they were interposed more than six years after they accrued, they are time-barred.

## IV.   THE COMPLAINT IS BARRED BY THE PUBLIC DISCLOSURE BAR

The Amended Complaint also fails because the court does not have jurisdiction over it due to the FCA's "public disclosure bar":

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news

12

media, unless the action is brought by the Attorney General or the person bringing
the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who
has direct and independent knowledge of the information on which the allegations
are based and has voluntarily provided the information to the Government before
filing an action under this section which is based on the information.

§ 3730(e)(4) (2010).[6]  Because this is a question of subject matter jurisdiction, it is Kolchinsky's

burden to show jurisdiction is proper.

For the public disclosure bar to apply, the public allegations need not be identical to those

in the *qui tam* complaint; it is enough that they are "substantially similar." *See United States ex

rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 346 (S.D.N.Y. 2014); *United States

ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F. 2d 1148, 1158 (2d Cir. 1993) (bar

applies to any action "based in any part upon publicly disclosed allegations or transactions").

"The question is whether the information conveyed [in the public disclosures] could have formed

the basis for a governmental decision on prosecution, or could at least have alerted law-

enforcement authorities to the likelihood of wrongdoing."  *Kester*, 43 F. Supp. 3d at 347

(quotation omitted).

To be an "original source," Kolchinsky must show that he has "direct and independent

knowledge, i.e., he

must have knowledge obtained from actually viewing source documents, or first
hand observation of the fraudulent activity that provides the grounds for the *qui
tam* suit.  This requirement is not satisfied if a third party is the source of the core
information upon which the *qui tam* complaint is based, or if the relator's
knowledge is derived from public disclosures.

*Id.* at 354.  He must also show that he provided this original source information to the

government prior to filing.

Most obviously, the AIG Claims are subject to the public disclosure bar.  The complaint's

allegations that concern about possible downgrades played a role in the Federal Reserve's

---

[6] Although this provision was amended by the Patient Protection and Affordable Care
Act ("PPACA"), Pub. L. 111-148 (enacted Mar. 23, 2010), it was not made retroactive to
conduct that predated its enactment.  *See Kester*, 43 F. Supp. 3d at 354.

structuring has been discussed in numerous public fora, including ones directly quoted in the complaint.[7]   Meanwhile, the terms of Moody's Joint Default Analysis have been made public by, *inter alia*, Moody's itself (as alleged in the complaint).  *See* Am. Compl. ¶ 202.  All Kolchinsky purports to do is put these public facts together and claim an inconsistency.  Even if this amounted to a false claim – and, as discussed *infra* Section VII it does not – Kolchinsky does not, and obviously cannot, claim to be an original source of this information. The FDIC Claims also depend on publicly disclosed information.  *See* Am. Compl. ¶¶ 265-73.

But even more generally, the complaint rests largely on allegations that Moody's compromised its rating processes, and issued or maintained unduly high ratings, in order to curry favor with issuers.  Moody's of course denies the truth of these allegations in their entirety, but these, or "substantially similar," allegations, have been repeated (though never proven) in numerous government hearings and reports, or in lawsuits (both by private and/or government actors), or in news media.[8]   The allegations certainly "could have alerted law-enforcement authorities to the likelihood of wrongdoing."  *Kester*, 43 F. Supp. 3d at 347.  At most,

---

[7] *See* Am. Compl. ¶ 198 (quoting *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* ("FCIC Report"), at 352 (January 2011); ¶ 200 (quoting Congressional Oversight Panel, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* ("COP Report"), at 196 (June 10, 2010); ¶ 201 (quoting Government Accountability Office, *Financial Crisis: Review of Federal Reserve System Financial Assistance to American International Group, Inc.*, at 51 (Sept. 2011); ¶ 209 (quoting COP Report, at 86); *see also Starr Int'l. Co. v. United States*, 121 Fed. Cl. 428, 451 (2015).

[8] *See, e.g.*, *Connecticut v. Moody's Corp.*, 2011 WL 63905, at *1 (D. Conn. 2011); *Flynn v. McDaniel*, 689 F. Supp. 2d 686, 687-88 (S.D.N.Y. 2010); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 -79 (S.D.N.Y. 2009); FCIC Report, at xxv; *Credit Rating Agencies and the Financial Crisis*, 110th Cong. 155 (Oct. 22, 2008); U.S. Senate Permanent Subcommittee on Investigations, "Senate Investigations Subcommittee Releases Levin-Coburn Report on the Financial Crisis" (Apr. 13, 2011); *The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets*, 110th Cong. 931 (Sept. 26, 2007); Lawrence J. White, *Markets: The Credit Rating Agencies*, 24 Journal of Economic Perspectives 211 (2010); Sam Jones, "How Moody's Faltered," *Financial Times* (Oct. 17, 2008).  Indeed, claims that the rating agencies were not downgrading quickly enough were lodged from the very inception of the financial crisis.  *See, e.g.*, Mark Pitman, "S&P, Moody's Mask $200 Billion of Subprime Bond Risk," *Bloomberg.com* (June 29, 2007).

14

Kolchinsky's complaint adds certain details, but that does not prevent the allegations from qualifying as "publicly disclosed."  *See id.* at 350 (the fact that the relator provided more information about the scheme does not mean that the [prior public disclosures] did not 'expose all the *essential* elements of the alleged fraud.'") (quoting *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 437 Fed. App'x 13, 17 (2d Cir. 2011)).

Thus, Kolchinsky must prove that he is the original source of the allegations in the complaint.  His conclusory pleading of that fact, Am. Compl. ¶ 35, is insufficient.  *See, e.g.*, *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1052-53 (10th Cir. 2004).  And there is ample reason why he would not be such a source, since all of the material allegations in the complaint post-date his position within MIS, the ratings organization.  Indeed, the Amended Complaint repeatedly makes clear that his broad assertions are based, not on his own knowledge, but on "information and belief."  *See, e.g.*, Am. Compl. ¶ 143 ("Upon information and belief, nearly all of Moody's ratings on structured finance CDO tranches … were also false …."); ¶ 179 ("On information and belief, analysts in the Moody's Insurance group were also concerned" about the model being used); ¶ 271 (ratings of insured institutions would "upon information and belief" have been downgraded "if Moody's true credit ratings … had been made public.").  *See Rockwell*, 549 U.S. at 475-76 (relator could not be original source for purported false claims that post-dated activities he had personal knowledge of).

Even to the extent that he supplies specific documents in this complaint, moreover – and even then much of the allegations are on information and belief, *see id.* ¶¶ 134, 136, 142 – the most those documents relate to is a claim as to the results of certain Moody's model runs, which are only one input to a rating.  There is nothing to suggest that Kolchinsky could be an original source of the key claim he makes, i.e., that Moody's determination not to rely solely on those models was knowingly false or fraudulent.[9]

---

[9] Even to the extent that Kolchinsky could establish himself as the "original source" for the model run information he supplies about a few dozen CDOs, that information by itself does not state a claim under the FCA.  To connect up to an actual claim requires not only the inference that Moody's "true" opinion on these CDOs was dictated by the models and not any exercise of

15

## V.     ALLEGATIONS OF FALSE RATINGS DO NOT STATE A CLAIM

Much of the complaint consists of allegations that Moody's compromised its ratings integrity and that, as a result, not only were ratings purportedly false but investors were allegedly hurt as a result. *See, e.g.*, Am. Compl. ¶¶ 11, 22. Moody's of course denies that any of this is true, but such allegations do not state a claim under the FCA. The FCA requires a false or fraudulent claim for payment from the federal government (or, for a reverse false claim, a preexisting obligation to pay money to the federal government). False statements (e.g., purportedly wrong ratings) made to *investors*, i.e, persons not the federal government, are simply not actionable under the FCA. *See Karvelas*, 360 F.3d at 232 ("presentation of false or fraudulent claims to the government is a central element of every [FCA] case").

These allegations have not, in any case, been pled with specificity. Rather than plead *which* statements – i.e., ratings – were "false," Kolchinsky pleads, on information and belief, that, for a given period, they all are. But he pleads no facts from which it could be plausibly alleged that all of Moody's ratings were materially false, nor that give rise to an inference that Moody's published any false ratings knowingly. *See Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) (plaintiff must plead facts which give rise to a "strong inference" of "knowledge of falsity"). Credit ratings are opinions and matters of judgment, as many courts have clearly held. *See, e.g.*, *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010). Kolchinsky's disagreement with Moody's judgment does not establish any rating as "false." *See United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 813 (S.D.N.Y. 2010) (no "false statement" based on auditor's opinion absent allegation that auditor did not actually hold that opinion); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331-32 (S.D.N.Y. 2004) (errors or differences in

---

judgment – itself utterly untrue and not plausibly alleged – but that these CDOs are representative of all CDOs (and, similarly, for monoline-wrapped municipals). Kolchinsky does not plead, and cannot prove, either this essential link or that he is an original source for it. *See Rockwell*, 549 U.S. at 476 (fact that relator was an original source for certain claims did not provide jurisdiction with respect to others for which he was not).

16

judgment not "false" under the FCA.  In short, the complaint's pleading fails the most basic requirements of Rule 9(b) – that the complaint state the "who, what, when, where and how" of the purported fraud, *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 513 (S.D.N.Y. 2014) – and cannot reasonably be expected to be responded to.  *See United States v. N.Y. Soc. for the Relief of the Ruptured & Crippled*, 2014 WL 3905742, at *16 (S.D.N.Y. 2014) ("Fraud is a serious allegation, and Rule 9(b) provides meaningful protection against blunderbuss claims of fraud.").

For much the same reason, the complaint's allegation that Moody's "caused the filing of false certifications in SEC Shelf Registration and related documents, upon which investors relied in making reasonable purchasing decision," ¶ 291, does not state a claim.  Even if this allegation had been pled with the specificity required under Rule 9(b) (which it clearly has not been – not a single specific "false" Shelf Registration Statement is even alleged), a registration statement filed with the SEC is not a claim for payment from the federal government, nor is there any allegation that such registration statements were used to obtain payments from the federal government.  *See United States v. Richard Dattner Architects*, 972 F. Supp. 738, 747 (S.D.N.Y. 1997) (claim that defendant presented a false request for a labor certification for alien employee did not involve a "claim" under FCA because it did not affect Treasury).

## VI.   THE FDIC CLAIMS ARE NOT SUFFICIENTLY PLED

### A.  The FDIC Claims are Not Pled With Particularity

As noted above, FCA claims are subject to the heightened pleading requirements of Rule 9(b).  Not only does this require pleading of the allegedly false statements with particularity, it requires pleading of the false *claims* with particularity as well:

> A plaintiff must plead the submission of a false claim with a high enough degree of particularity that defendants can reasonably identify particular false claims for payment that were submitted to the government.  This stricter standard serves the purposes of Rule 9(b) by requiring plaintiffs to both (1) identify which of the claims submitted were 'false' and (2) provide factual support (as opposed to mere speculation) for their assertions that claims were actually submitted to a government program.

*Kester*, 23 F. Supp. 3d at 260.  A plaintiff cannot satisfy this standard "'by alleging a fraudulent scheme in detail and concluding, that as a result of the fraudulent scheme, false claims must have been submitted.'"  *Id.* at 253 (quoting *United States ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *5 (E.D.N.Y. 2009)); *see United States ex rel. Osmose, Inc. v. Chem. Specialties, Inc.*, 994 F. Supp. 2d 353, 366 (W.D.N.Y. 2014) (relator's "market-share theory of causation is patently insufficient").  Rule 9(b) is equally applicable to "reverse false claims." *See Wood ex rel. U.S. v. Applied Res. Assocs., Inc.*, 2008 WL 2566728, at *5 (S.D.N.Y. 2008), *aff'd*, 328 Fed. App'x 744, 748 (2d Cir. 2009).

With respect to the FDIC claims, that is precisely what Kolchinsky does here.  His complaint describes the basic operation of FDIC insurance, and alleges that credit ratings factored into the risk assessment of member institutions, and that these risk assessments factored into the calculation of the premiums these institutions would pay.  Am. Compl. ¶¶ 265-83.  Beyond that, however, the complaint simply pulls the names of a few financial institutions out of the air and asserts in conclusory fashion that institutions "such as" these had balance sheets the riskiness of which was understated.  Am. Compl. ¶ 275.  The complaint does not allege that any of these institutions actually underpaid their FDIC premiums due to Moody's ratings, much less specify when such underpayments were made or the facts that would support such a claim.

The one even cursory attempt at more detail – relating to Citibank – can only muster a claim that "on information and belief," had Moody's credit ratings been reported accurately, Citibank would have fallen in a different risk category, and that this would have led to a higher premium payment.  *Id.* ¶¶ 276-78.  But it is well-settled in this circuit that fraud cannot be pled under Rule 9(b) on "information and belief" unless the matters are "peculiarly within the adverse parties' knowledge and the allegations are accompanied by a statement of facts upon which the belief is based."  *Aronov v. Mersini*, 2015 WL 1780164, at *4 (S.D.N.Y. 2015).  Citibank's FDIC reporting is not likely within Moody's knowledge *at all*, much less "peculiarly so."  Nor does the complaint contain any statement of facts upon which the supposed belief is based.

18

In short, what Kolchinsky has done is take the publicly known mechanism of FDIC insurance premium calculations, coupled with his general claims about Moody's overrating of securities, and speculated that this *must* have led to *some* financial institution underpaying its premiums. He cannot, however, actually allege any to have done so, or when, or what Moody's statements caused the underpayment, as required by Rule 9(b). And his dropping of the names of random insured financial institutions does not make his allegations any more precise.[10] *See United States ex rel. Joseph v. Brattleboro Retreat*, 2014 WL 3908432, at *9 (D. Vt. 2014) ("mere speculation" that false claims submitted insufficient under 9(b)).

### B. The Complaint Does Not Allege that Moody's Made any False Statement for the Purpose of Reducing FDIC Premiums

As the FCA stood during the allegations made relative to the FDIC Claims, a reverse false claim such as alleged here required an allegation that the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement *to conceal, avoid, or decrease* an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (2009) (emphasis added).[11] This language requires that a false record or statement be made *for the purpose* of reducing or avoiding a payment to the government. *See United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1302-03 (10th Cir. 2010); *Taylor*, 345 F. Supp. 2d. at, 331-32. The complaint never alleges *at all* that Moody's purportedly false ratings were made with the intent that to reduce FDIC premiums, much less do so in a plausible fashion.

---

[10] The complaint's reference to Moody's Ratings Delivery Service ("RDS"), *see* Am. Compl. ¶¶ 77-80, fails to state a claim for the same reason. Though alleging, upon "information and belief," that Moody's sells its RDS to "a number of federal and state agencies," not a single one is named. Kolchinsky is simply assuming that there must be a federal agency somewhere that pays for Moody's RDS. In addition, the only statement alleged to have been made by Moody's with respect to the RDS is that a "provides a current snapshot of ALL publishable ratings from Moody's database," *id.* ¶ 79, and that is nowhere alleged to be false.

[11] This provision was amended by Fraud Enforcement and Recovery Act ("FERA"), Pub. L. 111-21, made applicable to "conduct on or after" May 20, 2009. As discussed *supra* at 8, the FDIC claims end in March 2009. Thus, they are covered by the pre-FERA version of the FCA.

19

### C.  There is No Plausible Allegation of Materiality

The complaint also fails to allege, in plausible fashion, that Moody's purported failure to downgrade securities properly was material to the FDIC premium payments, i.e., had "a natural tendency to influence, or be capable of influencing, the payment … of money or property." § 3729(b)(4).  While the complaint alleges that ratings are used in the risk assessment of financial institutions, to determine if any allegedly false rating was material would appear to require that one know, at a minimum, (1) how "false" it was, i.e., what was the maximum "true" rating the security should have had; (2) how that difference would affect the weighting of the security in the risk assessment; (3) how much of that security was held by a given financial institution; and (4) what percentage of an insured financial institution's assets were comprised by affected securities; and (5) how "close" the institution was to a change in capitalization classification.  The complaint alleges none of these, and provides absolutely no plausible basis to conclude that a given security's rating was "material" to *any* institution's FDIC premium.

## VII.   THE ALLEGATIONS RELATING TO THE AIG BAILOUT DO NOT STATE A FALSE CLAIM

The amended complaint devotes a large percentage of its ink to allegations regarding AIG, its near-collapse and its (successful) bailout by the United States.  Even if the allegations regarding Moody's role in all of these events were true (and they are not), they do not state a claim under the FCA.

### A.  Claims Relating to the AIG Collapse and Bailout are Not Actionable

Much of the complaint's references to AIG consists of allegations claiming that Moody's overrated AIG itself, either by use of inaccurate models for AIG itself or by failing to downgrade the reference securities on which AIG was issuing CDSs.  Am. Compl. ¶¶ 166-168.  The complaint acknowledges that it was the downgrades of reference securities that increased the collateral requirements on AIG and made its position untenable, *see id.* ¶ 165; for Moody's to have downgraded sooner would, logically, have only brought on AIG's financial woes sooner. The complaint's claim that, if only Moody's had brought about this collapse in more rapid

20

fashion, AIG would have not needed a bailout, is completely conclusory, unsupported by any factual allegations that would render it plausible.[12]

But even were this highly speculative counterfactual correct, it is irrelevant.  None of these allegations include the *sine qua non* of an FCA claim, i.e., the presentation to the federal government of a false or fraudulent claim for payment.  AIG is not now, nor has it ever been, an agency of the federal government.  And even if one accepts the far-fetched causal chain in the complaint between Moody's ratings practices and the AIG bailout, it is simply not the case that every allegedly false statement that purportedly led to the payment of money by the federal government states an FCA claim.  *See United States ex rel. Alcohol Found., Inc. v Kalmanovitz Charitable Found.*, 186 F. Supp. 2d 458, 464 (S.D.N.Y.) (rejecting theory that would "enlarge the *qui tam* mechanism to address all manner of misrepresentations … if ultimately it might result in the federal Government's payment of a bill"), *aff'd*, 53 Fed. App'x 153 (2d Cir. 2002).

### B.  Claims Relating to November 2008 Restructuring are Not Actionable

Kolchinsky alleges that, following the initial federal government rescue of AIG in September 2008, the government's decision to increase its support in November 2008 was based in part on the threat of further ratings downgrades by the rating agencies, including Moody's.  The complaint alleges that no further downgrades were possible because, under Moody's "Joint Default Analysis" ("JDA"), AIG had become a "government-related issuer" due to the September 2008 intervention by the federal government, and thus the "certainty" of further support "protected AIG's credit rating from any further downgrade."  Am. Compl. ¶202.

First, there is no allegation of the presentment of a "false or fraudulent claim for payment."  Certainly there is no allegation that Moody's made a claim for payment to the government.  Indeed, there is not even an allegation that AIG did.  Even reading the allegations

---

[12] The complaint does not allege, nor could it, that AIG issued CDS protection on CDOs in reliance upon the purportedly false ratings by Moody's alleged in the complaint.  AIG ceased writing credit protection on new CDOs in 2005, well before the material allegations of the complaint.  *See* Orig. Compl. ¶ 247; *Starr*, 121 Fed. Cl. at 439.

21

of negotiations liberally as a request for further relief by AIG (and even if that counts as a "claim" for purposes of the FCA), there is no plausible allegation that the claim was *false*, i.e., that AIG was not actually in serious financial trouble that warranted further intervention.  Indeed, the complaint says exactly the opposite.  *See, e.g.*, ¶ 209 ("AIG was having difficulty selling assets to pay down debt from the [FRBNY Revolving Credit Facility] and meet anticipated liquidity needs, particularly in light of continuing collateral calls under its CDS contracts.").

Nor is there any allegation of a false statement by Moody's.  First, the complaint does not attribute any specific statement to Moody's, as required by Rule 9(b).  But assuming Moody's made a statement in substance similar to that reported by the Congressional Oversight Panel, *see* ¶ 209 ("The credit rating agencies advised AIG that the company's upcoming November 10 report of third quarter results would likely trigger a ratings downgrade in the absence of a 'parallel announcement of solutions to its liquidity problems'"), this is not plausibly alleged to be false.  For one, absent an allegation that Moody's did not genuinely hold these opinions such a statement cannot be "false" for purposes of the FCA.  *See Pervez*, 736 F. Supp. 2d at 813.

Kolchinsky's claim that the JDA rendered any further downgrades impossible is both wrong and irrelevant.  First, the claim amounts to nothing more than a claim that Moody's wrongly applied its JDA methodology.  Merely *erroneous* statements, however, do not constitute fraud for purposes of the FCA, they must be "knowingly" false.  *See* § 3729(a)(1)(B); *United States ex rel. Resnick v. Weill Med. College*, 2010 WL 476707, at *6 (S.D.N.Y. 2010).

Nothing in the complaint alleges that the JDA *must* be applied to every issuer that is receiving government support.  Even if it did, the complaint's allegation that Moody's warnings of downgrades were "false" is a complete nonsequitur.  The JDA does not say (and the complaint never alleges) that the JDA precludes a "Government-related Issuer" from being downgraded, only that "the possibility that the Government will intervene" is a factor in rating, i.e., warrants "a ratings uplift."  ¶ 203.  It is fully consistent with this policy for Moody's to say that further downgrades were likely, though not as severe as they might otherwise be without government

22

support, and nothing in the JDA says otherwise.[13]  The JDA, moreover, makes clear that the range of likely government support is itself a factor in the analysis, from 0 (no likelihood) to 100% (effectively, a guarantor).  There are no allegations that plausibly render false a statement by Moody's regarding the likelihood, in November 2008, of further AIG downgrades.[14]

The complaint fares no better in its attempt to set out a claim based on the allegation that the Federal Reserve, in its November 2008 restructuring of the AIG bailout, gave AIG an "upside" based on a false statement by Moody's.  Am. Compl. ¶¶ 207-25.  According to the complaint, in November 2008 the Federal Reserve proposed to create two special-purpose vehicles, Maiden Lane II and Maiden Lane III, which were intended to purchase, and thus remove AIG's exposure to, some of its worst-performing RMBS and CDOs.  It is alleged that although the FRBNY originally had determined that any residual value in these SPVs (i.e., the amount remaining after repayment of the FRBNY loan) would go entirely to the government, but that it changed its mind and allowed some of the residual to go back to AIG.

The complaint alleges that this was due to a communication by Moody's to the FRBNY that "[t]he RMBS and CDO portfolio solutions (the FRBNY SPVs) lock in losses, forcing the company to absorb a substantially greater loss relative to what Moody's expected the ultimate losses on this portfolio to be." *Id.* ¶ 219.  The complaint alleges that this statement was false because, had Moody's used proper analysis, its "expected losses" would have been *greater* than that "locked in" by the proposed SPVs. *Id.* ¶ 220.  Even if true, this does not state a claim.

---

[13] See "The Application of Joint Default Analysis to Government Related Issuers," Edwards Decl. Ex. A, at 3-4.  Because the complaint quotes from and relies on this document, the Court may consider it on this motion to dismiss. *See Retirement Bd. of Policeman's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 2014 WL 3858469, at *3 (S.D.N.Y. 2014).

[14] The complaint essentially repeats this allegation when it argues that Moody's "forced" AIG to engage Moody's Ratings Assessment Service ("RAS"), a higher-fee service for complex transactions, rather than recognize that under its JDA policy no further downgrades were possible.  Am. Compl. ¶ 226.  It fails to state a claim for the additional reason that it alleges a claim for payment – i.e., of the RAS fee – to AIG, which is not a federal agency.

23

First, as with the November 2008 restructuring generally, there is no allegation of a false claim for payment being presented to the federal government.  There is no allegation that AIG made the request for a residual at all, much less that such a request, had it been made, was false or fraudulent.  Second, even though the complaint characterizes Moody's putative statement as a "demand[] that AIG have an 'upside' upon completion of the transactions," *id.* ¶ 215, it is clear from the facts pled that at most, Moody's told the FRBNY that the deal as originally proposed (i.e., with no residual) would lead to further downgrades.  Indeed, this is exactly what is reflected in the November 1 email from Sarah Dahlgren of FRBNY, upon which the complaint relies.  *See* Edwards Decl. Ex. B ("The overall conclusion from Moody's was that they are almost certainly not going to give AIG a stable outlook, and there is a good chance they will decide to downgrade.").  There is no allegation that Moody's "demanded" that the FRBNY do anything.

But more fundamentally, the statement by Moody's (assuming it was made) that AIG warranted a lower rating based on the initial restructuring proposal, and the losses it "locked in," is not alleged to be false.  There is no allegation that Moody's did not genuinely believe that, nor is it alleged to be objectively false.  That is, there is no allegation that a "proper" analysis using the "correct" methodology would have led to a different conclusion.[15]

What the complaint does allege as false is Moody's statement (again, if made) that its *expected* losses (i.e., in the "non-locked-in" scenario) were lower than that locked in by the SPVs.  But this statement is not plausibly alleged to be material to the federal government's decision to implement the residual.  What the FRBNY was concerned about was what rating AIG would have under the proposed restructuring; the losses Moody's expected under a different, hypothetical scenario had no bearing on the FRBNY decision.[16]

---

[15] The Dahlgren email, moreover, makes it clear that Moody's downgrade did not turn solely on the "lock-in" of the losses, but on all aspects of the restructuring.  *See* Ex. B.

[16] In effect, what the complaint is alleging is that the rating on AIG was *already* too high, i.e., because Moody's was allegedly ignoring its "better" analytical data.  If anything, this simply reinforces the fact that Moody's statement about potential downgrades was true.

24

## VIII.    THE CONSPIRACY CLAIM FAILS

The complaint purports, in Count III, to state a claim for conspiracy between Moody's and various "John Does" which are alleged to be persons or entities through which Moody's does business.  Am. Compl. ¶¶ 44, 326.  The complaint alleges no agreement to commit any FCA violation other than those that Moody's is alleged to have committed directly, and it therefore fails for the same reasons.  In any case, the claim fails due to the intra-corporate conspiracy doctrine, by which a corporation may not conspire with its subsidiaries or employees acting in the scope of their duties.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 201 (D.D.C. 2011). Moreover, the conspiracy claim plainly fails under Rule 9(b), as it neither names the conspirators nor provides factual allegations evincing any agreement.  *See, e.g.*, *N.Y. Soc. for Relief*, 2014 WL 3905742, at *25; *Pervez*, 736 F. Supp. 2d at 815.

### <u>CONCLUSION</u>

As described above, the Amended Complaint was both improperly filed and untimely.  In addition it fails to establish a plausible, specific connection between any allegedly improper ratings practice and a false or fraudulent claim to the federal government.  For the foregoing reasons, Moody's requests that the Amended Complaint be dismissed in its entirety, with prejudice and without leave to replead.

July 31, 2015
New York, NY

SATTERLEE STEPHENS LLP

By:____/s/Glenn C. Edwards_____
James J. Coster
Joshua M. Rubins
Glenn C. Edwards

230 Park Avenue, Suite 1130
New York, NY 10169
(212) 818-9200
(212) 818-9606/7 (fax)
*Attorneys for Defendants*

25