```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/4/16
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA, ex rel.   :
ILYA ERIC KOLCHINSKY,
                                    :
            Plaintiff,
                                    :     12cv1399
      -against-
                                    :     MEMORANDUM & ORDER
MOODY'S CORPORATION et al.,
                                    :
            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

  Ilya Eric Kolchinsky brings this qui tam action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., against Moody's Corporation and Moody's Investors Service, Inc. (collectively "Moody's") accusing them of manipulating credit ratings. Kolchinsky seeks disgorgement, damages, civil penalties, costs, attorney's fees, and a whistleblower award.

  Kolchinsky filed his initial complaint under seal on February 24, 2012. Thereafter, the Government sought numerous extensions of time to investigate his claims in order to decide whether to intervene. (See ECF Nos. 2–8.) On May 28, 2014, the United States declined to intervene. (ECF No. 13.) By Order dated May 30, 2014, and unsealed on July 15, 2014, this Court authorized Kolchinsky to serve Moody's. (ECF No. 13.) After protracted compromise negotiations, Moody's now moves to dismiss Kolchinsky's Amended Complaint. (ECF Nos. 28, 37.) For the reasons set forth below, Moody's motion is granted. However, Kolchinsky is granted leave to replead his "Ratings Delivery Service" claims.

BACKGROUND

  Kolchinsky's sprawling Amended Complaint is a Homeric "Catalogue of Ships" for the 2008 financial crisis. Like that tome, Kolchinsky's Amended Complaint has grown by

accretion, recounting each new episode that roiled the financial markets over the past decade. Nevertheless, the hydra-like allegations can be summarized in a few broad strokes for purposes of this motion.

Kolchinsky is a former Managing Director of Moody's. (Am. Compl. ¶ 33.) Moody's, a Nationally Recognized Statistical Rating Organization ("NRSRO"), has a 40% share of the credit rating agency market. (Am. Compl. ¶ 42.) It "publishes rating opinions on a broad range of credit obligations issued in domestic and international markets" and derives its revenue principally from issuers of those financial products. (E.g., Am. Compl. ¶¶ 37, 43, 45–47.)

Kolchinsky alleges that Moody's engineered certain credit ratings to be either fraudulently optimistic or fraudulently pessimistic. (Am. Compl. ¶ 101.) Kolchinsky claims that Moody's knew that numerous residential mortgage-backed securities ("RMBS"), credit default swaps, and collateralized debt obligations ("CDOs") were substantially less safe than indicated by their credit ratings. According to Kolchinsky, Moody's ignored its own analyses and inflated its ratings of "thousands" of CDO tranches to ensure that issuers continued to bring their securities business to the firm. (E.g., Am. Compl. ¶ 140.) Kolchinsky alleges that Moody's waited too long to downgrade those securities and caused more than "466,700 false ratings" to be submitted to the Government. (Am. Compl. ¶¶ 4, 74, 96.)

According to the Amended Complaint, Moody's lack of independence and conflicts of interest concealed massive losses to RMBS products, underpayment of Federal Deposit Insurance Corporation ("FDIC") insurance premiums, and the undercapitalization of financial institutions. For example, the Amended Complaint alleges that Moody's managers created "cheat sheets" for junior analysts guiding them to downgrade tranches only "half way (i.e. if tranche looks 6 notches worse, downgrade 3 notches[)]." (Am. Compl. ¶ 126.) Other

2

tranches that should have been downgraded were "merely placed on watch." (Am. Compl. ¶ 129.) The Amended Complaint catalogues numerous CDOs that should have been downgraded under Moody's ratings methodology, but never were. (See, e.g., Am. Compl. ¶ 133 (Glacier Funding CDO transaction not downgraded during an October 2007 "rating marathon"); Am. Compl. ¶ 150 (failure to downgrade trust preferred securities, insurance company surplus notes, and real estate investment trust debt); Am. Compl. ¶¶ 152–53 (failure to downgrade trust preferred security CDO with "substantial exposure" to IndyMac).)

Similarly, Kolchinsky criticizes Moody's for deploying risk-assessment models contrary to industry-accepted norms. (Am. Compl. ¶ 188.) And despite clear signs of a deteriorating mortgage market, Kolchinsky claims that Moody's continued to issue inflated ratings and concealed its burgeoning conflicts of interest because of the transition from an "investor pays" to an "issuer pays" system. (Am. Compl. ¶ 295.) Under that regime, debt-instrument issuers paid Moody's based on the size of their securities offerings and Moody's adjusted its business model to encourage more and larger offerings. (Am. Compl. ¶ 43.)

After Kolchinsky warned Moody's about deficiencies in its rating practices, Moody's constructively discharged him.[1] (Am. Compl. ¶¶ 34, 262.) Following his termination, Kolchinsky testified before the House Committee on Oversight and Government Reform, the Senate Permanent Subcommittee on Investigations, and the Financial Crisis Inquiry Commission. Kolchinsky asserts that Moody's fraudulent credit-rating practices constitute violations of the False Claims Act.

---

[1] The original complaint also included retaliation claims. However, Moody's asserted that they were barred by res judicata because Kolchinsky stipulated to dismiss similar claims with prejudice in another action. See ECF No. 18, at 3; Kolchinsky v. Moody's Corp., et al., No. 10-cv-6840 (S.D.N.Y.). The Amended Complaint does not include a retaliation count.

LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice.'" Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting Iqbal, 556 U.S. at 679). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679). Claims under the FCA fall within the "express scope of Rule 9(b)" because it is fundamentally an "anti-fraud statute." Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995) (per curiam).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "[W]hether a complaint satisfies Rule 9(b) 'depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'" U.S. ex rel. Bilotta v. Novartis Pharms. Corp., 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (citation omitted).

4

DISCUSSION

Moody's argues that the Amended Complaint: (1) violates the FCA's prohibition on bringing claims based on publicly disclosed facts; (2) fails to state a plausible FCA claim; (3) violates the FCA's requirement that any "complaint" be filed under seal; and (4) violates the FCA's statute of limitations. For the reasons discussed below, Moody's motion is granted, but Kolchinsky may replead his Ratings Delivery Service Claims.

I.  The Public Disclosure Bar

Before analyzing the plausibility of Kolchinsky's allegations, this Court must make a threshold inquiry into its power to adjudicate this suit.[2] The False Claims Act requires courts to dismiss any action in which the relator relied on publicly disclosed allegations, but was not the original source of those allegations:

> The court <u>shall</u> dismiss an action or claim under this section, unless opposed by the Government, if <u>substantially the same allegations</u> or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> <u>unless</u> the action is brought by the Attorney General or the person bringing the action is an <u>original source</u> of the information.

---

[2] Previously, the False Claims Act provided that if the public disclosure bar was violated, the district court lacked "jurisdiction" over the action. <u>Rockwell Intern Corp. v. United States</u>, 549 U.S. 457, 469 (2007). Because the statute now provides only that courts "shall dismiss an action or claim" violating the public disclosure bar, it is no longer clear whether the requirement relates to jurisdiction. <u>Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.</u>, 966 F. Supp. 2d 282, 293 (S.D.N.Y. 2013).

31 U.S.C. § 3730(e)(4)(A) (emphasis added). A relator's allegations are deemed "substantially the same" as public allegations if they would expose the same "essential elements" as the publicly aired fraud. See U.S. ex rel. Kester v. Novartis Pharms. Corp., 43 F. Supp. 3d 332, 346 (S.D.N.Y. 2014); see also U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1159 (2d Cir. 1993).

There is no serious dispute that Kolchinsky's allegations are substantially similar to stories previously reported in the media and investigated by Congressional committees. See, e.g., The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets, 110th Cong. 931 (Sept. 26, 2007), available at https://www.gpo.gov/fdsys/pkg/CHRG-110shrg50357/html/CHRG-110shrg50357.htm. Sources abound regarding pre-2009 studies of AIG's collapse, the failure of RMBS-related products, and ultimately, media reports holding credit ratings agencies responsible for aspects of the financial crisis. See, e.g., CONG. RESEARCH SERV., R40613, CREDIT RATING AGENCIES AND THEIR REGULATION (2009) (describing 2008 study on lack of independence and non-competitive ratings criteria at Moody's, S&P, and Fitch); Gretchen Morgenson, Debt Watchdogs: Tamed or Caught Napping?, N.Y. TIMES, Dec. 6, 2008, at A1 (criticizing Moody's for its "rosy ratings of mortgage securities," noting that bank capital requirements were based on credit-rating agencies' ratings, and alleging a lack of independence at the ratings agency). Accordingly, for Kolchinsky's qui tam action to survive the "public disclosure" bar, he must allege that he is an "original source" of the publicly disclosed information about Moody's credit-ratings fraud.

An individual is an "original source" if he had "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B);

6

see also Rockwell Intern Corp. v. United States, 549 U.S. 457, 463 (2007). The individual must also have direct and independent knowledge of the information incorporated in any amended complaint. Rockwell, 549 U.S. at 473. In other words, the "core information" on which the qui tam complaint is based cannot come from a third party. United States v. New York Med. Coll., 252 F.23d 118, 121 (2d Cir. 2001) (per curiam); see also Ping Chen ex rel. U.S. v. EMSL Analytical, Inc., 966 F. Supp. 2d 282, 300 (S.D.N.Y. 2013). Ultimately, the "public disclosure requirement was 'designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it.'" U.S. ex rel. Feldman v. Van Gorp., 674 F. Supp. 2d 475, 482 (S.D.N.Y. 2009).

   Here, although information about the inaccuracy of Moody's credit ratings was widely promulgated at the time this action was filed, Kolchinsky has direct and independent knowledge of the allegations in the Amended Complaint. As a Moody's Managing Director, he had far more than "mere background information of the alleged fraud." Van Gorp., 674 F. Supp. 2d at 482. And a substantial portion of the Amended Complaint relates directly to Kolchinsky's attempts to raise concerns about Moody's false credit ratings with his superiors. (See, e.g., Am. Compl. ¶¶ 97–298.) Those attempts were ignored, and then rebuffed when Kolchinsky was terminated.

   Congress subpoenaed Kolchinsky to testify at three separate hearings regarding the concerns he raised within Moody's. In 2009, Kolchinsky testified at a series of hearings before the House Committee on Oversight and Government Reform. See Credit Rating Agencies and the Next Financial Crisis, 111th Cong. 15 (2009), available at https://oversight.house.gov/hearing/credit-rating-agencies-and-the-next-financial-crisis. In 2010, he testified before the Financial Crisis Inquiry Commission. See FINANCIAL CRISIS INQUIRY

7

COMM., CREDIBILITY OF CREDIT RATINGS, THE INVESTMENT DECISIONS MADE BASED ON THOSE RATINGS, AND THE FINANCIAL CRISIS 17 (2010), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0602-Transcript.pdf. He also testified before the Senate Permanent Subcommittee on Investigations. See Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, 111th Cong. 14 (2010), available at https://www.gpo.gov/fdsys/pkg/CHRG-111shrg57321/html/CHRG-111shrg57321.htm. Given his Congressional testimony and the highly specific allegations in the Amended Complaint, it is clear that Kolchinsky was an "original source" for the essential elements of the alleged fraud. Accordingly, Moody's motion to dismiss for failure to comply with the public disclosure bar is denied.

## II. Failure to State a Claim

The False Claims Act permits a "private individual, known as a relator [to] bring a civil qui tam action on behalf of the [G]overnment" for the making of a false claim against government funds. U.S. ex rel. Grupp v. DHL Express (USA), Inc., 742 F.3d 51, 53 (2d Cir. 2014). The plaintiff must file the complaint under seal, and it must remain under seal for at least sixty days. 31 U.S.C. § 3730(b). The Government may extend the sealing period by applying to the Court and showing good cause. 31 U.S.C. § 3730(b)(3). The Government may choose to intervene and prosecute the action or allow the plaintiff to proceed alone. Kreindler & Kreindler, 985 F.2d at 1153. The Government must be served with all pleadings and deposition transcripts, and may later intervene with the court's approval.

The False Claims Act imposes liability on anyone who:

(A) knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . or

8

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government.

31 U.S.C. § 3729(a)(1). The relator must show that a defendant (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury. Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001). A "false claim" is "any request or demand, whether under a contract or otherwise, for money or property . . . that—is (i) presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent and used on the Government's behalf or to advance a Government program or interest." 31 U.S.C. § 3729(b)(2). Conspiring to violate the FCA also creates liability. 31 U.S.C. § 3729(a)(1)(C).

The crux of the Amended Complaint is that numerous financial institutions relied on Moody's misleading credit ratings. (See Am. Compl. ¶¶ 4, 8–10, 45–64, 68–80, 96–158, 160–228.) However, the "sine qua non" of a False Claims Act case is that a false claim must be forwarded to the Government, not a private entity.[3] U.S. ex rel. Kester v. Novartis Pharms. Corp., 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014); see U.S. ex rel. Sterling v. Health Ins. Plan, No. 06-cv-1141, 2008 WL 4449448, at *6 (S.D.N.Y. Sept. 30, 2008) (alleged claim "must at some point be forwarded to the Government for payment"); U.S. ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377, 391–92 (1st Cir. 2011) ("Only persons who knowingly submit or

---

[3] Of course, this does not foreclose "false claim[s]" that are transmitted to the Government by means of an intermediary, such as a Government contractor. Allison Engine Co v. U.S. ex rel. Sanders, 553 U.S. 662, 670 n.1 (2008).

cause the submission of a false or fraudulent claim can be held liable for violating the FCA. The term 'causes' is hardly boundless . . . .); Hopper v. Solvay Pharms., Inc., 588 F.3d 1318, 1330 (11th Cir. 2009) (no false claim "caused" when pharmaceutical company misled physicians writing off-label prescriptions, which were paid for by state health programs, some of which were reimbursed by the Government). And to "cause" the false claim to be submitted, it must be the "natural, ordinary and reasonable consequence[] of [one's] conduct." Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 671–72 (2008) (citation omitted).

After sifting through the Amended Complaint, this Court has identified five theoretical bases for False Claims Act liability: (1) the NRSRO Claims, (2) the FDIC Claims, (3) the AIG Claims, (4) the SEC Claims, and (5) the Ratings Delivery Service Claims. Each of Kolchinsky's theories—save one—fails to state a claim under the False Claims Act.

Under his first theory, Kolchinsky alleges that Moody's submitted false certifications to the SEC in its NRSRO application and its Form 10-Ks (the "NRSRO Claims"). (Am. Compl. ¶¶ 12–24; 81–83; 229–83.) The Credit Rating Agency Reform Act of 2006 ("CRARA") requires NRSROs to file applications advising the SEC of their codes of ethics, potential conflicts of interest, largest paying customers, and procedures employed to determine credit ratings. (Am. Compl. ¶¶ 248–51.) And Sections 13 and 15(d) of the Securities Exchange Act of 1934 require reporting companies, such as Moody's, to file annual reports with the SEC. 15 U.S.C. §§ 78m, 78o(d). Kolchinsky asserts that Moody's filings with the SEC misrepresented the integrity of its ratings and its willingness to abide by a code of professional conduct. (Am. Compl. ¶¶ 252–64.) In sum, Kolchinsky alleges that Moody's maintained its coveted Government sponsorship as an NRSRO through fraudulent misrepresentations.

However, "the False Claims Act is not intended to reach fraudulent conduct where no claim for payment is made." U.S. ex rel. Westmoreland v. Amgen, Inc., 707 F. Supp. 2d 123, 135 (D. Mass. 2010). Under his NRSRO liability theory, Kolchinsky makes no allegation that Moody's sought any money from the Government. Rather, he alleges that Moody's fraudulently obtained a Government endorsement and later used that special status to submit false claims to private entities for payment. But Government licensure does not transform credit ratings issued to private entities into false claims to the Government for payment.

Under his second theory—the FDIC Claims—Kolchinsky alleges that the capital requirements of certain banks, pension funds, and insurance companies rely on NRSROs' credit ratings. (Am. Compl. ¶¶ 25, 58, 65–67.) But again, Kolchinsky does not plead that Moody's directed any of these entities to submit false claims to the Government for payment. Rather, he alleges that these institutions must make an assessment of the quality of their assets when reporting those assets to the Government, and use NRSROs' credit ratings to do so. But Kolchinsky does not plead that Moody's actually causes third parties to rely on its ratings—rather than the ratings of other entities—when submitting asset-quality measurements to the Government. Even if it were true that reliance on Moody's ratings caused entities to underpay on their FDIC premiums, the choice to rely on Moody's was made independently by those entities.

Third, Kolchinsky alleges that Moody's attempted to improve its business relationship with AIG by extracting "concessions" from the Government during 2008 bailout negotiations involving AIG (the "AIG Claims"). (Am. Compl. ¶ 202.) In the past, Moody's employed a "Joint-Default Analysis methodology" in its credit ratings, giving entities ratings

11

boosts when they received support from the Government. (Am. Compl. ¶ 202.) Kolchinsky alleges that Moody's refused to use that methodology to upgrade AIG's ratings during the 2008 Government bailout until the Government agreed to provide AIG with a larger bailout package. (Am. Compl. ¶¶ 207–28.) Accordingly, Kolchinsky argues, Moody's "caused" the Government to overpay for AIG.

Again, Kolchinsky provides no colorable argument that Moody's refusal to raise its ratings was a "false claim for payment" to the Government. Indeed, under Kolchinsky's theory, Moody's accurately represented to the Government that it would not increase its credit ratings unless AIG received a superior bailout. Deploying an atypical financial model—and telling the Government that it would not increase AIG's credit ratings—is not a "falsehood." Moreover, Kolchinsky does not allege that Moody's did this in return for payment.

Fourth, Kolchinsky alleges that issuers use Moody's ratings to register shelf offerings of investment-grade asset-backed securities on SEC Form S-3 (the "SEC Claims"). (See Am. Compl. ¶¶ 27, 57, 286.) However, the Form S-3 does not require issuers to use Moody's ratings, or those of any particular ratings agency. See 17 C.F.R. § 239.13. To use the Form S-3 for this purpose, issuers are free to register asset-backed securities on the Form S-3 in reliance on any rating agency, as long as there is "at least one [NRSRO]" that has rated them as investment grade. 17 C.F.R. § 239.13. Accordingly, the fact that Moody's was distributing allegedly false ratings to issuers did not "cause" them to submit any false claims to the Government. Similar to the FDIC Claims, each securities issuer was permitted—and required to—decide at its own peril whether its securities were investment grade, and which ratings agency's evaluations should be employed.

Finally, Kolchinsky alleges that Moody's "delivers its [credit] ratings to subscribers and the market through an electronic delivery service," called the Ratings Delivery Service. Kolchinsky asserts that Government agencies are charged for subscriptions to this service. (Am. Compl. ¶¶ 77–80.) Thus, Kolchinsky pleads the elements of a claim under the False Claims Act. Specifically, Moody's made a claim to the United States that was false, knowing of its falsity, and seeking payment from the federal treasury. (See Am. Compl. ¶¶ 77–80.)

Nonetheless, to state a plausible False Claims Act violation, Rule 8 pleading is not sufficient—the alleged violations must be pleaded with particularity. Morrison-Knudsen, 68 F.3d at 1477. In the Amended Complaint, Kolchinsky fails to provide a single example of any agency that uses the Ratings Delivery Service. Accordingly, and for the reasons discussed below, Kolchinsky is granted leave to file a substantially narrowed Second Amended Complaint that pleads, with particularity, the Ratings Delivery Service Claims.

III.   Sealing Provisions

Moody's also argues that the Amended Complaint should be dismissed in its entirety because, unlike Kolchinsky's original complaint, it was not filed under seal. Moody's argument derives from an ambiguity in the text of the FCA, which requires that "[t]he complaint shall be filed in camera, shall remain under seal . . . and shall not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2). When a relator fails to file the initial complaint under seal, the appropriate response is to dismiss the action. U.S. ex rel. Pilon v. Martin Marietta Corp., 60 F.3d 995, 1000 (2d Cir. 1995). But the Second Circuit has not addressed whether the requirement to seal "complaints" also encompasses amended complaints.

13

The purpose of the sealing requirement is to give the Government the opportunity to investigate a relator's claims and decide whether to intervene in the action. U.S. ex rel. Mikes v. Straus, 931 F. Supp. 248, 259 (S.D.N.Y. 1996). In Mikes, the district court concluded that the text of the sealing provision was not intended to categorically bar plaintiffs from amending their complaints in FCA actions, particularly when there was "no prejudice to the rights of the Government or the defendants." Mikes, 931 F. Supp. at 248.

In recent years, district courts have generally agreed, finding that when an amended complaint makes similar allegations of fraud, resealing is not required. U.S. ex rel. Davis v. Prince, 766 F. Supp. 2d 679, 684 (E.D. Va. 2011); see also U.S. ex rel Ubl. v. IIF Data Solutions, No. 06-cv-641, 2009 WL 1254704 (E.D. Va. May 5, 2009) (amended complaint merely "added specificity"); U.S. ex rel. Saldivar v. Fresenius Med Care. Holdings, Inc., 972 F. Supp. 2d 1317, 1325–26 (N.D. Ga. 2013) (collecting cases). However, if an amended complaint adds "new and substantially different" allegations of fraud, re-sealing may be required. See U.S. ex rel Wilson v. Bristol Myers Squibb, Inc., No. 06-cv-12195, 2011 WL 2462469 (D. Mass. 2011).

While the Amended Complaint adds allegations regarding Moody's fraud, including allegations that it directly defrauded the Government using its "Ratings Delivery Service" and led other entities to underpay on their FDIC premiums, these allegations are variations on a theme. And amending the Complaint did not prejudice Defendants, who anticipated that the relator would file an amended pleading if their settlement discussions failed. (See ECF No. 28.) Similarly, the Amended Complaint did not prejudice the Government, which was given the opportunity to investigate Kolchinsky's allegations of fraud for more than two years. As in Mikes, there is no reason to prejudice Plaintiff by dismissing the Complaint when

14

the Government was afforded the opportunity to intervene, elected not to do so, and retained the ability to receive all pleadings and intervene at a later date. Mikes, 931 F. Supp. at 248.

IV.   Statute of Limitations

Moody's argues that even if Kolchinsky did not have to seal the amended complaint, he filed it too late. Under the FCA, a civil action may not be commenced "more than 6 years after the date on which the violation of section 3729 is committed." 31 U.S.C. § 3731(b)(1). The statute of limitations runs from "the date the claim is made, or, if the claim is paid, on the date of payment," Kreindler & Kreindler, 985 F.2d at 1157, until the complaint is filed, Hayes v. Dep't of Educ., 20 F. Supp. 3d 438, 444 (S.D.N.Y. 2014). Because the Amended Complaint was filed on May 27, 2015, Moody's argues that any FCA violations prior to May 27, 2009—including Kolchinsky's FDIC and AIG Claims—are time-barred. In response, Kolchinsky argues that his Amended Complaint relates back to the date of his original pleading.

Under Rule 15(c)(1)(B), an amended pleading relates back whenever it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[4] The relevant inquiry is "whether adequate notice of the

---

[4] Moody's also argues that relators cannot employ Rule 15 to relate an amended complaint back to an original complaint for statute-of-limitations purposes. See Hayes v. Dep't of Educ., 20 F. Supp. 3d 468, 499 (S.D.N.Y. 2014) (citing United States v. Baylor Univ. Med. Ctr., 469 F.3d 263, 268–70 (2d Cir. 2006)). There is no need to reach that question here because this Court holds that the FDIC, AIG, and Ratings Delivery Service Claims did not satisfy Rule 15. But this Court entertains significant doubts about Moody's reliance on Baylor.

Baylor did not address the question of whether a relator can relate an amended pleading back to his original complaint. Rather, Baylor held that "Rule 15[] does not allow complaints-in-intervention filed by the government to relate back to a relator's qui tam complaint." The Second Circuit reasoned that "the seal provision of the [FCA] deprives the defendant in an FCA suit of the notice usually given by a complaint," and that relation back of later filings by the Government is therefore "incompatible with [Rule 15's] core requirement of notice." Baylor, 469 F.3d at 270. But Baylor's holding was overturned by statute in 2009. See 31 U.S.C. § 3731(c).

Moreover, even though defendants lack "notice" of FCA actions when qui tam complaints are filed, the action's timeliness under the statute of limitations is determined at the time of filing. Hayes, 20 F. Supp. 3d at 444–45. Accordingly, applying Baylor to cases such as this would create a double standard: The relator can comply with the statute of limitations without notifying defendants at the time the action is filed, but if similar allegations are

matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." Slayton v. Am. Exp. Co., 460 F.3d 215, 228 (2d Cir. 2006). "The rationale of Rule 15(c) is that a party who has been notified concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." United States v. Baylor Univ. Med. Ctr., 469 F.3d 263, 270 (2d Cir. 2006). Accordingly, "a new legal theory applied to the same facts set out in the earlier pleading will relate back." U.S. ex rel. Kirk v. Schindler Elevator Corp., 926 F. Supp. 2d 510, 518–19 (S.D.N.Y. 2013) (citing Mayle v. Felix, 545 U.S. 644, 664 n.7 (2005)). "In contrast, even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an 'entirely distinct set' of factual allegations will not relate back." Slayton, 460 F.3d at 228. Ultimately, "[t]he purpose of 'Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." Slayton, 460 F.3d at 228.

Here, Kolchinsky provided no indication of the FDIC and AIG claims in the original Complaint. In a new section in his Amended Complaint titled "Moody's Knowingly Caused the Submission of False, Fraudulent or Misleading Claims, or False Records or Statements, Contained in Banks' Reporting to the FDIC and other Regulators," (Am. Compl. ¶ 265), Kolchinsky alleges that because Moody's made false certifications on its NRSRO application and released false credit ratings, insured depository institutions held less capital than required. (Am. Compl. ¶ 267.) In turn, Kolchinsky notes that those institutions filed statements

---

added later—even with notice to defendants—they would fail to comply with the statute of limitations. Additionally, such a reading would permit the Government—but not the relator himself—to use the qui tam complaint as an anchor for the statute of limitations.

16

with the Federal Deposit Insurance Corporation that misrepresented their financial health, causing the institutions to pay less in deposit insurance premiums than they otherwise would have. (Am. Compl. ¶ 268.) However, the notion that institutions regulated by the FDIC underpaid on insurance premiums did not appear in the original Complaint. Indeed, the only mention of the FDIC in the original Complaint relates to a 2004 quarterly report "sound[ing] an alarm" about unrelated mortgage delinquencies. (Compl. ¶ 161.)

Likewise, although AIG is referred to throughout the original complaint, the factual circumstances to which the current "AIG Claims" relate are entirely different. In the original Complaint, Kolchinsky alleged that Moody's ratings of AIG were an example of its improper practice of overrating securities. (See Compl. ¶¶ 75–91.) But in the Amended Complaint, Kolchinsky crafts completely new allegations, describing bargaining with the Government in connection with the AIG bailout. (Am. Compl. ¶¶ 198–228.) According to the Amended Complaint, Moody's deliberately <u>underrated</u> AIG securities during the 2008 AIG bailout deal, persuading the United States to pay AIG more money. Because these facts appear nowhere in the initial Complaint, they do not relate back for statute-of-limitations purposes.

The Ratings Delivery Service Claims are also not pled in the original Complaint, and therefore face a statute-of-limitations bar. However, because the Ratings Delivery Service Claims also relate to time periods after May 27, 2009, they are not precluded in their entirety. Kolchinsky may replead the Ratings Delivery Service Claims in his Second Amended Complaint.

17

## CONCLUSION

For the foregoing reasons, Moody's motion to dismiss is granted. Kolchinsky may file a Second Amended Complaint consistent with this Memorandum and Order by March 11, 2016. The Clerk of Court is directed to mark the motion pending at ECF No. 37 as closed.

Dated: February 4, 2016
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record via ECF.*