UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES *ex rel.* KOLCHINSKY,         :

         Plaintiff,         :

            12cv1399

    -against-         :

            OPINION & ORDER

MOODY'S CORP., *et al.*,         :

         Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, District Judge:

        Ilya Eric Kolchinsky brings this action on behalf of the United States of America against Moody's Corporation and Moody's Investors Service, Inc. (collectively, "Moody's") and various John Does under the qui tam provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq. Kolchinsky, a former Managing Director of Moody's, alleges that he attempted to criticize inaccurate credit rating practices at the company in 2009 and was constructively discharged after protesting against a practice of issuing false credit ratings.[1] (See Second Amended Complaint ("SAC") ¶ 29.) Moody's now moves to dismiss the Second Amended Complaint, arguing that, like the First Amended Complaint, it fails to state a sufficiently particularized claim under the FCA. For the following reasons, Moody's motion is granted and this action is dismissed.

BACKGROUND

        While familiarity with this Court's prior opinion and order, United States ex rel. Kolchinsky v. Moody's Corp. ("Moody's I"), 162 F. Supp. 3d 186 (S.D.N.Y. 2016) is presumed,

---

[1]     The constructive-discharge and retaliation claims were dropped after Moody's argued that they were barred by res judicata because of Kolchinsky's stipulation to dismiss with prejudice similar claims filed in a prior action. See ECF No. 18, at 3; see also United States ex rel. Kolchinsky v. Moody's Corp., 162 F. Supp. 3d 186, 192 n.1 (S.D.N.Y. 2016).

a brief review of the history of this action is appropriate.  Kolchinsky filed this action on February 24, 2012, asserting a bevy of FCA claims under varying theories of relief.  The common thread among those claims was that credit ratings issued by Moody's prior to 2009 were improperly inflated or deflated; that the ratings entered the financial markets through various channels; and that certain governmental entities were ultimately affected by the quality of those ratings.  (See ECF No. 1.)  After two years of investigation, the Government declined to intervene.  (See ECF Nos. 2–8.)  Thereafter, this Court entered orders unsealing the Complaint and authorizing Kolchinsky to serve Moody's.  (See ECF Nos. 9–10, 13.)  Following protracted settlement discussions, Kolchinsky interposed an Amended Complaint in May 2015.  (ECF Nos. 28–30.)

The Amended Complaint was a 124-page tome: a lengthy catalogue exhaustively chronicling the major events of the 2008 financial crisis, and alleging in substance that Moody's, a Nationally Registered Statistical Rating Organization ("NRSRO"), defrauded financial markets nationwide by issuing inaccurate credit ratings.  See Moody's I, 162 F. Supp. 3d at 191.  The Amended Complaint largely tracked the original Complaint, alleging that Moody's pre-2009 credit ratings were insufficiently accurate (see, e.g., Am. Compl. ¶ 4); that Moody's anticipated that the financial markets would rely those ratings (see, e.g., Am. Compl. ¶ 2); and accordingly, that each of the "466,700 false [credit] ratings" issued by Moody's during this period, with a "face value of over $2.3 trillion," were "false claim[s] for payment to the Government" within the meaning of the False Claims Act (Am. Compl. ¶ 4).  While the Amended Complaint did not clearly demarcate the different theories on which Kolchinsky relied, this Court's prior opinion endeavored to do so.  To that end, this Court grouped Kolchinksy's claims into five categories

and dismissed four of them[2] in Moody's I. Specifically, this Court held that the four dismissed categories of claims failed to establish the "sine qua non" that is required for FCA liability—seeking payment from Government, as opposed to payment from private entities. See Moody's I, 162 F. Supp. 3d at 195 (quoting United States ex rel. Kester v. Novartis Pharms. Corp., 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) (emphasis omitted)). This Court permitted Kolchinsky to attempt to replead the fifth category—the Ratings Delivery Service claims. The Ratings Delivery Service claims alleged that Moody's provided ratings directly to subscribers (including Government entities) in return for payment. (See Am. Compl. ¶¶ 77–80.)

In Moody's I, this Court reasoned that Kolchinsky might be able to state a valid claim under his Ratings Delivery Service theory. This Court concluded that charging the Government for inaccurate credit ratings—if Moody's had promised to provide truthful ratings—could satisfy the basic elements required by the FCA. See Moody's I, 162 F. Supp. 3d at 197. This Court noted, however, that the Amended Complaint pleaded no Government agency that actually agreed to pay Moody's for its credit ratings, or any credit rating that had been received in return. See Moody's I, 162 F. Supp. 3d at 197. Further, this Court held that because the Ratings Delivery Service claims were not pleaded until the May 27, 2015 Amended Complaint, any such claims accruing prior to May 27, 2009 were time-barred,[3] even under the more generous of the FCA limitations periods. See 31 U.S.C. § 3731(b)(1) (providing that a civil FCA

---

[2] The Nationally Registered Statistical Ratings Organization Claims (see Am. Compl. ¶¶ 12–24, 81–83, 229–83, 248–51, 252–62); the Federal Deposit Insurance Corporation Claims (see Am. Compl. ¶¶ 25, 58, 65–67); the American International Group Claims (see Am. Compl. ¶¶ 207–28); and the Securities and Exchange Commission Claims (see Am. Compl. ¶¶ 27, 57, 286).

[3] This Court rejected Moody's argument that relation-back was categorically unavailable, Moody's I, 162 F. Supp. 3d at 199, but concluded that no relation-back theory was available as to the Ratings Delivery Service claims because there was no "adequate notice" that they were being asserted in the original Complaint. See Fed. R. Civ. P. 15(c)(1)(B); see also Slayton v. Am. Exp. Co., 460 F.3d 215, 228 (2d Cir. 2006).

3

action may not be brought more than "6 years after the date on which the violation of [the FCA] is committed"). Accordingly, this Court authorized Kolchinsky to "file a substantially narrowed Second Amended Complaint" that pleaded, with particularity, Ratings Delivery Service claims accruing after that date. Moody's I, 162 F. Supp. 3d at 197.

Kolchinsky filed a Second Amended Complaint which was—for all relevant purposes—no different from his prior two pleadings. (See ECF No. 54.) Indeed, even after this Court had dismissed four of Kolchinsky's five theories, and instructed that any amended pleading be streamlined, the Second Amended Complaint was even longer than its predecessors, and failed to identify which specific claims submitted after May 27, 2009 were submitted to which specific entities. Instead, Kolchinsky attached to his Amended Complaint a twenty-page Microsoft Excel spreadsheet—printed from the internet—showing that Moody's had some contracts with Government agencies in the years 2007 and later. A few rows in the spreadsheet related to "Ratings Delivery Service" contracts. (See SAC Ex. C, "Excerpts of data from www.usaspending.gov," at 1–23.)

Moody's now moves to dismiss the Second Amended Complaint for failure to state a claim, arguing (1) that Kolchinsky failed to plead with specificity any particular "false claim for payment" to the Government; (2) that none of the claims for payment were "factually" or "legally" false under the FCA; and (3) that Kolchinsky's claims accrued before the May 27, 2009 statute-of-limitations cutoff. Kolchinsky argues that the motion is procedurally barred because Moody's previously filed a 12(b)(6) motion, and that the presence of pre-2009 false ratings suggests that Government agencies also received false ratings on and after May 27, 2009.

DISCUSSION

I.    Fed. R. Civ. P. 12(g) Bar

Kolchinsky argues that Moody's 12(b)(6) motion is procedurally barred by reason of prior motion to dismiss. Specifically, Kolchinsky contends that he was prejudiced by Moody's alleged failure to "raise[] any arguments that [Kolchinsky's] [Ratings Delivery Service]-related allegations of false claims failed under 9(b) or under the theories of factual or legal falsity," or issues regarding the "statute of limitations . . . in connection with [the Ratings Delivery Service] claim." (Pl.'s Opp. to Motion to Dismiss, ECF No. 66, at 6–7.) Kolchinsky then relies on the text of Rule 12, which provides that a "party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g). In short, Kolchinsky argues that once a defendant makes a Rule 12(b)(6) motion, it cannot make additional 12(b)(6) motions if the relevant argument could have been asserted at an earlier time.

Kolchinsky's argument rests on a misunderstanding of Rule 12, which bars successive motions premised on the differing <u>defenses</u> listed in Fed. R. Civ. P. 12(b)(2)–(5), not differing <u>arguments</u> raised on a Fed. R. Civ. P. 12(b)(6) motion. As Rule 12(h) explains, the only defenses that are "waive[d]" if not asserted in the first pre-answer motion are listed in Rules 12(b)(2)–(5).[4] Indeed, Rule 12 provides an <u>exception</u> to waiver for any motion to dismiss for "[f]ailure to state a claim," which may be raised not only in a pleading or motion, but as late as trial itself. <u>See</u> Fed. R. Civ. P. 12(h)(2). In sum, Rule 12 provides that while procedural defenses are waived if omitted from a pleading or pre-answer motion, a defendant cannot waive the more fundamental 12(b)(6) defense—that the plaintiff has no legal right to recovery in the

---

[4]    The waivable defenses are personal jurisdiction, improper venue, insufficient process, and insufficient service of process.

5

first place.  See Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (explaining that "the defense of failure to state a claim is not waivable" and is "preserved from the waiver mechanism in Rule 12(h)") (quoting 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1361 (2d ed. 1990)); accord Ennenga v. Starns, 677 F.3d 766, 773 (7th Cir. 2012) ("The exception at issue here—contained in Rule 12(h)(2)—makes it clear that a litigant need not consolidate all failure-to-state-a-claim arguments in a single dismissal motion.")[5]

In any event, Kolchinsky's contention that Moody's failed to object to the legal validity of the Ratings Delivery Service claims in its prior motion is incorrect.  While the prior 12(b)(6) motion did not focus solely on the Ratings Delivery Service claims—given additional multifaceted claims addressed in the lengthy Amended Complaint—it specifically noted that Kolchinsky had failed to identify any particular government agency that paid for any false claims, including with respect to the Ratings Delivery Service theory.  (See ECF No. 39, at 25 & n.10.)  Moreover, the prior motion included an entire section titled, "The Amended Complaint is Barred by the Statute of Limitations," which argued that any claims "based on an alleged violation of [the FCA] occurring prior to May 27, 2009" were time-barred.  (ECF No. 39, at 17.) To the extent that Moody's challenges to the Ratings Delivery Service claims have been refined and narrowed, that argument is elsewhere addressed in this Opinion and Order.

---

[5]   The Ninth Circuit recently held that successive failure-to-state-a-claim motions should technically cite Rule 12(c) rather than Rule 12(b)(6), but that failure to cite the latter Rule is no bar where the motion is not filed for an improper purpose.  See generally In re Apple Iphone Antitrust Litig., 846 F.3d 313 (9th Cir. 2017).

II.     False Claims Act Liability Generally

Moody's argues that Kolchinsky's current Ratings Delivery Service theory fails to state a valid claim under the False Claims Act. For the reasons set forth below, this Court agrees.

A.      Theories of "Falsity" Under the False Claims Act

"Enacted in 1863, the False Claims Act 'was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War.'" Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1996 (2016) (quoting United States v. Borenstein, 423 U.S. 303, 309 (1976)). "Sensational congressional investigations" resulted in hearings that "'painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war.'" Universal Health, 136 S. Ct. at 1996 (quoting United States v. McNinch, 356 U.S. 595, 599 (1958)). Congress responded "by imposing civil and criminal liability for 10 types of fraud on the Government," later amending the Act to include both requests for Government payment and "reimbursement requests made to recipients of federal funds under federal benefits programs." Universal Health, 136 S. Ct. at 1996. The modern variant of the FCA permits "private persons known as 'relators'" to "file qui tam actions and recover damages on behalf of the United States" in return for a contingency fee, even if the Government deems its own intervention unwarranted. United States ex rel. Kester v. Novartis Pharms. Corp., 23 F. Supp. 3d at 245 (citing 31 U.S.C. § 3730(b), 31 U.S.C. § 3729).

Drawing from this historical context, it is clear that "[t]he FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts," but a narrow statute

7

focused on fraud against the Government. Bishop v. Wells Fargo & Co., 823 F.3d 35, 49 (2d Cir. 2016) (quoting United States ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 268 (5th Cir. 2010)). As the Second Circuit "has long recognized, the FCA was 'not designed to reach every kind of fraud practiced on the Government.'" Bishop, 823 F.3d at 48 (quoting Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001)). Rather, actionable fraud is limited to the classes specifically enumerated in the statute. Accordingly, even when a relator makes a very plausible "accusation[] of widespread fraud" in the public markets, the FCA is not the appropriate means of relief unless those accusations can be "plausibly connected . . . to express or implied false claims submitted to the Government for payment," and the relator must satisfy each applicable element of a valid claim. Bishop, 823 F.3d at 49.

An FCA complaint must allege that the defendants "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." Bishop, 823 F.3d at 43 (quoting Mikes, 274 F.3d at 695). "Because the False Claims Act is an anti-fraud statute, 'claims brought under the FCA fall within the express scope of Rule 9(b),'" and must therefore be plead with heightened specificity. United States ex rel. Bilotta v. Novartis Pharms. Corp., 50 F. Supp. 3d 497, 507 (S.D.N.Y. 2014) (quoting Gold v. Morrison–Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995)). To provide the requisite degree of specificity, the relator must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." United States ex rel. Kester v. Novartis Pharms. Corp., 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014).

B.     Factual Falsity

Courts in this circuit recognize that claims may be either "factually" or "legally" false for purposes of the FCA.  Under a factual falsity theory, the defendant agrees to provide an item or service, but does not in fact provide it—as where a contractor "delivers a box of sawdust to the military but bills for a shipment of guns."  Bishop, 823 F.3d at 43.  A "'factually false' certification, [] involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," Mikes, 274 F.3d at 697; see United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 112–13 (2d Cir. 2010), or "[i]n an appropriate case, knowingly billing for worthless services," Mikes, 274 F.3d at 703.

While Kolchinsky contends that the credit ratings Moody's submitted to Government agencies were "factually false," the Second Amended Complaint does not plead that Moody's failed to provide any credit ratings, or that the ratings it provided were entirely worthless.  Rather, Kolchinsky's claim is one of legal falsity—that its ratings differed in quality and accuracy from the ratings it promised to Government agencies.  (See, e.g., SAC ¶¶ 15, 77, 84, 131, 140.)

C.    Legal Falsity

1.     Express Legal Falsity

A promise to provide the Government with a service in return for payment may be "expressly" or "impliedly" legally false.  See Bishop, 823 F.3d at 43 (citing Mikes, 274 F.3d at 697).  The former theory of falsity—express legal falsity—arises when a contractor agrees to provide services satisfying certain requirements, with which it later fails to comply.  Because the Second Amended Complaint and Kolchinsky's motion papers fail to identify which ratings violated which legal requirements, Kolchinsky's counsel explained that his pleading does not

9

turn on an express-certification theory, but rather Moody's implied representation that any ratings it issued were accurate representations of credit risk:

> THE COURT: Let me ask you this: Which of the following two situations is the basis for the false claim here:  Is the false claim inherent in Moody's request that the government pay for a credit rating that Moody's knows to be inaccurate, or is the false claim that Moody['s] did not disclose its noncompliance with its NRSRO certifications when it asked the government to pay for those ratings?
>
> [Counsel]: The first one, your Honor, you said is it inherent in the request for payment whether there's a fraudulent statement at issue . . . To me the issues seemed more muddled or merged . . . . [T]he products incorporated the false ratings. . . . [I]t's [that] they passed on these ratings and they held them out to be, you know, valid ratings, not false or inaccurate.

(*See* August 18, 2016 Oral Arg. Tr., ECF No. 69, at 6:17–7:20.)  Accordingly, this Court concludes that the Second Amended Complaint is premised on a theory of implied legal falsity: that Moody's implicitly promised, after May 27, 2009, that the credit ratings it issued were accurate representations of the risk of the financial products they rated.

2. <u>Implied Legal Falsity</u>

Under an FCA theory of implied legal falsity, a relator alleges that the "very submission" of the defendant's claim for payment to the Government implicitly constitutes a certification of compliance with certain applicable regulations.  However, because "[t]he universe of potentially applicable laws or regulations is vast," the mere provision of a service does not certify compliance with all applicable regulations if not specified in the relevant contract.  <u>Bishop</u>, 823 F.3d at 45.  For example, in <u>Bishop</u>, the relators "contend[ed] that Wachovia and . . . Wells Fargo defrauded the government in violation of the FCA" by certifying compliance with all "applicable banking laws and regulations when they borrowed money at favorable rates from the discount window operated by the Federal Reserve."  The relators contended that because the defendants were below minimum capitalization thresholds during

certain periods, each use of the Fed's discount window to take out a loan constituted a "fraud" on the Government. See Bishop, 823 F.3d at 38–39. The Court of Appeals disagreed. "[T]he FCA was not intended to police general regulatory noncompliance," and "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." Bishop, at 44. Accordingly, while a defendant's non-compliance with a government regulation may give rise to other forms of liability, or civil or criminal violations, it does not give rise to an FCA claim unless violation of the regulation has some relevant connection to the contract at issue. See, e.g., Bishop, 823 F.3d at 46 ("The federal government has many tools other than the FCA at its disposal to discipline banks and to ensure compliance with banking laws and regulations, ranging from informal reprimands to fines to involuntary termination of a bank's status as an insured depository institution.").

As the Supreme Court recently explained, an FCA complaint premised on implied certification must satisfy "two conditions": "first, the claim . . . makes specific representations about the goods or services provided; and second, the defendant's failure to disclose non compliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Universal Health, 136 S. Ct. at 2001. Materiality turns on the "effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health, 136 S. Ct. 1989 at 2002. To plead materiality with the requisite particularity, a relator may draw inferences from various sources, including the Government's history of declining to pay claims for failure to comply with the applicable regulation. See Universal Health, 136 S. Ct. at 2003 (noting that materiality may be premised on "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual

requirement[s]"). By contrast, materiality is absent at the pleading stage when the relator's chronology suggests that the Government <u>knew</u> of the alleged fraud, yet paid the contractor anyway. See <u>Universal Health</u>, 136 S. Ct. at 2003–04 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.").

For this reason, <u>Universal Health</u> defeats Kolchinsky's claims in this action because—as this Court has previously explained—credible public reports of inaccuracies in Moody's ratings spawned inquiries by the federal Government well before the May 27, 2009 statute-of-limitations cutoff:

> There is no serious dispute that Kolchinsky's allegations are substantially similar to stories previously reported in the media and investigated by Congressional committees. See, e.g., <u>The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets</u>, 110th Cong. 931 (Sept. 26, 2007), <u>available at</u> https://www.gpo.gov/fdsvs/pkg/CHRG–110shrg50357/html/CHRG110shrg 50537.htm. Sources abound regarding pre–2009 studies of AIG's collapse, the failure of RMBS-related products, and ultimately, media reports holding credit ratings agencies responsible for aspects of the financial crisis. See, e.g., CONG. RESEARCH SERV., R40613, CREDIT RATING AGENCIES AND THEIR REGULATION (2009) (describing 2008 study on lack of independence and non-competitive ratings criteria at Moody's, S&P, and Fitch); Gretchen Morgenson, *Debt Watchdogs: Tamed or Caught Napping* ?. N.Y. TIMES, Dec. 6, 2008, at A1 (criticizing Moody's for its "rosy ratings of mortgage securities," noting that bank capital requirements were based on credit-rating agencies' ratings, and alleging a lack of independence at the ratings agency).

<u>Moody's I</u>, 162 F. Supp. 3d at 193–94. Accordingly, the sole surviving claims relate to a time period at which the Government—and the general public—was on notice of the very facts relied upon to support the fraud alleged here. And as the Second Amended Complaint and its

spreadsheet appendix establish, the Government has nonetheless continued to pay Moody's for its credit-ratings products each year. Such allegations plead Kolchinsky out of court, because when the "Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Universal Health, 136 S. Ct. at 2003–40. Kolchinsky provides no allegation giving rise to an inference that any listed agency could have been unaware of the alleged fraud during the proscribed time period.

III.  Rule 9(b) Pleading Requirement

Even if Kolchinsky had pleaded an actionable theory of falsity under Universal Health, he fails to satisfy the applicable pleading standard. See Fed. R. Civ. P. 9(b); Moody's I, 162 F. Supp. 3d at 192. Whether a complaint complies with this standard "depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." Novartis, 50 F.Supp.3d at 508 (internal quotation marks omitted). Thus, a relator's complaint may survive by alleging a "scheme to submit false claims paired with reliable indicia that lead to a strong inference that [such] claims were actually submitted." United States ex rel. Resnick v. Weill Cornell Med. Coll., No. 04-cv-3088, 2010 WL 476707 (WHP), at *5 (S.D.N.Y. Jan. 21, 2010) (emphasis added). Here, however, the Second Amended Complaint fails to allege either (a) specific and material false claims submitted to Government agencies after May 27, 2009 or (b) a scheme to do so after that date.

It now appears that Kolchinsky cannot plead additional facts that would support his claims. The relevant additions to the Second Amended Complaint—the twenty-page

13

spreadsheet of contract data—were created not from Kolchinsky's experience at Moody's, but by performing the following tasks: (1) opening an Internet browser; (2) typing "http://www.usaspending.gov"; (3) downloading a spreadsheet of the contracts Moody's had with the Government after 2007; and (4) pasting that spreadsheet into the Second Amended Complaint. (See SAC ¶¶ 250–59; Ex. C.) Such a practice cannot satisfy the requirements of Rule 9(b)—or even Rule 8—because a defendant faced with a complaint such as this has no means of conducting any focused discovery. If, as Kolchinsky contends, the allegedly false claims could be implicit in any of hundreds of thousands of credit ratings that Moody's issued to numerous government agencies, then the Second Amended Complaint fails to plead the required elements. Which ratings were false, and why? Which agency received those ratings? Where might the defendant look to find an answer to those questions? See Bishop, 823 F.3d at 43 (explaining that FCA complaint must establish, inter alia, existence of claim, its falsity, and that claim was made to the Government). Such a complaint is the paradigmatic "fishing expedition," and insufficient as a matter of later to survive dismissal in an False Claims Act case. See United States ex rel. Lissack v. Sakura Global Capital Mkts., Inc., No. 95-cv-1363, 2003 WL 21998968, at *3 (S.D.N.Y. Aug. 21, 2003), aff'd, 377 F.3d 145 (2d Cir. 2004) (concluding that relator's attempt to attach to second amended complaint a "partial, nonexclusive list of transactions . . . without any further detail is insufficient to satisfy the pleading requirement of Fed. R. Civ. P. 9(b)").

Moreover, the Second Amended Complaint fails to adequately plead the continuing falsity of specific credit ratings by Moody's after Kolchinsky left Moody's. Accordingly, whether viewed through the lens of the statute of limitations or applicable pleading standards, Kolchinsky's third attempt to state an actionable FCA claim fails.

IV. <u>Dismissal with Prejudice</u>

In a footnote, Kolchinsky requests a fourth opportunity to plead. While leave to amend should generally be freely granted, <u>see</u> Fed. R. Civ. P. 15(a)(2), denial of leave is appropriate here, where the plaintiff's request—raised only in a footnote—is "inconspicuous and never brought to the court's attention,"[6] and, moreover, "gives no clue as to how the complaint's defects would be cured," <u>Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC</u>, 797 F.3d 160, 190–91 (2d Cir. 2015). This is particularly so where this Court specifically directed Kolchinsky to provide particularized allegations of the false Ratings Delivery Service claims.[7] Further, this Court sees no means by which Kolchinsky could provide this information, insofar as the statute of limitations restricts any further amended pleading to claims submitted <u>after</u> May 27, 2009, a time by which the Government was aware of the allegedly false ratings. Thus, they would be immaterial under <u>Universal Health</u>. Accordingly, this Court concludes that dismissal of the Second Amended Complaint with prejudice is required.

V. <u>Pre-Motion Conference Request</u>

Recently, Kolchinsky filed an application for a pre-motion conference, arguing that he is entitled to a portion of the $864 million settlement among Moody's, the Department of Justice, several states, and the District of Columbia. (<u>See</u> ECF No. 76, at 1.) As the settlement

---

[6] This Court is not obligated to consider arguments raised in such a fashion. <u>See, e.g.</u>, <u>Dial Corp. v. News Corp.</u>, 314 F.R.D. 108, 121 (S.D.N.Y. 2015).

[7] Kolchinsky further argues that dismissal would only be appropriate if he could prove "no set of facts in support" of his complaint. (Pl.'s Opp. to Motion to Dismiss, at 25 n.9 (quoting <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 71 (2d Cir. 1999). The "no set of facts" standard of pleading to which Relator refers, <u>see</u> <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), was notably "abandoned" by the Supreme Court's decisions in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) and <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 83 (2d Cir. 2015).

15

documents explain, however, that settlement relates to violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and parallel state laws. (See ECF No. 76-1, ¶ 8(a)–(b).) Moreover, that agreement specifically carves out monetary recovery for "[a]ny liability for the claims or conduct alleged in United States ex rel. Kolchinsky v. Moody's Corp., Civ. No. 12-cv-01399-WHP (SDNY)." (ECF No. 76-1, ¶ 14(n).)

Kolchinsky nonetheless contends that the private settlement constitutes an "alternate remedy" to this proceeding. See 31 U.S.C. § 3730(c)(5) ("If an[] . . . alternative remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section."); see also United States ex rel. Bledsoe v. Community Health Sys., Inc., 501 F.3d 493, 500 (6th Cir. 2007) (noting that "fact that the government had pursued settlement negotiations, as opposed to intervening in Relator's suit" would not "foreclose the possibility of Relator's recovery as a matter of law").

No alternate remedy is available here, however, because the Second Amended Complaint fails to state a valid FCA claim as a matter of law. See Bledsoe, 501 F.3d 493, 521–23 (6th Cir. 2007) (providing that a "valid qui tam action must exist with respect to the FCA violations covered by the Settlement agreement" for entitlement to alternate-source relief); United States ex rel. Newell v. City of St. Paul, 728 F.3d 791, 799–800 (8th Cir. 2013) (same); United States ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103 (3d Cir. 2007) (same). Nor is the alleged "overlap" between Kolchinsky's allegations and those described in the settlement agreement a basis for recovery by Kolchinsky. Even if a timely variant of Kolchinsky's Ratings Delivery Service theory could have formed a basis for the settlement, that theory did not appear in his initial pleading, which was the basis on which the Government

declined to intervene.  See Bledsoe, 501 F.3d at 522–23 (noting that qui tam proceeds are only available when government proceeds "with an action" on the basis of relator's allegations).  Indeed, at least two of the "state cases" that formed the basis for the Government's settlement occurred in the years before Kolchinsky's first complaint was filed under seal.  Kolchinsky is not entitled to the proceeds of a settled action he did not initiate.

This Court acknowledges that this a harsh result.  The role of a whistleblower is never an easy one.  Kolchinsky provided enormously helpful information to various congressional committees and government investigators.  This Court is particularly sympathetic to Kolchinsky's position in light of the serious and far-reaching effects that Moody's conduct had on the American economy.  This observation does not, however, cure the deficiencies in Kolchinsky's pleadings or enable him to collect a share of the FIRREA settlement.

## CONCLUSION

For the foregoing reasons, Moody's motion to dismiss is granted, and this action is dismissed with prejudice.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 63 and 76 and mark this case as closed.

Dated: March 2, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.